EXHIBIT A TO
MOTION TO SEAL
(DRAFT)

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:<br>William H. Hensler, Jr. and<br>Susan J. Hensler,<br>Debtors. | : | Bankruptcy Case No. 24-20441-GLT<br><br>Chapter 11 |
| William H. Hensler, Jr. and<br>Susan J. Hensler,<br><br>Movants,<br><br>v.<br><br>NO RESPONDENTS. | : | Document No.:<br><br>Related to Document Nos. 253 & 263<br><br>**Hearing Date & Time:** |

**DEBTORS' MOTION FOR AN ORDER**
**APPROVING SETTLEMENT OF THE MALPRACTICE CLAIMS**

AND NOW COME the Debtors, William H. Hensler, Jr. ("Mr. Hensler") and Susan J. Hensler ("Mrs. Hensler") (the Henslers, together, are hereinafter the "Debtors"), by and through their counsel, Brian C. Thompson, Esquire, and Thompson Law Group, P.C., and file this Motion for an Order Approving Settlement of the Malpractice Claims[1] ("Motion"), stating as follows:

**JURISDICTION**

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2).

2. Venue for this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

[1] The term "Malpractice Claims" shall have the meaning ascribed to it in Debtors' Motion for an Order Approving Settlement Agreement by and among the Debtors, Becker/Wholesale Mine Supply, LLC, Becker Global-America, Inc., and Other Related Entities (Dkt. No. 253) and March 27, 2025 Order approving same (Dkt. No. 263).

3. The statutory predicate for the relief hereinafter requested is Rule 9019 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

### A. Procedural History

4. The Debtors initiated the above-captioned bankruptcy case on February 23, 2024.

5. On March 27, 2025, this Court issued an Order (Dkt. No. 263) (the "Order") approving Debtors' Motion for an Order Approving Settlement Agreement by and among the Debtors, Becker/Wholesale Mine Supply, LLC, Becker Global-America, Inc., and Other Related Entities (the "March 2025 Settlement Agreement") (Dkt. No. 253).

6. The Order at paragraph 3(a) confirmed that Debtors' Malpractice Claims remain an asset of the bankruptcy estate, and at paragraph 3(b) requires approval of this Court for any settlement or compromise of Debtors' Malpractice Claims.

7. Independent of the March 2025 Settlement Agreement, on August 29, 2024, (i) Becker/Wholesale Mine Supply, LLC and Becker Global America, Inc. (collectively, the "Becker Parties") and (ii) Alan Quinn, Comtrol Corp., and Comtrol-West, LLC (collectively, the "Quinn Parties") signed a settlement agreement ("Quinn Parties' Settlement Agreement"), *inter alia*, assigning to the Becker Parties the Quinn Parties' malpractice claims against Sherrard, German & Kelly, P.C. ("Quinn Parties' Malpractice Action"). The Quinn Parties' Settlement Agreement (without exhibits) is attached hereto as **Exhibit A.**

8. After lawsuits were filed in the Hensler Parties' Malpractice Action and the Quinn Parties' Malpractice Action, the parties have reached a settlement and now bring that settlement before this Court for approval.

**B. Malpractice Actions Settlement Agreement**

9. After significant and complex negotiations occurring over numerous months, Debtors, the Quinn Parties, and a number of other, similarly situated persons, have reached a settlement agreement with SGK[2] with regard to, *inter alia*, the Hensler Parties' Malpractice Action and Quinn Parties' Malpractice Action (the "Malpractice Actions Settlement Agreement"). The proposed Malpractice Actions Settlement Agreement is attached hereto as **Exhibit B**.

10. A summary of the pertinent terms of the Malpractice Actions Settlement Agreement are as follows:

a. ***Settlement Payment.*** SGK's insurance carriers have agreed to make payment of the full policy limits of SGK's malpractice insurance policies, less the fees and costs incurred by the attorneys defending SGK in an amount not to exceed $400,000.00, in settlement of the Hensler Parties' Malpractice Action and Quinn Parties' Malpractice Action. Consequently, SGK and their malpractice carriers will be making a Settlement Payment of at least [redacted] dollars.

The Settlement Payment will be made in accordance with the terms of Paragraph G of the Malpractice Actions Settlement Agreement.

b. ***Allocation of the Settlement Proceeds.*** The allocation requirements of Section 2 of the March 2025 Settlement Agreement previously approved by this Court will be used by the Parties to allocate the net settlement proceeds of the Malpractice Actions Settlement Agreement. Section 3(c)(v) of the Quinn Parties' Settlement Agreement contains the same allocation formula as is contained in Debtors' March 2025 Settlement Agreement. Attached to the Malpractice Actions Settlement Agreement as Exhibit A is a document entitled "Methodology for Allocation of Settlement Proceeds" that explains the application of the approved allocation requirements to the net settlement proceeds of the Malpractice Actions Settlement Agreement (the "Methodology").

Specifically, as a result of the application of the Methodology, 68.34% of the Settlement Payment shall be apportioned to the Hensler Parties' Malpractice Action and 31.66% of the Settlement Payment shall be apportioned to the Quinn Parties' Malpractice Action, and the respective allocations of the Settlement Payment shall be distributed in accordance with (i) the March 2025 Settlement Agreement, as approved by the Bankruptcy Court at ECF Docket No. 253, "*Debtors' Motion for an Order Approving Settlement Agreement By and Among the Debtors, Becker/Wholesale Mine Supply, LLC, Becker Global-America, Inc. and other Related Entities*," and (ii) the Quinn Parties' Settlement Agreement.

---

[2] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the Malpractice Actions Settlement Agreement.

c. ***Dismissal of Malpractice Actions.*** The Hensler Parties' Malpractice Action in the Court of Common Pleas of Allegheny County, Pennsylvania at No. GD-24-009104, and the Quinn Parties' Malpractice Action in the Court of Common Pleas of Allegheny County, Pennsylvania at Nos. GD-24-014510, GD-25-006439, GD-25-008640, and GD-25-009704 will be discontinued with prejudice within twenty (20) days of receipt of the Settlement Payment.

d. ***Releases***. Pursuant to paragraph A of the Malpractice Actions Settlement Agreement, Debtors are fully and completely releasing, *inter alia*, all claims against SGK.

## RELIEF REQUESTED

11. By this Motion, Debtors seek the entry of an Order of Court authorizing and approving the terms of the Malpractice Actions Settlement Agreement pursuant to Bankruptcy Rule 9019(a).

## BASIS FOR RELIEF REQUESTED

12. Bankruptcy Rule 9019 provides that "[o]n motion by [a debtor-in-possession] and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor . . . and to any other entity as the court may direct." Fed. R. Bankr. P. 9019(a); see also Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996).

13. The Debtors' ultimate obligation is to maximize the value of the Debtors' bankruptcy estate and make their decisions in the best interests of all of their creditors. See Martin, 91 F.3d at 394. To this end, Courts generally defer to the business judgment of a debtor-in-possession when there is a legitimate business justification for the decision to settle. See Martin, 91 F.3d at 395.

14. The decision to approve or disapprove a settlement or compromise is within the sound discretion of the bankruptcy court. *Id.* at 393.

15. In determining whether a settlement should be approved under Bankruptcy Rule 9019, the Court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." Id. at 393. Courts should consider four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Id. (citation omitted).

16. "When considering the relevant factors courts are admonished to avoid second-guessing the Trustee in the exercise of his or her business judgment, and instead endeavor to ascertain whether the terms of the proposed settlement fall below the lowest range of reasonableness." In re Covenant Partners, L.P., 555 B.R. 490, 493 (Bankr. E.D. Pa. 2023).

17. This Court should approve the Malpractice Actions Settlement Agreement because it is supported by sound justification, the terms of the Malpractice Actions Settlement Agreement are reasonable, and the four (4) Martin factors weigh overwhelmingly in favor of approval.

18. SGK's insurance policies are wasting policies, i.e., every dollar paid to defend the malpractice action or pay for expenses related to the malpractice claims reduces the insurance coverage dollar for dollar. This poses risk to Debtors in terms of collection, depending on the erosion of the coverage the longer the case continues.

19. If the Court approves this Motion, SGK's fees and costs to defend the malpractice claims are capped and will not continue to erode the policies, as set forth above in paragraph No. 10a.

20. Therefore, the minimum net value of the settlement, after reducing the gross value of the settlement by the expected maximum defense fees and costs, is a minimum as set forth above in paragraph No. 10a.

21. Assuming the minimum settlement amount remains to fund the settlement, the amount of the final Settlement Payment allocated to Debtors' estate, in accordance with the allocation formula previously approved by this Court in the March 2025 Settlement Agreement, is [redacted].[3]

22. The Malpractice Actions Settlement Agreement was reached after the pleadings in the malpractice actions were closed and after SGK made a complete production of documents, which totaled in excess of 1 million pages. To get to this stage, counsel for the Hensler Parties and counsel for the Quinn Parties performed the necessary work to become sufficiently familiar with the extensive record in the underlying litigation, which involved complex business, employment, and accounting issues. The underlying litigation spanned over six years of active litigation that included extensive document and deposition discovery (of both fact and expert witnesses), a 33-day trial, and extensive motion practice both before and after trial, referenced further in the next paragraph. Malpractice counsel for the Hensler Parties and Quinn Parties developed these facts into sound legal claims and theories, worked with the subject matter experts necessary for the prosecution of complex legal malpractice claims, filed detailed, extensive complaints, and engaged in extensive written discovery. Additionally, the 1 million-plus pages of documents, which were produced by SGK, were managed and reviewed. Due to certain procedural complexities in the Quinn Parties' Malpractice Action, the Quinn Parties filed multiple actions and complaints, and responded to preliminary objections filed by SGK.

[3] Calculation assumes (i) [redacted] value of settlement, (ii) 68.34% allocation ([redacted], (iii) less 25% contingency fee ([redacted], and (iv) less estimated $75,000 expenses incurred by Hensler's malpractice counsel. The contingency fee amount comes from the compensation terms approved by this Court's July 24, 2024 Order Employing Special Counsel (Dkt. No. 172). The Debtors understand that payment of compensation to the attorneys who prosecuted the Hensler Parties' Malpractice Action remains subject to Bankruptcy Court approval.

23. SGK did not admit liability and vigorously disputed all claims of malpractice. In response to Debtors' Complaint, SGK filed an Answer and New Matter asserting 100 paragraphs of affirmative defenses. SGK's defenses included, among other defenses, Debtors' alleged contributory negligence. SGK contends this was premised, in part, upon the trial court's findings as to Debtors and others as set forth in an August 23, 2022 Opinion and Order (the verdict), followed by a subsequent January 19, 2024 Opinion and Order of Court (resolving post-trial motions). In combination, the trial court's Opinions and Orders were approximately 158 pages in length, reflecting the complexity of the facts and issues.

24. Before depositions were scheduled, the Parties recognized that it would be an appropriate time to engage in settlement discussions given the wasting nature of the insurance policies, the anticipated expense of litigation and the recognized risk to all parties in all cases. Both sides evaluated the strengths and weaknesses of their positions and ultimately engaged in settlement negotiations that resulted in the Malpractice Actions Settlement Agreement.

25. Given the settlement results in a Settlement Payment that is the full amount of the malpractice insurance available to SGK less only SGK's costs and fees in defending the Hensler Parties' Malpractice Action and Quinn Parties' Malpractice Action, the result of the settlement negotiations is clearly a better result than any further litigation of the malpractice actions could yield.

26. As a rough estimate, should litigation in the Hensler Parties' Malpractice Action and the Quinn Parties' Malpractice Action continue, litigating the actions to completion would likely take multiple years at a cost of at least high six figures to well over $1 million for SGK to defend. Due to the wasting nature of the policies combined with the policy limits, those defense

fees and costs would necessarily significantly reduce the potential recovery for Debtors and, ultimately, the bankruptcy estate.

27. Importantly, the Malpractice Actions Settlement Agreement provides creditors of the bankruptcy estate with a substantial recovery from the net proceeds of settlement. Specifically, the creditors that filed timely proof of claims will obtain pro rata shares of the net settlement proceeds.

28. The Debtors have exercised their business judgment and, given the substantial risk and complexities of Hensler Parties' Malpractice Action and the Quinn Parties' Malpractice Action and the wasting nature of the policies, further litigating the malpractice actions would not result in a greater recovery for the bankruptcy estate than the Malpractice Actions Settlement Agreement.

29. Furthermore, the allocation of proceeds from Hensler Parties' Malpractice Action is certain, will comport with the March 2025 Settlement Agreement and Orders of this Court, and provides a significant benefit to creditors.

30. The Malpractice Actions Settlement Agreement easily falls well within the range of reasonableness for purposes of satisfying the Martin factors and Bankruptcy Rule 9019.

31. In the final analysis, the Malpractice Actions Settlement Agreement represents the most cost-efficient way of resolving the Debtors' malpractice claims in a manner that maximizes the possible recovery for the Debtors' creditors.

32. For the foregoing reasons, and because the Malpractice Actions Settlement Agreement resulted from good faith, arms-length settlement negotiations, the Court's approval of the Agreement is appropriate and in the best interest of the creditors. Moreover, Debtors believe that this settlement is in their best interest.

## NOTICE

33. Notice of this Motion and any scheduling order respecting response deadlines and a hearing date will be provided to (i) the Office of the United States Trustee for the Western District of Pennsylvania; (ii) the Debtors; (iii) counsel for Becker Parties; and (iv) all parties who have requested notice pursuant to Fed. R. Bankr. P. 2002 at the time the Debtors filed the Motion. The Debtors submit that such notice is proper and adequate and no further notice is necessary or required.

## CONCLUSION

WHEREFORE, the Debtors in the above-captioned bankruptcy case hereby respectfully request that this Court enter an Order authorizing and approving the Malpractice Actions Settlement Agreement pursuant to Bankruptcy Rule 9019, and granting such other and further relief as the Court deems appropriate.

Respectfully submitted,

Date: November 2, 2026

*Brian C. Thompson, Esq.*

Brian C. Thompson, Esquire
PA ID #91197
THOMPSON LAW GROUP, P.C.
301 Smith Drive, Suite 6
Cranberry Township, PA 16066
(724) 799-8404 Telephone
(724) 799-8409 Facsimile
bthompson@thompsonattorney.com

*Counsel for Debtors,*
*William H. Hensler, Jr. and*
*Susan J. Hensler*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:<br>William H. Hensler, Jr. and<br>Susan J. Hensler,<br>Debtors. | : | Bankruptcy Case No. 24-20441-GLT<br><br>Chapter 11 |
| William H. Hensler, Jr. and<br>Susan J. Hensler,<br><br>Movants,<br><br>v.<br><br>NO RESPONDENTS. | : | Document No.:<br><br>Related to Document Nos. 253 & 263 |

**ORDER**

AND NOW, this _____ day of ______________, 2026, upon consideration of *Debtors' Motion for an Order Approving Settlement of the Malpractice Claims* (the "*Motion*"), and after due notice of the *Motion* and an opportunity for a hearing were provided, and in the absence of any timely written opposition, it is hereby **ORDERED, ADJUDGED**, and **DECREED** as follows:

1. The Notice of the *Motion* was sufficient and no further Notice is required; and

2. The *Motion* is hereby **GRANTED** as provided herein.

____________________________________
**GREGORY L. TADDONIO**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Prepared by: Brian C. Thompson, Esq.

# EXHIBIT A

# SETTLEMENT AGREEMENT AND RELEASE

This SETTLEMENT AGREEMENT AND RELEASE ("**Agreement**") is effective as of this 29th day of August, 2024 (the "**Effective Date**") between and among (i) ALAN J. QUINN ("**Quinn**"), COMTROL CORP. ("**Comtrol**") and COMTROL-WEST, LLC ("**Comtrol-West**") (Quinn, Comtrol, and Comtrol-West collectively, the "**Quinn Parties**"), and (ii) BECKER/WHOLESALE MINE SUPPLY, LLC ("**BWMS**") and Becker Global-America, Inc. ("**Becker America**") (BWMS and Becker America collectively, the "**Becker Parties**"). The Quinn Parties and Becker Parties are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

WHEREAS, BWMS is in the business of selling, *inter alia*, communications and related products to the mining and tunneling industries;

WHEREAS, Quinn formerly was employed by BWMS subject to an Employment Agreement that contained non-competition and non-solicitation restrictions (the "**Restrictive Covenants**");

WHEREAS, Quinn became employed by Comtrol in July 2012, became President of Comtrol in January 2013, and acquired all of Comtrol's equity interests in January 2016;

WHEREAS, Quinn is the President and 50 percent owner of Comtrol-West;

WHEREAS, on April 11, 2019, BWMS filed a Second Amended Complaint in Becker/Wholesale Mine Supply, LLC and Becker Global America, Inc. v. Hensler, *et al.*, Case No. 6330 of 2016 in the Court of Common Pleas of Westmoreland County, Pennsylvania, consolidated with Hensler, *et al.* v. Becker/Wholesale Mine Supply, LLC, *et al.,* Case No. 5219 of 2016 in the Court of Common Pleas of Westmoreland County, Pennsylvania (collectively, the "**Lawsuit**"), asserting, *inter alia*, various claims against the Quinn Parties, including, but not limited to that (i) Quinn breached his non-competition obligations and (ii) Comtrol and Comtrol-West tortiously interfered with BMWS' employment agreements with Quinn and/or William H. Hensler, Jr. ("**Hensler**");

WHEREAS, following a non-jury trial and post-trial motions, BWMS obtained the following judgments (collectively, the "**Original Judgments**") in the Court of Common Pleas of Westmoreland County, Pennsylvania (the "**Trial Court**"):

(i) On February 1, 2024 against Quinn in the amount of $5,783,787, plus pre-judgment interest for Count XI of BWMS' Second Amended Complaint starting on July 1, 2021;

(ii) On February 1, 2024 against Comtrol in the amount of $6,063,410; and

(iii) On January 26, 2024 against Comtrol-West in the amount of $378,501.

WHEREAS, the Quinn Parties filed an appeal of the Original Judgments in the Superior Court of Pennsylvania (the "**Superior Court**") docketed as 231 WDA 2024 (the "**Quinn Parties' Appeal**");

WHEREAS, BWMS filed an appeal in the Superior Court contesting the Trial Court decisions regarding certain claims asserted by BMWS against the Quinn Parties, docketed as 232 WDA 2024 (the "**BWMS Appeal**" and, collectively with the Quinn Parties' Appeal, the "**Appeals**"); and

WHEREAS, on appeal, Quinn disputes the enforceability and/or duration of the Restrictive Covenants, and the Quinn Parties otherwise deny liability with respect to the Original Judgments against the Quinn Parties;

WHEREAS, on February 12, 2024, the Becker Parties filed in the Trial Court a Motion for Sanctions Pursuant to 42 Pa.C.S.A. § 2503(7) and (9) ("**Motion for Sanctions**") against all defendants, including the Quinn Parties, and their former legal counsel, Sherrard, German & Kelly, P.C. ("**SGK**").

WHEREAS, the Parties have reached a settlement of all matters in dispute between them and are entering into this Agreement to memorialize the terms of their settlement.

NOW, THEREFORE, for good and valuable consideration, and intending to be legally bound, the Parties hereby agree as follows:

## AGREEMENT

1. The Quinn Parties' Settlement Payments to BWMS.

(a) In consideration of the Becker Parties' releases set forth in Section 4(a), BWMS' agreement to mark the Original Judgments satisfied, the Quinn Parties' other payment obligations under this Settlement Agreement, and given the other terms and conditions and mutual promises set forth herein, the Quinn Parties agree to make the following payments to BWMS in the amount of Three-Million Three-Hundred Thousand Dollars ($3,300,000), and up to One-Hundred Fifty-Thousand Dollars ($150,000) as an Interest Payment, as specified herein (collectively, the "**Settlement Payments**"):

(i) The sum of Eight-Hundred Fifty-Thousand Dollars ($850,000) payable within five (5) business days of the Effective Date (the "**Initial Payment**");

(ii) A total of Two-Million Dollars ($2,000,000) payable in five (5) annual installments of Four-Hundred Thousand Dollars ($400,000) each on the first, second, third, fourth, and fifth anniversaries of the Effective Date;

(iii) The sum of Four-Hundred Fifty-Thousand Dollars ($450,000) due on the sixth anniversary of the Effective Date (the "**Final Payment**"); and

(iv) An additional sum of up to One-Hundred Fifty-Thousand Dollars ($150,000) due on the sixth anniversary of the Effective Date, representing accrued interest on the settlement proceeds (the "**Interest Payment**"). If the Quinn Parties make Settlement Payments totaling Three-Million Three-Hundred Thousand Dollars ($3,300,000) prior to the sixth anniversary of the Effective Date, a discounted Interest Payment shall become immediately due and payable in accordance with the following schedule:

- If the Quinn Parties make Settlement Payments totaling $3,300,000 on or before the first anniversary of the Effective Date, the Interest Payment shall be $25,000;
- If the Quinn Parties make Settlement Payments totaling $3,300,000 after the first anniversary of the Effective Date but on or before the second anniversary of the Effective Date, the Interest Payment shall be $50,000;
- If the Quinn Parties make Settlement Payments totaling $3,300,000 after the second anniversary of the Effective Date but on or before the third anniversary of the Effective Date, the Interest Payment shall be $75,000;
- If the Quinn Parties make Settlement Payments totaling $3,300,000 after the third anniversary of the Effective Date but on or before the fourth anniversary of the Effective Date, the Interest Payment shall be $100,000;
- If the Quinn Parties make Settlement Payments totaling $3,300,000 after the fourth anniversary of the Effective Date but on or before the fifth anniversary of the Effective Date, the Interest Payment shall be $125,000;
- If the Quinn Parties make Settlement Payments totaling $3,300,000 any time after the fifth anniversary of the Effective Date, the Interest Payment shall be the full $150,000.

(b) Time shall be of the essence regarding the Settlement Payments, subject to Comtrol's right to cure as set forth in Section 2(b).

(c) The Quinn Parties shall be jointly and severally liable for the Settlement Payments; however, Comtrol shall make all Settlement Payments hereunder, except for Settlement Payments made directly to BWMS by Malpractice Counsel (as defined in Section 3(c) below) from the net proceeds of the Quinn Parties' Malpractice Action (as defined in Section 3(a) below). To the extent Quinn supplies funds for the Settlement Payments, Quinn will contribute the funds to Comtrol to make the payments. The entirety of the Settlement Payments, including any interest (imputed or actual) shall be allocated to BWMS' tortious interference claim against Comtrol (including for income tax purposes), and the Becker Parties shall not allocate any portion of the Settlement Payments to claims made against Quinn or Comtrol-West. The Quinn Parties and the Becker Parties agree to conform their income tax reporting to this allocation and not take any position inconsistent with such tax treatment on their income tax returns or in connection with any audit by a taxing authority.

(d) Comtrol shall make all Settlement Payments to BWMS by wire transfer to the following account:

ABA/ROUTING #: [redacted]

ACCOUNT NAME: Becker Wholesale Mine Supply

ACCOUNT NUMBER: [redacted]

BWMS may update the account information for the Settlement Payments by providing written notice to the Quinn Parties in accordance with the notice requirements set forth in Section 10.

2. <u>The Quinn Parties' Consent Judgments; Default; Dischargeability Issues; Security Interest; and Preservation of Assets and Financial Reporting.</u>

(a) <u>Consent Judgments.</u> As part of the consideration for the Becker Parties' releases of the Quinn Parties and agreement to satisfy the Original Judgments, the Quinn Parties shall, immediately upon the Effective Date, deliver the following documents by hand delivery or a nationally-recognized overnight courier to the Becker Parties' counsel, Jay D. Marinstein at Fox Rothschild LLP ("**Fox Rothschild**"), BNY Mellon Center, 500 Grant Street, Suite 2500, Pittsburgh, PA 15219 to hold and distribute the papers strictly in accordance with this Agreement:

(i) An executed Consent Judgment in the form attached hereto as **Exhibit A** in favor of BWMS and against Quinn and Comtrol, jointly and severally, in the amount of Five-Million Eight-Hundred Thousand Dollars ($5,800,000), plus simple interest at the rate of six percent (6%), accruing as of February 1, 2024 (the "**$5,800,000 Consent Judgment**"). Quinn and Comtrol also will execute and deliver an alternate version of the $5,800,000 Consent Judgment (the "**Alternate $5,800,000 Consent Judgment**"), which shall be used if the Quinn Parties are entitled to reduce the amount of the $5,800,000 Consent Judgment due to prior Settlement Payments, as described below;

(ii) An executed Consent Judgment in the form attached hereto as **Exhibit B** in favor of BWMS and against Comtrol in the amount of One-Million Dollars ($1,000,000), plus simple interest at the rate of six percent (6%), accruing as of February 1, 2024 (the "**$1,000,000 Consent Judgment**"). Comtrol also will execute and deliver an alternate version of the $1,000,000 Consent Judgment (the "**Alternate $1,000,000 Consent Judgment**"), which shall be used if the Quinn Parties are entitled to reduce the amount of the $1,000,000 Consent Judgment due to prior Settlement Payments, as described below; and

(iii) Executed Praecipes for Entry of Consent Judgments in the forms attached hereto as **Exhibit C** (collectively, the "**Praecipes**"), which correspond to (i) the $5,800,000 Consent Judgment and the Alternate $5,800,000 Consent Judgment and (ii) the $1,000,000 Consent Judgment and the Alternate $1,000,000 Consent Judgment.

The (i) $5,800,000 Consent Judgment and Alternate $5,800,000 Consent Judgment and (ii) $1,000,000 Consent Judgment and Alternate $1,000,000 Consent Judgment are referred to herein collectively as the "**Consent Judgments**." Fox Rothschild shall hold the Consent Judgments and the Praecipes until such time as (i) there has been a Default (as defined in Section 2(b)), or (ii) the Quinn Parties have fully and completely satisfied all Settlement Payments and the Quinn Parties' Malpractice Action (as defined in Section 3) has been finally determined through a settlement or final, non-appealable order, whichever occurs first <u>provided</u> <u>however</u>, (a) upon the Becker Parties receiving the Initial Payment, Fox Rothschild shall deliver the $1,000,000 Consent Judgment and the corresponding Praecipe to the Quinn Parties, (b) upon the Becker Parties receiving an aggregate of $1,000,000 from the Settlement Payments and/or any Net Proceeds (as defined below) from the Quinn Parties' Malpractice Action that are applied towards the Cap (as Cap is defined and amount is determined in Sections 3(c) and (d), and hereinafter "**Cap Payments**"), Fox Rothschild shall deliver the Alternate $1,000,000 Consent Judgment and the corresponding Praecipe to the Quinn Parties, and (c) upon the Becker Parties receiving over $1,000,000 from the Settlement Payments and/or Cap Payments, Fox Rothschild shall deliver the $5,800,000 Consent Judgment and the corresponding Praecipe to the Quinn Parties.

If a Default occurs before the Becker Parties receive any Settlement Payments and/or Cap Payments: (a) Fox Rothschild shall deliver the $5,800,000 Consent Judgment and $1,000,000 Consent Judgment to the Becker Parties, along with the corresponding Praecipes, and (b) the Becker Parties shall be entitled to immediately file and execute upon the $5,800,000 Consent Judgment and the $1,000,000 Consent Judgment.

If a Default occurs after the Becker Parties receive the Initial Payment and before the Becker Parties receive an aggregate of $1,000,000 in Settlement Payments and/or Cap Payments: (a) Fox Rothschild shall deliver the $5,800,000 Consent Judgment, the Alternate $1,000,000 Consent Judgment, and the corresponding Praecipes to the Becker Parties, and (b) the Becker Parties shall be entitled to immediately file and execute upon the $5,800,000 Consent Judgment. Additionally, the Becker Parties shall calculate and provide the Quinn Parties with notice of the amount of the judgment in the Alternate $1,000,000 Consent Judgment and corresponding Praecipe, which amount shall equal (i) the $1,000,000 principal obligation minus the Settlement Payments and Cap Payments received by the Becker Parties prior to the Default, plus (ii) cumulative interest calculated in accordance with the next sentence ("**Alternate $1,000,000 Consent Judgment**

**Amount**"). Interest for the Alternate $1,000,000 Consent Judgment Amount shall accrue as of February 1, 2024 and be calculated on a monthly basis by applying a monthly interest rate of 0.5% to the remaining balance of the initial $1,000,000 principal obligation outstanding during each month prior to the Default, as reduced when Settlement Payments are made or Cap Payments are received by the Becker Parties. Within three (3) business days of receiving notice of the Alternate $1,000,000 Consent Judgment Amount, the Quinn Parties shall advise the Becker Parties whether they agree with such calculation. If the Quinn Parties agree with such calculation, or fail to respond within three (3) business days, the Becker Parties shall type the Alternate $1,000,000 Consent Judgment Amount into the Alternate $1,000,000 Consent Judgment. If the Quinn Parties disagree on the Alternate $1,000,000 Consent Judgment Amount, the matter shall be referred to Thomas D. Pratt, CPA of Schneider Downs (if at such time Mr. Pratt certifies that he is independent and impartial) or, if Mr. Pratt is unavailable or unwilling, then it will be submitted to such other impartial nationally or regionally recognized firm of independent certified public accountants mutually selected by the Quinn Parties and the Becker Parties (Mr. Pratt and the alternative, mutually-selected CPA firm are referred to herein collectively as the "**Independent Accountant**"), whose determination of the Alternate $1,000,000 Consent Judgment Amount shall be final. After the Alternate $1,000,000 Consent Judgment Amount has been determined as set forth herein, the Becker Parties shall be entitled to type the Alternate $1,000,000 Consent Judgment Amount into the Alternate $1,000,000 Consent Judgment and immediately file and execute upon the $1,000,000 Alternate Consent Judgment, unless the Quinn Parties have paid the Alternate $1,000,000 Consent Judgment Amount prior to such time.

If a Default occurs after the Becker Parties receive more than $1,000,000 in Settlement Payments and/or Cap Payments, the $1,000,000 Consent Judgment, the Alternate $1,000,000 Consent Judgment, and the $5,800,000 Consent Judgment will be eliminated (and Fox Rothschild shall return such three Consent Judgments to the Quinn Parties) and Fox Rothschild shall deliver the Alternate $5,800,000 Consent Judgment and corresponding Praecipe to the Becker Parties. The Becker Parties shall calculate and provide the Quinn Parties with notice of the amount of the judgment in the Alternate $5,800,000 Consent Judgment and corresponding Praecipe, which amount shall equal (i) the $5,800,000 principal obligation minus the Settlement Payments and Cap Payments by the Becker Parties prior to the Default that exceed $1,000,000, plus (ii) cumulative interest calculated in accordance with the next sentence ("**Alternate $5,800,000 Consent Judgment Amount**"). Interest for the Alternate $5,800,000 Consent Judgment shall accrue as of February 1, 2024 and be calculated on a monthly basis by applying a monthly interest rate of 0.5% to the remaining balance of the initial $5,800,000 principal obligation outstanding during each month prior to the Default, as reduced when Settlement Payments are made or Cap Payments are received by the Becker Parties that are not applied to reduce the $1,000,000 Consent Judgment. Within three (3) business days of receiving notice of the Alternate $5,800,000 Consent Judgment Amount, the Quinn Parties shall advise the Becker Parties whether they agree with such calculation. If the Quinn Parties agree with such calculation or fail to respond within three (3) business days, the Becker Parties shall type the Alternate $5,800,000 Consent Judgment Amount into the Alternate $5,800,000 Consent Judgment. If the Quinn Parties disagree on the Alternate $5,800,000 Consent Judgment Amount, the matter shall be referred to the Independent Accountant, whose determination of the amount of the Alternate $5,800,000 Consent Judgment Amount shall be final. After the Alternate $5,800,000 Consent Judgment Amount has been determined as set forth herein, the Becker Parties shall be entitled to type the Alternate $5,800,000

Consent Judgment Amount into the Alternate $5,800,000 Consent Judgment (less any payments made by the Quinn Parties or Cap Payments received by the Becker Parties after Default) and immediately file and execute upon the $5,800,000 Alternate Consent Judgment.

With respect to the Independent Accountant, (A) the Independent Accountant will determine the Consent Judgment Amount by selecting either the Becker Parties' calculation or the Quinn Parties' calculation, and not on the basis of an independent review, and (B) the fees and expenses of the Independent Accountant shall be paid by the party whose calculation was rejected by the Independent Accountant.

Subject to the terms and conditions of this Agreement, upon Fox Rothschild's delivery of the Consent Judgment(s) and Praecipe(s) to BWMS, BWMS shall be entitled to immediately file and record the Consent Judgments, execute the Consent Judgments against Quinn and Comtrol, and pursue all other rights related to the Consent Judgments under applicable law. If the Quinn Parties fully and completely satisfy the Settlement Payments prior to any Default and the Quinn Parties' Malpractice Action is finally determined through a settlement or final non-appealable order (collectively, the "**Triggering Events**") (i) the Consent Judgments shall be null and void, and (ii) within ten (10) business days of the Triggering Events, Fox Rothschild shall return the Consent Judgments and Praecipes to the Quinn Parties or their counsel.

(b) Default. A "**Payment Default**," as defined herein, shall mean: (i) the Quinn Parties' failure to make a Settlement Payment when due, which has not been cured within five (5) business days after receipt of a written notice of default sent by the Becker Parties to the Quinn Parties, or (ii) any filing for bankruptcy protection by Quinn and/or Comtrol. A "**Covenant Default**," as defined herein, shall mean the Quinn Parties' failure to perform any of the non-monetary obligations of this Agreement (*i.e.*, any default other than a Payment Default), which has not been cured within ten (10) days after a written notice of default sent by the Becker Parties to the Quinn Parties. If a Covenant Default cannot be cured within ten (10) days after written notice of default, the Quinn Parties' time to cure a Covenant Default shall be extended for so long as necessary to cure the Covenant Default, provided that the Quinn Parties have initiated measures to cure such Covenant Default and continue to exercise best efforts to cure such Covenant Default at the earliest opportunity. If the Quinn Parties dispute the existence of a Covenant Default, no Covenant Default will be deemed to have occurred until conclusion of the dispute resolution process for a Covenant Default as detailed in this subsection 2(b). A "**Default**," as defined herein, shall mean either a Payment Default or a Covenant Default that is not timely cured (or in the case of a Covenant Default, that is not in the dispute resolution process or subsequent right to cure as provided in this subsection 2(b)).

Upon the purported occurrence of a Covenant Default, the Becker Parties shall provide written notice of such purported Covenant Default to the Quinn Parties, including details surrounding the purported facts and circumstances that support such purported Covenant Default. The Quinn Parties may dispute such Covenant Default by providing the Becker Parties written notice of such dispute (including details surrounding the purported facts and circumstances that support the position that no Covenant Default occurred) within five (5) business days of receiving the Becker Parties' written notice of a Covenant Default. If the Quinn Parties dispute the occurrence of a Covenant Default, the Quinn Parties and the Becker Parties shall negotiate in good faith for no

more than five (5) business days to resolve the dispute. If the dispute is not resolved within such five (5) business days, then the dispute over whether a Covenant Default occurred shall be submitted to David Ross (if at such time he remains admitted to practice law in the Commonwealth of Pennsylvania and certifies that he is independent and impartial) or, if Mr. Ross is unavailable or unwilling, then it will be submitted to such other impartial and independent attorney admitted to practice law in the Commonwealth of Pennsylvania mutually selected by the Quinn Parties and the Becker Parties (Mr. Ross and the alternative attorney are referred to herein collectively as the "**Independent Arbiter**"). If the Independent Arbiter determines that he cannot render a determination of a Covenant Default because it requires a financial determination that he does not feel qualified to make without the guidance of a CPA, the Independent Arbiter may select a CPA of his choice (other than Mr. Pratt) to assist in such determination. The determination by the Independent Arbiter regarding whether a Covenant Default has occurred shall be final. For purposes of certainty, if the Independent Arbiter determines that a Covenant Default has occurred, the Quinn Parties shall have the right to cure such Covenant Default within the cure period set forth above. The fees and expenses of the Independent Arbiter, including any CPA engaged by the Independent Arbiter, shall be paid by the non-prevailing party.

Upon any Default, BWMS shall provide written notice to Fox Rothschild setting forth the basis of the Default, and Fox Rothschild shall immediately deliver the appropriate Consent Judgment(s) and Praceipe(s) to BWMS, in accordance with Section 2(a).

(c) Determination Whether Consent Judgments Are Dischargeable if Bankruptcy is Filed by the Quinn Parties. The Parties agree and hereby stipulate that, in the event of any bankruptcy filing by Comtrol and/or Quinn, the determination of whether the Consent Judgments are dischargeable will be based on the dischargeability of the Original Judgments and Comtrol's and/or Quinn's conduct with respect to BWMS prior to the verdicts in the Lawsuit, and will not be based on a breach of their obligations under this Agreement. All rights/defenses of the Parties as to dischargeability are reserved.

(d) Security Interest. To secure the prompt payment and performance of the Quinn Parties' obligations under this Agreement, Comtrol hereby grants to BWMS a continuing security interest in and lien upon all Property of Comtrol, including all of the following, whether now owned or hereafter acquired, and wherever located: (i) all Accounts; (ii) all Chattel Paper, including electronic chattel paper; (iii) all Commercial Tort Claims; (iv) all Deposit Accounts; (v) all Documents; (vi) all General Intangibles, including without limitation Intellectual Property; (vii) all Goods, including Inventory, Equipment and fixtures; (viii) all Instruments; (ix) all Investment Property; (x) all Letter-of-Credit Rights; (xi) all Supporting Obligations; (xii) all monies, including any Cash Collateral; (xiii) all accessions to, substitutions for, and all replacements, products, and cash and non-cash proceeds of the foregoing, including proceeds of and unearned premiums with respect to insurance policies, and claims against any Person for loss, damage or destruction of any Collateral; (xiv) any proceeds Comtrol is entitled to receive from the Quinn Parties' Malpractice Action as defined in Section 3 of this Agreement, and (xv) all books and records (including customer lists, files, correspondence, computer programs, print-outs and computer records) pertaining to the foregoing (collectively, the "**Security Interest**"). Capitalized terms used in this Section 2(d) and not otherwise defined herein shall have the meanings ascribed to such terms in the Uniform Commercial Code in effect in Pennsylvania as of the Effective Date. The Quinn

Parties represent and warrant that, other than: (i) a lien in favor of First National Bank in relation to a line of credit in the maximum principal amount of $500,000 (the "**FNB Existing Financing/Lien**"); and (ii) liens in favor of certain vehicle lenders as identified on the Historic Financials (as defined below) (collectively, with the FNB Existing Financing/Lien, the "**Existing Financing/Lien**"), no Person has any security interest or lien in the Property subject to BWMS' Security Interest as of the Effective Date. Comtrol further agrees that it will not permit any Person to acquire a security interest or lien in any of the Property subject to BWMS' Security Interest, other than the Permitted Financing/Lien (as defined below), without BWMS' express written consent, which may be granted, denied, or conditioned in BWMS' sole but reasonable judgment. As a condition to BWMS' evaluating such request for consent, Comtrol is required to provide BWMS with written notice and relevant documentation to justify both the expense and request to subordinate BWMS' Security Interest. After BWMS' receipt of the written notice and relevant documentation from Comtrol and receipt of additional documentation, if any, requested by BWMS, BWMS shall have ten (10) days to provide its written consent or decision not to consent to the request. If no response is received from BWMS within the 10-day period, the request is deemed approved by BWMS. Any security interest or lien for which BWMS provides (or is deemed to have provided) its express written consent shall be referred to herein as a "**Consented To Lien**"). Notwithstanding the foregoing, (a) in the event Comtrol determines to replace the FNB Existing Financing/Lien, Comtrol shall be entitled to grant a security interest and lien to a bank or other lending institution regularly engaged in the business of lending money, provided that the Permitted Financing/Lien to replace the FNB Existing Financing/Lien shall not exceed Five-Hundred Thousand Dollars ($500,000), and (b) in the event Comtrol determines, in the exercise of its reasonable business judgment, that it is necessary for the operation of its business to replace or acquire manufacturing, production (including a forklift) or office equipment, or motor vehicles used for Comtrol's business purposes (which vehicles may be used for ancillary personal purposes), Comtrol shall be entitled to grant purchase money security interests to lenders, but only with respect to the equipment or motor vehicles being financed by such lender (collectively and together with the Existing Financing/Lien and any Consented To Lien, the "**Permitted Financing/Liens**"). With respect to the Permitted Financing/Liens, BWMS shall execute any reasonable, customary agreements requested by such bank or lending institution to subordinate BWMS' Security Interest to such Permitted Financing/Lien. Promptly upon request, Comtrol shall deliver such reasonable, customary instruments and agreements and take such other actions as reasonably necessary to evidence or perfect BWMS' lien in the Security Interest. Comtrol authorizes BWMS to file the UCC Financing Statement (UCC-1) attached hereto as **Exhibit D** that describes the Security Interest as "All assets and personal property" of Comtrol.

(e) Preservation of Assets and Financial Reporting. For the period starting on the Effective Date and continuing through the full and complete satisfaction of the Settlement Payments (the "**Payment Period**"), Comtrol shall not take any action to materially dissipate, impair, devalue, encumber, transfer, or dispose of any assets that it owns, or over which it has control, including without limitation BWMS' Security Interest, nor shall Comtrol fail to take any action of which it is reasonably capable to prevent the value of such assets from being materially impaired. During the Payment Period, Comtrol shall continue to operate its business in the ordinary course, may continue to exercise its reasonable business judgment (including making reasonable business decisions to expand into different business endeavors) and shall not, except as expressly permitted by this Agreement, (i) incur any obligations or liabilities outside the ordinary

course of business; (ii) dispose of any assets or inventory outside the ordinary course of business, except for reasonably equivalent value; (iii) divert any business, business opportunities, sales, or customers to another person or entity, provided however, Comtrol may exercise its reasonable business judgment to determine: (A) whether it can appropriately and adequately provide a good/service for the customer or the prospective customer, and/or (B) whether such customer or prospective customer would be better served by obtaining such good/service from a third party unaffiliated with any of the Quinn Parties, and, if either (A) or (B) applies, Comtrol may refer such customer or prospective customer to such unaffiliated third parties; (iv) solicit or encourage any customers to terminate their relationship with Comtrol unless termination of such customer is in the best interest of Comtrol (for example, if a customer fails to pay Comtrol for goods/services or is otherwise in default of its contract); (v) redeem or otherwise repurchase any equity from shareholders; and/or (vi) distribute any profits to shareholders, or repay any shareholder loans, except as expressly permitted in this Section 2(e). Notwithstanding the foregoing, Comtrol shall be permitted during the Payment Period: (i) to pay any of its bona fide liabilities incurred in the ordinary course of business; (ii) make tax distributions to shareholders (including estimated tax distributions); (iii) make discretionary profit distributions to shareholders ("**Discretionary Profit Distribution**"), provided that, if Comtrol elects to make a Discretionary Profit Distribution, Comtrol also shall make a contemporaneous payment to BWMS in an amount equal to the Discretionary Profit Distribution being made to shareholders (for illustration purposes only, if Comtrol elects to make a Discretionary Profit Distribution of $10,000 to shareholders, it shall also contemporaneously make a $10,000 payment to BWMS) and such payment to BWMS shall be applied as follows: (A) first, to reduce or eliminate the Final Payment, then (B) to reduce or eliminate the Settlement Payments due on the first through fifth anniversaries of the Effective Date, applied in reverse order of when such payments are due, then (C) to make the Interest Payment, then (D) to pay the Quinn Parties' Allocable Share of Expenses, provided, however, that the remaining obligation to make Settlement Payments cannot exceed the amount remaining due under the Cap; (iv) repay loans made by shareholders to Comtrol after the Effective Date, provided that (A) such loans are made for purposes reasonably related to the operation of Comtrol's business and (B) the interest rate on such loans is no greater than the prime rate at the time of the loan; and/or (v) to replace or dispose of obsolete, slow-moving, damaged, destroyed, or other unnecessary assets, so long as such disposition is consistent with Comtrol's ordinary course of business and represents a reasonable exercise of business judgment.

To allow BWMS to monitor Comtrol's compliance with this Section 2(e) (the "**Permitted Purpose**"), during the Payment Period, Comtrol will provide to BWMS, on or before the fifteenth (15th) day of each month, financial reports (income statement, balance sheet and cash flow statement, collectively, the "**Comtrol Financial Reports**") in the same form and substance as Comtrol's counsel provided to the Becker Parties on or about March 20, 2024, a sample of which is attached hereto as **Exhibit E** (the "**Historic Financials**") or its substantially reasonable equivalent if Comtrol's current accounting software is discontinued or no longer available or Comtrol determines to change accounting software. In addition, Comtrol will provide BWMS with copies of its Federal and state income tax returns and schedules filed during the Payment Period (collectively, the "**Comtrol Tax Returns**"), within ten days of Comtrol filing such returns. The Comtrol Financial Reports and the Comtrol Tax Returns shall be: (I) strictly confidential and shall not be used outside the Permitted Purpose for any purpose whatsoever, and (II) designated as "confidential" pursuant to the terms and conditions of the Stipulated Confidentiality Agreement

and Protective Order entered by the Trial Court on April 28, 2017 in the Lawsuit (for certainty, the Becker Parties agree that they shall comply with the Order with respect to the Comtrol Financial Reports and the Comtrol Tax Returns regardless of any effect on the Order when the Original Judgments are marked satisfied and the Lawsuit is marked settled and discontinued and otherwise closed).

(f) Continuation of Business Relationship. During the Payment Period, the Parties agree as follows: (i) Becker Parties will not remove Comtrol's power supplies from MSHA's approval for use with the Varis and/or Becker Electronics leaky feeder communications systems (collectively, the "**Becker Communication Systems**") or take any regulatory action that would preclude Comtrol from being able to sell its power supplies to power the Becker Communication Systems; and (ii) the Parties and their respective affiliates will continue their business relationship to sell goods and services to each other: (A) on trade terms no worse than the trade terms existing on the Effective Date, (B) at pricing no less favorable than the pricing such Party (or its affiliate) provides to its other customers that are purchasing similar quantities of goods/services, (C) such that BWMS production and delivery times on orders from Comtrol shall be consistent with the production and delivery times BWMS provides to its other customers that are purchasing similar quantities of goods, (D) such that Comtrol's production and delivery times on orders from BWMS (excluding BMWS' orders of PS1571 power supplies, which are addressed in the following subsection E) shall be consistent with the production and delivery times Comtrol provides to its other customers that are purchasing similar quantities of goods, and (E) such that Comtrol production and delivery times on the sale of its PS1571 power supply to BWMS shall be no more than twelve (12) weeks from the date BWMS submits a purchase order for such PS1571 power supply(ies) to Comtrol (subject to a Permitted Delay), provided however, such twelve-week lead time only applies if the aggregate number of PS1571 power supplies then in production for BWMS, *plus* the additional PS1571 power supplies sought under the new purchase order from BWMS, does not exceed five (5) PS1571 power supplies. "**Permitted Delay**" means: (I) Force Majeure Events, (II) delays agreed upon between the Parties, which agreement will not be unreasonably withheld, and/or (III) delays due to an emergency order from a customer for the purchase of Comtrol's power supplies which will cause significant imminent harm to the customer [such as emergency orders to ensure the mine remains in compliance with applicable law] and fulfilling such emergency order will delay Comtrol's production and delivery of BWMS' order for power supplies. In the event of any Permitted Delay, Comtrol shall communicate the reason for the delay to BWMS and make commercially reasonable efforts to minimize the duration of such Permitted Delay.

3. Assignment of Quinn Parties' Malpractice Action.

(a) In consideration of the Becker Parties' release set forth in Section 4(a), agreement to satisfy the Original Judgments, and other obligations pursuant to this Agreement, the Quinn Parties hereby assign to the Becker Parties their right and interest in legal malpractice claims against SGK, including without limitation the Quinn Parties' right to assert and maintain litigation against SGK and recover damages therefrom (collectively, the "**Quinn Parties' Malpractice Action**"), subject to the allocation of expenses and proceeds set forth in this Section 3. The Becker Parties are currently interviewing multiple qualified firms that are interested in litigating the Quinn Parties' Malpractice Action on a customary contingent fee basis, and that also will advance the costs to litigate the Quinn Parties' Malpractice Action. If the Becker Parties do not elect to engage

any of those firms to serve as Malpractice Counsel (as defined in Section 3(c)), the Becker Parties shall provide written notice to the Quinn Parties of the Becker Parties' election, and then the Quinn Parties shall be entitled to select Malpractice Counsel, in the exercise of their reasonable discretion, provided that such counsel (A) has prior experience litigating legal malpractice cases and (B) agrees to charge no more than a customary contingent fee. The allocation of expenses and proceeds shall remain the same regardless of which party selects Malpractice Counsel. If the Quinn Parties do not elect to engage Malpractice Counsel in accordance with such terms, the Quinn Parties shall provide the Becker Parties with written notice of the Quinn Parties' election. Under such circumstance, neither the Becker Parties nor the Quinn Parties are obligated to engage Malpractice Counsel or pursue the Quinn Parties' Malpractice Action, although they may jointly agree to do so. In the event that any court, arbitrator or other decisionmaker awards Quinn a recovery on the Quinn Parties' Malpractice Action, Quinn agrees to have Malpractice Counsel distribute such recovery as Net Proceeds (as defined in Section 3(c)) of Comtrol, in accordance with this Agreement.

(b) Regardless whether the Becker Parties or the Quinn Parties select Malpractice Counsel per subsection (a), the Becker Parties shall have complete control over the Quinn Parties' Malpractice Action in the exercise of their sole discretion, including, but not limited to, control over (i) the engagement of Malpractice Counsel, in accordance with the procedures and terms set forth in Section 3(a), (ii) the approval of Malpractice Counsel's selection of expert witnesses and the compensation to be provided to Malpractice Counsel and expert witnesses, which compensation needs to be commercially reasonable, (iii) the litigation strategy and tactics in the Quinn Parties' Malpractice Action, and (iv) the settlement negotiations in the Quinn Parties' Malpractice Action, provided however, the Becker Parties shall obtain the Quinn Parties' consent (which consent shall not be unreasonably withheld) for any settlement of the Quinn Parties' Malpractice Action.

(c) The plaintiffs' malpractice counsel in the Quinn Parties' Malpractice Action (which counsel shall be different than counsel for the Hensler Parties' malpractice claim against SGK, "**Malpractice Counsel**") shall pay the net proceeds of the Quinn Parties' Malpractice Action received through settlement and/or verdict, after payment of Malpractice Counsel's fee (the "**Net Proceeds**") eighty percent (80%) to BWMS (the "**BWMS Malpractice Share**") and twenty percent (20%) to Comtrol (the "**Comtrol Initial Malpractice Share**") until such time that (i) BWMS has received from the combined Settlement Payments, including the Interest Payment, and Net Proceeds the principal amount of $6,800,000, plus an additional amount of $5,416.67 per month commencing as of the Effective Date and continuing until the principal amount of $6,800,000 has been paid pursuant to the terms of this Agreement, but for no more than a maximum period of 36 months (*i.e.*, a maximum additional amount of $195,000.00) (the "**Additional Interest**" and, collectively with the $6,800,000 principal, the "**Cap**"), and (ii) the Quinn Parties have fully paid, or had paid on their behalf from the Comtrol Initial Malpractice Share, the Quinn Parties' Allocable Share of Expenses (as defined in Section 3(d)). In no event shall the Becker Parties be entitled to receive from the Quinn Parties under this Agreement more than the Cap and reimbursement of the Quinn Parties' Allocable Share of Expenses, and any interest payable on the Cap shall be paid exclusively from the Net Proceeds. After BWMS has received an amount equal to the Cap from the Settlement Payments, including the Interest Payment, and the Net Proceeds, and the Quinn Parties have fully paid the Quinn Parties' Allocable



158418429.25

Share of Expenses, Comtrol shall receive one-hundred percent (100%) of the remaining Net Proceeds. The Net Proceeds shall be applied as follows:

(i) The BWMS Malpractice Share shall first be applied to the Cap (which includes the Additional Interest) less the Settlement Payments (which includes the Interest Payment) (the "**Malpractice Recovery Opportunity**"), until such time as the Malpractice Recovery Opportunity is paid in full.

(ii) The Comtrol Initial Malpractice Share shall first be applied to the Settlement Payments, including the Interest Payment, and Quinn Parties' Allocable Share of Expenses: (A) first, to reduce or eliminate the Final Payment, then (B) to reduce or eliminate the Settlement Payments due on the first through fifth anniversaries of the Effective Date, applied in reverse order of when such payments are due, then (C) to make the Interest Payment, then (D) to pay the Quinn Parties' Allocable Share of Expenses, until the Settlement Payments, Interest Payment, and the Quinn Parties' Allocable Share of Expenses are fully satisfied.

(iii) If the Malpractice Recovery Opportunity is fully satisfied from the BWMS Malpractice Share before the Settlement Payments, Interest Payment, and Quinn Parties' Allocable Share of Expenses are fully satisfied, then the remaining Net Proceeds shall be applied 100% to the Settlement Payments, including the Interest Payment, and the Quinn Parties' Allocable Share of Expenses until they are fully satisfied.

(iv) If the Settlement Payments, including the Interest Payment, and the Quinn Parties' Allocable Share of Expenses are fully satisfied from the aggregate direct payments from Comtrol and Comtrol Initial Malpractice Share before the Malpractice Recovery Opportunity is fully satisfied, then the remaining Net Proceeds shall be applied 20% to Comtrol and 80% to the Malpractice Recovery Opportunity until the Malpractice Recovery Opportunity is fully satisfied.

(v) If the Malpractice Recovery Opportunity, Settlement Payments, including the Interest Payment, and the Quinn Parties' Allocable Share of Expenses are all fully satisfied, then 100% of the remaining Net Proceeds shall be paid to Comtrol. Under no circumstances may BWMS receive more than the Cap plus the Quinn Parties' Allocable Share of Expenses.

The combination of Settlement Payments, including the Interest Payment, and payments made to satisfy the Malpractice Recovery Opportunity up to the amount of $6,063,410 plus simple interest accruing as of February 1, 2024, calculated at the rate of 0.5% per month, shall be treated as paid in satisfaction of the BWMS claim and judgment against Comtrol for tortious interference with contractual relations by Comtrol. The Quinn Parties and the Becker Parties agree to apply this allocation on their income tax returns and maintain such allocation upon any audit by any taxing authorities. The combination of Settlement Payments, including the Interest Payment, and payments made to satisfy the Malpractice Recovery Opportunity in excess of $6,063,410 plus simple interest accruing as of February 1, 2024, calculated at the rate of 0.5% per month, shall be treated as paid in satisfaction of BWMS' claim and judgment against Quinn for breach of Quinn's BWMS Employment Agreement. The manner in which the Net Proceeds will be paid to the Parties is addressed in the last paragraph of this subsection.

Given that some of the claims in the Quinn Parties' Malpractice Action overlap with the claims that Hensler, Susan J. Hensler ("**S. Hensler**"), Wholesale Mine Supply, L.P., WSAJT Properties, L.P., and Hensler Communications Consultants, L.P. d/b/a HC Global (collectively, the "**Hensler Parties**") have against SGK, and given the potential limits on SGK's insurance coverage, if the claims asserted by the Quinn Parties and Hensler Parties are under the same insurance policy claims period, the Parties agree to seek approval from the United States Bankruptcy Court for the Western District of Pennsylvania (the "**Bankruptcy Court**") in the Bankruptcy case filed by Hensler and S. Hensler at Case No. 24-20441-GLT for the allocation of proceeds from SGK (including SGK's insurance policy) between the Hensler Parties and the Quinn Parties. If the claims asserted against SGK by the Quinn Parties and the Hensler Parties are under the same insurance policy claims period, and such claims are resolved by settlement or where verdicts are **not** issued in both the Quinn Parties' Malpractice Action and the Hensler Parties' malpractice action, the Quinn Parties' proportionate share of the proceeds from SGK (including SGK's insurance policy) (the "**Quinn Parties' Proportionate Share**") will be (A) the value of the Becker Parties' aggregate judgments against the Quinn Parties, including applicable interest, plus attorneys' fees and costs paid by the Quinn Parties in connection with the Lawsuit, divided by (B) the aggregate value of the Becker Parties' judgments against the Hensler Parties and the Quinn Parties collectively, including applicable interest, plus attorneys' fees and costs paid by the Hensler Parties and the Quinn Parties, collectively, in connection with the Lawsuit. If verdicts are issued in both the Quinn Parties' Malpractice Action and the Hensler Parties' malpractice action, the Quinn Parties' Proportionate Share will be (A) the value of the verdicts rendered in favor of the plaintiff(s) in the Quinn Parties' Malpractice Action, divided by (B) the value of all verdicts rendered in favor of the plaintiff(s) in the Quinn Parties' Malpractice Action and the Hensler Parties' malpractice action, collectively. The calculations of the Quinn Parties' Proportionate Share set forth in this Section 3(c) are contingent upon (i) the Becker Parties reaching an agreement with the Hensler Parties to accept such calculations and (ii) Bankruptcy Court approval. If the Hensler Parties and/or Bankruptcy Court do not approve the calculations of the Quinn Parties' Proportionate Share set forth in this Section 3(c), the Becker Parties, Quinn Parties, and Hensler Parties shall immediately negotiate in good faith an alternate calculation of the Quinn Parties' Proportionate Share, subject to Bankruptcy Court approval.

Upon resolution of the Quinn Parties' Malpractice Action by settlement, final non-appealable verdict, or otherwise, Malpractice Counsel shall provide the Parties a written accounting that identifies (i) the gross proceeds obtained in the Quinn Parties' Malpractice Action, (ii) Malpractice Counsel's fee, and (iii) the costs incurred in connection with the Quinn Parties' Malpractice Action and by whom such costs were paid (the "**Litigation Costs**"). Within seven (7) days of receiving such accounting, the Becker Parties shall provide written notice to the Quinn Parties regarding the proposed distribution of the Net Proceeds by the Malpractice Counsel in accordance with the terms and conditions of this Agreement, including the reimbursement of any Litigation Costs. Within seven (7) days of receiving the Becker Parties' written notice, the Quinn Parties shall respond in writing whether they agree or disagree with the Becker Parties' proposed distribution of the Net Proceeds and reimbursement of Litigation Costs. If the Quinn Parties disagree with the Becker Parties' proposed distribution, within the next five (5) business days, the Becker Parties and Quinn Parties shall engage in good faith negotiations to resolve the area(s) of disagreement. If the Becker Parties and Quinn Parties are unable to agree on how the Net Proceeds should be distributed and

the Litigation Costs reimbursed, the dispute will be submitted to the Independent Arbiter, who may in his sole discretion engage a CPA (other than Mr. Pratt) to assist him if he deems such engagement necessary. The Independent Arbiter shall determine distribution of the Net Proceeds and reimbursement of Litigation Costs by selecting either the Becker Parties' proposal or the Quinn Parties' proposal, without conducting any independent review, and the fees and expenses incurred by the Independent Arbiter and any CPA he engages shall be paid by the side whose proposal was rejected.

(d) The Quinn Parties shall be responsible for twenty percent (20%) of the first $300,000 of Litigation Costs (the "**Quinn Parties' Allocable Share of Expenses**"), not to exceed $60,000. For up to six (6) years after the Effective Date of the Agreement, Comtrol shall reserve for accounting purposes Ten-Thousand Dollars ($10,000) per year, for a maximum of Sixty-Thousand Dollars ($60,000) ("**Amounts in Reserve**") and reflect the Amounts in Reserve on Comtrol's financial statements. When the Quinn Parties' Malpractice Action resolves by settlement, final non-appealable verdict, or otherwise:

(i) BWMS shall pay any Litigation Costs that have been advanced by Malpractice Counsel from the BWMS Malpractice Share.

(ii) The Quinn Parties shall pay to BWMS the Amounts in Reserve or the Quinn Parties' Allocable Share of Expenses, whichever is less.

(iii) If the Quinn Parties' Allocable Share of Expenses exceeds the Amounts in Reserve, and the Net Proceeds are sufficient to fully satisfy the Settlement Payments including the Interest Payment due to BWMS, the Quinn Parties' Allocable Share of Expenses will be paid from the Net Proceeds in accordance with Section 3(c), to the extent that sufficient Net Proceeds are available.

(iv) If the Amounts in Reserve and the amounts paid pursuant to subsection 3(d)(iii) are less than the Quinn Parties' Allocable Share of Expenses, the Quinn Parties shall pay to BWMS Ten-Thousand Dollars ($10,000) per year or the outstanding balance of the Quinn Parties' Allocable Share of Expenses, whichever is less, on each anniversary date of the Agreement until the Quinn Parties' Allocable Share of Expenses has been fully paid.

(v) The payments made by the Quinn Parties pursuant to this Section 3(d) for the Quinn Parties' Allocable Share of Expenses shall not be considered for purposes of the Cap. Moreover, the amounts that BWMS receives from the Net Proceeds to pay Litigation Costs that BWMS or Malpractice Counsel has advanced shall not be considered for purposes of the Cap, up to a maximum of Two-Hundred Forty Thousand Dollars ($240,000). Any amounts that BWMS receives from the Net Proceeds to pay Litigation Costs that BWMS or Malpractice Counsel has advanced, which are in excess of $240,000, shall count for purposes of the Cap.

(vi) For purposes of clarity, based on the above provisions, the order of distribution of Net Proceeds (*i.e.,* proceeds of the Quinn Parties' Malpractice Action after payment of Malpractice Counsel's fees) shall be as follows:

(A) Net Proceeds initially are credited 20% to Comtrol (*i.e.*, Comtrol's Initial Malpractice Share) and 80% to BWMS (*i.e.*, BWMS' Malpractice Share) (3(c));

(B) BWMS first pays or reimburses all Litigation Costs advanced by Malpractice Counsel from the BWMS Malpractice Share (3(d)(i)); then

(C) The Quinn Parties pay to BWMS the lesser of (i) the Amounts in Reserve or (ii) the Quinn Parties' Allocable Share of Expenses (3(d)(ii)); then

(D) BWMS will receive the BWMS Malpractice Share applied to the Malpractice Recovery Opportunity until the Malpractice Recovery Opportunity is fully satisfied; then

(E) The Comtrol Initial Malpractice Share shall be applied to any unpaid Settlement Payments in reverse order (Section 3(c)(ii)), then to the Interest Payment, then to the Quinn Parties' Allocable Share of Expenses (if the Amounts in Reserve are insufficient to cover the Quinn Parties' Allocable Share of Expenses), and then to Comtrol. If payments made directly by Comtrol, together with the Comtrol Initial Malpractice Share, are insufficient to pay the Settlement Payments, Interest Payment, and Quinn Parties' Allocable Share of Expenses in full, and the Malpractice Recovery Opportunity has been fully satisfied, then the remaining Net Proceeds will be applied to the Settlement Payments, Interest Payment, and Quinn Parties' Allocable Share of Expenses (Section 3(c)(iii)) until those amounts are fully satisfied; then

(F) If BWMS has received amounts totaling the Cap, plus up to $300,000 for reimbursement of Litigation Costs as set forth herein, Comtrol will receive 100% of the remaining Net Proceeds.

(G) If the Amounts in Reserve and distributed Net Proceeds are insufficient to cover the Quinn Parties' Allocable Share of Expenses, then the Quinn Parties will pay to BWMS the remaining balance of the Quinn Parties' Allocable Share of Expenses up to $10,000 per year on each of the next anniversaries of the Effective Date up to the aggregate maximum of $60,000 (3(d)(iv)).

4. Mutual Releases and Waivers of Claims.

(a) Becker Parties' Releases. Upon the Becker Parties' receipt of the Initial Payment, and in consideration of the mutual promises and covenants contained in this Agreement, including without limitation the Settlement Payments and Consent Judgments, and further subject to the exceptions set forth in Section 4(c), BWMS and Becker America, on behalf of themselves and their predecessors, successors, parents, affiliates, and assigns, unconditionally release and forever discharge (i) Quinn, Comtrol, Comtrol-West and Ashley Quinn; (ii) their respective current and/or former officers, directors, shareholders, managers, members, employees, parents, subsidiaries, affiliates, heirs, counsel other than SGK, and executors; and (iii) the successors and assigns of each of the foregoing, from any and all causes of action, suits, damages, claims, judgments, interest, attorneys' fees, costs and expenses whatsoever (collectively, "**Claims**"), whether known or unknown, arising from or relating to any acts or omissions predating this

Agreement, including without limitation the Claims asserted by one or more of the Becker Parties against the Quinn Parties in the Lawsuit, the Motion for Sanctions, under any employment agreement with any Becker Party, and/or any and all restrictive covenants or covenants not to compete the Quinn Parties may have to the Becker Parties (including the Restrictive Covenants).

(b) Quinn Parties' Releases. In consideration of the mutual promises and covenants contained in this Agreement, and subject to the exceptions set forth in Section 4(c), Quinn, Comtrol, Comtrol-West, and Ashley Quinn on behalf of themselves and their predecessors, successors, parents, affiliates, and assigns, unconditionally release and forever discharge (i) BWMS and Becker America, (ii) their respective current and/or former officers, directors, shareholders, managers, members, employees, parents, subsidiaries, affiliates, heirs, counsel, and executors; and (iii) the successors and assigns of each of the foregoing, from any and all Claims, whether known or unknown, arising from or relating to any acts or omissions predating this Agreement, including without limitation the Claims asserted by one or more of the Quinn Parties against the Becker Parties in the Lawsuit and/or any Claims arising under Quinn's Employment Agreement with BWMS.

(c) Exceptions to Releases. The releases and waivers of Claims set forth in Sections 4(a) and (b) shall not extend to (i) any rights or obligations created by this Agreement; (ii) any Claims for breach of this Agreement; (iii) any Claims by any of the Parties against SGK or its insurer; (iv) any Claims by any of the Parties against the Hensler Parties or DiBridge; and/or (v) any Claims arising in connection with any business relationship between BWMS and Comtrol in the ordinary course of business whereby they buy and sell products and/or services from each other, including without limitation Claims for amounts owed for goods sold and/or services rendered by the Becker Parties or the Quinn Parties to the other in the ordinary course of business.

(d) Approval of the Settlement and Discontinuance of the Appeals. Promptly after the Becker Parties' receipt of the Initial Payment, the Parties will present a joint motion to the Trial Court seeking approval of the settlement as reflected in this Agreement that requests the following relief ("**Joint Motion**"):

(i) The docket shall reflect that all of the Becker Parties' claims against the Quinn Parties in Case No. 6330 of 2016 are settled and discontinued;

(ii) The Original Judgments shall be marked satisfied ninety-five (95) days after the Initial Payment is received by BWMS, as long as none of the Quinn Parties have filed for bankruptcy prior to that time and no uncured Covenant Default exists (or if a Covenant Default exists on such date, the Original Judgments shall be marked satisfied when such Covenant Default is cured). The primary reason why the Parties are agreeing to have the Original Judgments marked satisfied and replaced with the Consent Judgments, which will be filed if there is a Payment Default or Covenant Default, is to place the Quinn Parties in a position to obtain the Permitted Financing/Lien;

(iii) The injunction set forth in the Consented-To Order of Court dated December 21, 2022 shall be dissolved as of the date the Court grants the Joint Motion;

(iv) The limited receiver appointment set forth in the Consented-To Order of Court Regarding Selection of Limited Third-Party Receiver dated January 10, 2023 shall be terminated as of the date the Court grants the Joint Motion;

(v) The Becker Parties' Motion for Sanctions shall be withdrawn against the Quinn Parties only with prejudice;

(vi) The Petition for Contempt, for Sanctions, and to Enforce Order of Court Dated December 21, 2022 Against Comtrol Corp. and Alan J. Quinn shall be withdrawn with prejudice; and

(vii) The Court will retain jurisdiction to enforce all terms and conditions set forth in this Agreement, including without limitation issuance of the Consent Judgments upon presentation of the Praecipes.

Promptly after the Becker Parties' receipt of the Initial Payment, the Parties also shall take all action necessary to discontinue the Appeals pending in the Pennsylvania Superior Court.

5. Fees and Expenses. Except as expressly set forth herein, the Parties shall bear their own fees, expenses, and costs, including without limitation attorneys' fees and costs incurred in connection with the negotiation and preparation of this Agreement.

6. No Admission of Liability. The Parties acknowledge that the terms and conditions of this Agreement are the result of a compromise of disputed Claims and shall not be deemed or construed to be an admission of liability or defenses by any of the Parties, but instead constitutes a good faith settlement that is being entered into to avoid the costs, risks, and delays of further litigation in the Lawsuit and Appeals.

7. Voluntary Agreement. The Parties acknowledge that they fully understand the terms and conditions of this Agreement, that they have been represented by competent counsel with regard to the negotiation and execution of this Agreement, and that they have had ample opportunity to review the terms of this Agreement with their respective attorneys. The Parties further acknowledge that they are voluntarily executing this Agreement without any coercion on the part of any person, and that they are not relying upon any promises or inducements made to cause them to execute this Agreement, other than those contained herein.

8. No Third-Party Interests in Claims. The Parties represent and warrant that no other persons or entities have any interest in the Claims, demands, obligations, causes of action or potential causes of action released in this Agreement, and that they have not sold, assigned, transferred, conveyed, or otherwise disposed of any of the Claims, demands, obligations, causes of action or potential causes of action released herein.

9. Warranty of Authority. Each of the Parties to this Agreement represents and warrants that it has the right and authority to enter into this Agreement on the terms set forth herein, and that no third party has any right to prevent, approve or control in any manner the execution, the terms, or the performance of this Agreement, except for the potential Bankruptcy Court

approval for the allocation of SGK's insurance proceeds, as referenced in Section 3(c). Comtrol represents and warrants it has obtained corporate resolutions approving this Settlement Agreement and authorizing Alan Quinn to sign the Settlement Agreement on behalf of Comtrol. Alan Quinn, as a 50 percent owner of Comtrol-West, represents and warrants that he shall use his best efforts to obtain, by no later than September 30, 2024, corporate resolutions approving this Settlement Agreement and authorizing Alan Quinn to have signed this Settlement Agreement on behalf of Comtrol-West. Each of the Parties further represents and warrants that neither the execution nor performance of such Party's obligations under this Agreement will result in a breach or default of any material contract or agreement to which it is a party.

10. Notices. All notices must be written and sent to the address identified below or in a subsequent notice. All notices must be given (a) by personal delivery, (b) by prepaid certified or registered mail, return receipt requested, or (c) by prepaid recognized next business day delivery service. Notices will be effective upon receipt.

If to the Quinn Parties:

Alan Quinn
Comtrol International
500 Pennsylvania Ave.
Irwin, PA 15642

With a copy to:

Marjorie Obod, Esq.
Patrick Hamlet, Esq.
Jenna M. Coyle, Esq.
DILWORTH PAXSON, LLP
1500 Market Street, Suite 3500E
Philadelphia, PA 19102

-and-

Paul J. Cordaro, Esq.
CAMPBELL & LEVINE, LLC
310 Grant Street, Suite 1700
Pittsburgh, PA 15219

If to the Becker Parties:

Greg Sanders
Becker Global America, Inc.
14660 Industrial Park Road
Bristol, VA 24201

With a copy to:

Jay D. Marinstein
Patrick L. Abramowich
Fox Rothschild LLP
BNY Mellon Center
500 Grant Street, Suite 2500
Pittsburgh, PA 15219

If to Fox Rothschild:

Jay D. Marinstein
Patrick L. Abramowich
Fox Rothschild LLP
BNY Mellon Center
500 Grant Street, Suite 2500
Pittsburgh, PA 15219

11. Complete Agreement. This Agreement constitute the only and entire understanding and agreement between and among the Parties concerning the subject matter of this Agreement and supersedes and replaces any and all prior negotiations, representations, agreements, and understandings, whether oral, electronic, or written, between and among them concerning the subject matter of this Agreement. The Parties expressly acknowledge that they have not relied on any written or oral understandings, promises, agreements, statements, or representations among the Parties directly or indirectly related to this Agreement that are not incorporated herein.

12. Severability. If any one or more of the provisions of this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such provision will be equitably reformed in accordance with the intent of the original provision to the extent necessary to make such provision fully valid, legal, and enforceable.

13. Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.

14. Choice of Law and Forum. This Agreement, and the terms contained herein, shall be governed by the internal laws of the Commonwealth of Pennsylvania without regard to its rules regarding choice of law. Any lawsuit or dispute arising between or among the Parties shall be brought exclusively in the Court of Common Pleas of Westmoreland County, Pennsylvania. To the extent permitted by the applicable rules of court, the Parties will request the matter be assigned to Judge Harry F. Smail, Jr., if he is presiding at the time that such action is filed. The Parties hereby submit to the exclusive jurisdiction of the Court of Common Pleas of Westmoreland County to resolve any such dispute and waive any objection that the Court is an inconvenient forum.

15. Counterparts. This Agreement may be executed in counterparts, any one of which shall be considered an original for all purposes, and each of the counterparts taken together shall constitute one valid and binding agreement among the Parties. Facsimile and .pdf signatures shall be equivalent to original signatures for all purposes.

16. No Oral Modification. This Agreement may not be modified, amended, discharged, or waived except by an agreement in writing signed by the Party against whom enforcement of such modification, amendment, discharge, or waiver is sought.

17. Waiver. The waiver by either Party hereto of (i) any right under this Agreement, (ii) a Party's failure to perform, or (iii) a breach by the other Party, will not be deemed a waiver of any other right under this Agreement or of any other breach or failure by such other Party, whether of a similar nature or otherwise.

18. Effective Date. The Effective Date shall be the date set forth in the first paragraph of this Agreement.

19. Force Majeure. Except as provided below, in the event that either Party is prevented or delayed from performing any act or obligation required hereunder by circumstances beyond that Party's reasonable control (a "**Force Majeure Event**"), that Party's performance shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. For purposes of this Section 19, a "Force Majeure Event" shall include, without limitation, (1) an act of God; (2) labor strikes; (3) the unavailability of materials, utilities, services, software, or facilities on commercially reasonable terms; (4) laws, regulations, or orders of any governmental authority; and (5) fire, explosion, flood, epidemics, pandemics, or civil disturbance. Notwithstanding the foregoing, the provisions of this Section 19 shall not operate to excuse the Quinn Parties from prompt payment of the Settlement Payments, the Quinn Parties' Allocable Share of Expenses, or any other amount due hereunder.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound, have caused this Settlement Agreement and Release to be executed and sealed as of the day and year first written above.

BECKER WHOLESALE
MINE SUPPLY, LLC

WITNESS: [signature]

By: [signature]
Gregory A. Sanders,
President and CEO

BECKER GLOBAL-AMERICA, INC.

WITNESS: [signature]

By: [signature]
Gregory A. Sanders,
President and CEO

ALAN J. QUINN

WITNESS:____________________ ____________________

COMTROL CORP.

WITNESS:____________________

By:____________________
Alan J. Quinn, President and CEO

COMTROL-WEST, LLC

WITNESS:____________________

By:____________________
Alan J. Quinn, President

**AS TO THE RELEASE AND WAIVER OF CLAIMS SET FORTH IN SECTION 4(b):**

ASHLEY QUINN

WITNESS:____________________ ____________________

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound, have caused this Settlement Agreement and Release to be executed and sealed as of the day and year first written above.

BECKER WHOLESALE
MINE SUPPLY, LLC

WITNESS:__________ By:__________
Gregory A. Sanders,
President and CEO

BECKER GLOBAL-AMERICA, INC.

WITNESS:__________ By:__________
Gregory A. Sanders,
President and CEO

ALAN J. QUINN

WITNESS:__________ __________

COMTROL CORP.

WITNESS:__________ By:__________
Alan J. Quinn, President and CEO

COMTROL-WEST, LLC

WITNESS:__________ By:__________
Alan J. Quinn, President

**AS TO THE RELEASE AND WAIVER OF CLAIMS SET FORTH IN SECTION 4(b):**

ASHLEY QUINN

WITNESS:__________ __________



158418429.24

**SOLELY TO CONFIRM ITS OBLIGATION TO HOLD AND DISTRIBUTE THE CONSENT JUDGMENTS AND PRAECIPES IN ACCORDANCE WITH THIS AGREEMENT:**

FOX ROTHSCHILD, LLP

By: ______________________
Jay D. Marinstein, Authorized Partner

# EXHIBIT B

# FULL AND FINAL GENERAL RELEASE AND SETTLEMENT AGREEMENT

THIS FULL AND FINAL GENERAL RELEASE AND SETTLEMENT AGREEMENT ("**Release**") is entered into by and among the following parties, as defined herein.

## DEFINITIONS

"**Becker**" shall mean collectively all of the following entities and individuals for purposes of this **Release**:

1. Becker/Wholesale Mine Supply, LLC ("BWMS")
2. Becker Global America, Inc. ("Becker America")
3. Becker Mining Systems, A.G. ("Becker Mining")
4. Wholesale Mine Supply, L.P. ("WMS")
5. William H. Hensler, Jr. ("Hensler")
6. Susan J. Hensler ("Susan Hensler")
7. Hensler Communications Consultants, L.P. d/b/a HC Global ("HC Global")
8. Comtrol Corp. ("Comtrol")
9. Alan J. Quinn ("Quinn")
10. Comtrol-WEST, LLC ("Comtrol-WEST" and, with Quinn and Comtrol, the "Quinn Parties")
11. WSAJT Properties, L.P. ("WSAJT")
12. Gregory A. Sanders ("Sanders")
13. Franz Becker ("Franz")
14. Wolfgang Wegener ("Wegener")
15. Max Brinckman ("Brinckman")

**"SGK"** shall mean collectively all of the following entities and individuals for purposes of this **Release**:

16. Sherrard, German & Kelly, P.C. ("SGK")
17. Stanley J. Lehman, Esquire ("Lehman")
18. Christopher J. Davis, Esquire ("Davis")
19. Jennifer P. Richnafsky, Esquire ("Richnafsky")

**Becker** and **SGK** may be referred to herein collectively as the "**Parties**," and each individual and entity a "**Party**."

The **"Hensler Parties' Malpractice Action"** shall mean the litigation commenced by **Hensler**, **Susan Hensler**, and **WMS** against **SGK**, **Lehman**, **Davis**, and **Richnafsky** in the Court of Common Pleas of Allegheny County, Pennsylvania at No. GD-24-009104.

The **"Quinn Parties' Malpractice Action"** shall mean collectively the litigation commenced by **Quinn**, **Comtrol**, and **Comtrol-WEST**, in their individual capacities, or by **BWMS**, as assignee of the claims of **Quinn**, **Comtrol**, and **Comtrol-WEST**, against **SGK**, **Lehman**, and **Davis** in the

Court of Common Pleas of Allegheny County, Pennsylvania at Nos. GD-24-014510, GD-25-006439, GD-25-008640, and GD-25-009704.

The "**Litigation**" shall mean collectively all claims and demands of any nature that were pursued or that could have been pursued by **Becker** against **SGK**, including but not limited to, in the **Hensler Parties' Malpractice Action**; the **Quinn Parties' Malpractice Action**; and all actions consolidated at the following Docket Number in the Court of Common Pleas of Westmoreland County, Pennsylvania: 16CI05219.

The **"Becker-Hensler Settlement Agreement"** shall mean the Settlement Agreement and Release dated March 6, 2025, between and among **Hensler**, **Susan Hensler**, **WMS**, **WSAJT**, **HC Global**, Comtrol Acquisition, LLC, **BWMS**, and **Becker America**.

The **"Becker-Quinn Settlement Agreement"** shall mean the Settlement Agreement and Release effective as of August 29, 2024, between and among **Quinn**, **Comtrol**, **Comtrol-WEST**, **BWMS**, and **Becker-America** and any amendments thereto, including, but not limited to, the First Amendment to Settlement Agreement and Release dated August 8, 2025.

**"Malpractice Counsel"** shall mean, collectively, Feldman Shepherd Wolhgelernter Tanner Weinstock Dodig LLC (**"Feldman Shepherd"**) and The Beasley Law Firm, LLC (**"The Beasley Firm"**).

The **"Continental Policy"** shall mean insurance Policy No. 652389050, issued by Continental Casualty Company, for the policy period 12/01/2022 through 12/01/2023, in the amount of [redacted]

The **"North River Policy"** shall mean insurance Policy No. 550-116075-6 issued by The North River Insurance Company, for the policy period 12/01/2022 through 12/01/2023, in the amount of [redacted].

The **"Settlement Payment"** shall mean the payment by or on behalf of **SGK** to the IOLTA accounts of **Malpractice Counsel** on behalf of **Becker**, including without limitation to **Hensler**, **Susan Hensler**, **WMS**, **Quinn**, **Comtrol**, and **Comtrol-WEST**, of the remaining applicable per claim policy limits of the **Continental Policy** and the **North River Policy**, in an aggregate amount not less than [redacted] Dollars ($[redacted]

## GENERAL RELEASE AND SETTLEMENT AGREEMENT

For and in consideration of the **Settlement Payment**, as further set forth in Section G of the **Release**, and for other valuable consideration as set forth herein, the **Parties** agree as follows:

A. **Becker**, on behalf of himself, herself and itself and all predecessor and successor entities, and all of their respective present or former officers, attorneys, directors, principals, agents, employees, servants, shareholders, independent contractors, representatives, and insurance companies, and the heirs, administrators and executors and/or successors and assigns each thereof, hereby release, remise, hold harmless and

forever discharge **SGK** and all of their respective present or former officers, attorneys, directors, principals, agents, employees, servants, shareholders, independent contractors, representatives, and insurance companies, and the heirs, administrators and executors and/or successors and assigns of each thereof, from any and all liabilities, claims, causes of action, suits, debts, damages, damages for any alleged ethics violations, judgments, costs, expenses, attorneys' fees, interest, sanctions, contributions and demands of whatever kind, description or nature, whether in law or in equity, that **Becker** ever had, now has, or may have in the future arising from the **Litigation**.

B. **SGK** on behalf of himself, herself and itself and all predecessors and successor entities, and all of their respective present or former officers, attorneys, directors, principals, agents, employees, servants, shareholders, independent contractors, representatives, and insurance companies, and the heirs, administrators and executors and/or successors and assigns each thereof, hereby release, remise, hold harmless and forever discharge **Becker,** and all of their respective present or former officers, attorneys, directors, principals, agents, employees, servants, shareholders, independent contractors, representatives, and insurance companies, and the heirs, administrators and executors and/or successors and assigns of each thereof, from any and all liabilities, claims, causes of action, suits, debts, damages, damages for any alleged ethics violations, judgments, costs, expenses, attorneys' fees, interest, sanctions, contributions and demands of whatever kind, description or nature, whether in law or in equity, that **SGK** ever had, now has, or may have in the future arising from the **Litigation**.

C. The **Parties** agree and understand that the releases set forth in Sections A and B are full, complete, and general releases (i) of **SGK** by **Becker** and (ii) of **Becker** by **SGK**. The **Parties** further expressly waive and assume the risk of any and all claims for damages which are not set forth herein which exist as of this date, which the **Parties** do not know of or suspect to exist, whether through ignorance, oversight, error, negligence, or otherwise and which, if known, would materially affect their decision to enter into this **Release**. **Becker** further agrees that it has accepted payment of the sums specified herein as a complete compromise of matters involving disputed issues of law and fact and fully assumes the risk that the facts or the law may be otherwise than they believe.

For the avoidance of doubt, **Becker's** release set forth in Section A shall not apply to the mutual rights, claims, and obligations arising under the **Becker-Hensler Settlement Agreement** and/or the **Becker-Quinn Settlement Agreement**, nor shall the release set forth in Section A affect the claims filed by **BWMS** against Debtors Hensler and Susan Hensler (**"Debtors"**) in Debtors' Chapter 11 bankruptcy at Bankruptcy Docket No. 24-20441 in the United States Bankruptcy Court for the Western District of Pennsylvania ("**Bankruptcy Court**"). Moreover, the **Parties**' releases set forth in Sections A and B shall not apply to the **Parties'** rights to enforce the terms of this **Release**. Notwithstanding anything in this **Release** to the contrary, no agreements between or among the **Becker** parties themselves (including but not limited to, the **Becker-Hensler Settlement Agreement** and/or the **Becker-Quinn Settlement**

**Agreement**) shall affect or negate any provision of this **Release** between **Becker** and **SGK**.

D. Each **Becker** entity and individual represents and warrants, in their respective capacity, to the best of their knowledge, that there is no third-party lien or other encumbrance on this **Release** or the consideration payable hereunder. Except as set forth in the **Becker-Hensler Settlement Agreement** and the **Becker-Quinn Settlement Agreement**, **Becker** represents and warrants that no person or entity other than **Becker** has, or has had, any interest in the claims, demands, obligations, or causes of action that **Becker** has asserted or could have asserted against **SGK**, and that **Becker** has the sole right and exclusive authority to execute this **Release** and receive the sums specified in it, subject only to the approval of the **Bankruptcy Court**, as set forth further herein.

E. This **Release** shall not be construed as an admission of liability by any **Party**. Rather, it is an amicable compromise of contested claims to avoid the significant expense and the risks of litigation, notwithstanding **SGK's** vigorous dispute of all claims asserted against **SGK**.

F. **Debtors** (meaning Hensler and Susan Hensler) shall seek approval of this **Release** by the **Bankruptcy Court** as follows.

1. The **Debtors** shall prepare a written motion to the **Bankruptcy Court** seeking an order approving this **Release** (the "**Approval Motion**"), in accordance with Federal Rule of Bankruptcy Procedure 9019, Local Rule 9019-1 of the **Bankruptcy Court**, Judge Taddonio's Procedures, and the **Bankruptcy Court's** ruling on the **Motion to Seal** (as defined below). The **Approval Motion** may state that the **Debtors** are seeking approval in good faith and consistent with their fiduciary duties to the bankruptcy estate, and that given the amount of available insurance coverage and competing claims, the prospect of a greater recovery is unlikely. The **Debtors** shall provide a draft of the **Approval Motion** to **SGK**, **BWMS**, and the **Quinn Parties** for comment in advance of filing. Any comments provided thereto shall be considered in good faith and not unreasonably denied.

2. Prior to the **Debtors** filing the **Approval Motion**, **SGK** shall prepare and file a Motion to Seal, in accordance with Local Rule 5005-20 of the **Bankruptcy Court** (the "**Motion to Seal**"). Attached to the Motion to Seal, SGK shall include a redacted **Approval Motion,** which will redact material terms of the **Approval Motion, Release** and related exhibits that the **Parties** seek to maintain as confidential, including, but not limited to: (i) the amount of the settlement with the **Debtors** and **WMS**; (ii) the amount of the settlement with the **Quinn Parties**; and (iii) the limits of **SGK's** malpractice insurance policies.

The **Motion to Seal** shall reference, as reasons for confidential treatment of the **Release**, (i) the protective order entered in the Court of Common Pleas of Westmoreland County, (ii) the presence of commercial information in the case, and

(iii) the confidentiality provisions of the **Release**. **SGK** may represent that the **Debtors** and **BWMS** do not object to the **Motion to Seal**. **SGK** shall provide a draft of the **Motion to Seal** to the **Debtors** and **BWMS** for comment in advance of filing. Any comments provided thereto shall be considered in good faith and not unreasonably denied.

Pursuant to Local Bankruptcy Rule 5005-20, within two business days of filing the Motion to Seal, SGK shall deliver to the Clerk's Office by hand or overnight courier an unredacted copy of the Approval Motion.

**SGK** agrees that the legal **fees** and expenses incurred to prepare and present the **Motion to Seal** will erode the remaining policy limits by the lesser of (i) the amount of the incurred fees and expenses or (ii) $10,000.

If **SGK's** Motion **to Seal** is not granted by the **Bankruptcy Court**, this **Release** will remain fully enforceable.

3. The **Approval Motion** shall specify that 68.34% of the **Settlement Payment** shall be apportioned to the **Hensler Parties' Malpractice Action** and 31.66% of the Settlement **Payment** shall be apportioned to the **Quinn Parties' Malpractice Action**, and that the respective allocations of the **Settlement Payment** shall be distributed in accordance with the **Becker-Hensler Settlement Agreement**, as approved by the **Bankruptcy Court** at ECF Docket No. 253, "*Debtors' Motion for an Order Approving Settlement Agreement By and Among the Debtors, Becker/Wholesale Mine Supply, LLC, Becker Global-America, Inc. and other Related Entities*," and the **Becker-Quinn Settlement Agreement**.

4. **SGK** will schedule the **Motion to Seal** cooperatively with the **Debtors** and **BWMS** using self-scheduling so as to give other creditors notice and an opportunity to object and/or appear to obtain further information at the hearing. The **Debtors** will schedule the **Approval Motion** cooperatively with **SGK**, **BWMS**, and the **Quinn Parties** using self-scheduling so as to give other creditors notice and an opportunity to object and/or appear to obtain further information at the hearing.

5. After the **Bankruptcy Court** rules on the **Motion to Seal**, the **Debtors** shall promptly file the **Approval Motion** in accordance with the **Bankruptcy Court's** Order.

6. If the **Bankruptcy Court** denies the **Motion to Seal**, in whole or in part, it shall not be a breach of this **Release** for the **Debtors** to attach the **Release** to the **Approval Motion** and/or describe the terms of the **Release** in the **Approval Motion**, provided that the **Debtors'** disclosures are consistent with the **Bankruptcy Court's** ruling on the **Motion to Seal**.

7. Should the **Bankruptcy Court** not grant the **Approval Motion** and/or not enter an order approving this **Release**, the **Release** shall be deemed null and void and unenforceable as to all **Parties.**

G. The **Settlement Payment** shall be made as follows:

1. The amount of the **Settlement Payment** shall be the greater of (i) the combined remaining proceeds of SGK's $[redacted] **Continental Policy** and $[redacted] **North River Policy** after the carriers' payment of SGK's defense fees and costs incurred in conjunction with the **Litigation**, or (ii) [redacted] Thousand Dollars ($[redacted]

2. Within ten (10) days after the **Bankruptcy Court** approves the **Release**, Continental Casualty Company will identify in writing the remaining balance of the **Continental Policy** after the payment of defense fees and costs and provide a summary reconciliation of such fees and costs to **Becker** in the same format previously provided by **SGK's** counsel to **Becker's** counsel. A good faith estimate of the remaining applicable policy limits was previously provided, but **Becker** acknowledges that the reconciliation may alter that estimate. **Becker** acknowledges that no amount beyond the remaining limits will be paid to **Becker,** as long as the amount is at least [redacted]

3. **SGK** shall make the **Settlement Payment**, or cause its insurer(s) to make the **Settlement Payment** on **SGK's** behalf, within thirty (30) calendar days after (i) **Becker** delivers to **SGK** the signed **Release**; (ii) **Becker** delivers to **SGK** W-9 forms for the payees and (iii) the **Bankruptcy Court** approves the **Release**.

4. Sixty-eight and thirty-four hundredths percent (68.34%) of the **Settlement Payment** shall be made payable to Feldman Sheperd Wohlgelenter Weinstock Dodig LLP PA IOLTA Account and delivered to Feldman Shepherd at 1845 Walnut Street, 21st Floor, Philadelphia, PA 19103.

5. Thirty-one and sixty-six hundredths percent (31.66%) of the **Settlement Payment** shall be made payable to The Beasley Law Firm, LLC PA Interest on Lawyer's Trust Account and delivered to **The Beasley Firm** at 1125 Walnut Street, Philadelphia, PA 19107.

H. Except as set forth in the **Becker-Hensler Settlement Agreement** and the **Becker-Quinn Settlement Agreement**, the **Parties** hereto agree to pay their own respective counsel fees, court costs, and litigation expenses; provided, however, that the **Parties** hereto understand and agree that Continental Casualty Company will pay the fees, court costs, and litigation expenses incurred by **SGK** in defense of the **Litigation**.

I. The **Parties** shall maintain as confidential the terms of this **Release** and all non-public information obtained in this **Litigation**, including without limitation all investigations, mediations, and settlement negotiations. The **Parties** agree that neither they nor their attorneys or representatives shall comment on, publicize or cause to be disclosed to any person or entity, either verbally, in written form or in any other manner, any of the facts, terms or conditions of this **Release**, except (i) as may be required by law, subpoena, or compulsory legal process, (ii) by the **Parties** for tax and/or accounting purposes, (iii) to secure **Bankruptcy Court** approval as stated herein, (iv) to enforce the terms of the **Release**, and/or (v) as ordered by a court of competent jurisdiction, in which case reasonable efforts shall be undertaken to keep the **Release** confidential. If a party is served with a demand to produce confidential terms of this **Release**, that party shall provide written notice of such demand to the other **Parties** and take reasonable measures to oppose such demand and/or obtain an appropriate confidentiality order against further production.

The **Parties** and their attorneys and representatives further agree not to disparage any of the other **Parties** in any public communications. If a third party inquires regarding resolution of the **Litigation**, the **Parties** are permitted to merely state that the matter between them has been resolved amicably and without admission of fault or liability by any of the **Parties**.

The **Parties** hereto acknowledge that this confidentiality provision is a material term of this **Release**. No portion of the **Settlement Payment** represents consideration for the mutual promise to maintain strict confidentiality of all the terms of this **Release**. Rather, the **Parties** expressly have agreed that each other's reciprocal confidentiality covenant is the sole consideration given in exchange for that of the other.

Should it be adjudicated by a final order of the Court of Common Pleas of Allegheny County, Pennsylvania, which, if applicable, is affirmed on appeal by the Pennsylvania Superior Court and/or Pennsylvania Supreme Court, that any of the **Parties** violated this confidentiality provision, the specific party determined to be in breach shall pay the reasonable legal fees and expenses of the enforcing party incurred to enforce the confidentiality provision.

J. To the extent that any individual or entity encompassed within the definition of Becker incurs any tax obligations from the actual or constructive receipt of proceeds from the Settlement Payment, such tax obligations shall be the obligation of that individual or entity (provided, however, that this paragraph does not alter or abrogate any agreements among and between such individuals and entities). If any taxes, penalties, interest, tax liens, or tax claims (collectively, "Tax Obligation") are asserted against SGK arising from the Settlement Payment as a result of the failure of any individual or entity encompassed within the definition of Becker to pay any Tax Obligation (the "Delinquent Party"), the Delinquent Party shall indemnify SGK with respect to such Tax Obligation. No Party to this Release is relying upon any other party for tax advice, and no Party has made any representations as to potential tax obligations relating to or arising from this Release.

K. All pending cases that are part of the **Litigation** that have not yet already been discontinued with prejudice will be discontinued with prejudice on the docket within twenty (20) days of paying the **Settlement Payment** as required by Section G.

L. Upon discontinuance of the Litigation, **SGK** may destroy or confidentially discard the physical file at its discretion.

M. **SGK's** ediscovery vendor, KLDiscovery, will create a flat file backup and export to an external hard drive all of the electronic documents preserved and/or produced in discovery in the **Litigation and provide that hard drive to SGK. SGK will hold that hard drive** for a period of not less than one (1) year after the date of discontinuance of any pending **Litigation** (the **"Retention Period"**). After the one-year **Retention Period** has expired, **SGK** may, in its sole discretion, destroy the external hard drive. After KLDiscovery creates the hard drive, it is authorized to destroy its workspace database and all associated data.

N. This **Release** shall be binding upon and inure to the benefit of the **Parties** as well as their heirs, successors, transferees, and assigns.

O. The terms of this **Release** shall be construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to its rules regarding choice of laws and any terms provided for in this **Release** shall be enforced exclusively in the Court of Common Pleas of Allegheny County, Pennsylvania.

P. All notices required to be provided hereunder must be in writing and sent to the address identified below or in a subsequent notice. All notices must be given (a) by personal delivery, (b) by prepaid certified or registered mail, return receipt requested, or (c) by prepaid recognized next business day delivery service. Notices will be effective upon receipt.

If to Becker:

Mark W. Tanner, Esq.
Gregory B. Heller, Esq.
Feldman Shepherd Wohlgelernter
Tanner Weinstock Dodig LLP
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103

James E. Beasley, Jr., M.D., LL.M.
The Beasley Firm, LLC
1125 Walnut Street
Philadelphia, PA 19107
Edmond M. George, Esq.
Obermayer, Rebmann Maxwell & Hippel
1500 Market Street, Suite 3400
Philadelphia, PA 19103

Brian Thompson, Esq.
Thompson Law Group, P.C.
301 Smith Drive, Suite 6
Cranberry Township, PA 16066

Jay D. Marinstein, Esq.
Patrick L. Abramowich, Esq.
Fox Rothschild LLP
Six PPG Place, Suite 1000
Pittsburgh, PA 15222

If to SGK:

Bethann R. Lloyd, Esq.
Burns White
48 26th Street
Pittsburgh, PA 15222

Q. The **Parties** acknowledge and represent that they have consulted with, or had an opportunity to consult with, independent legal counsel of their own choosing prior to entering into this **Release**.

R. The **Parties** agree that there are no other written or oral understandings or agreements, directly or indirectly, connected with this **Release**, except the **Becker-Hensler Settlement Agreement,** the **Becker-Quinn Settlement Agreement** and fee agreements between and among **Becker** relating to the **Litigation** to which **SGK** is not a party and shall not affect or negate any provision of this **Release** between **Becker** and **SGK**. This **Release** is the entire agreement between the **Parties** with respect to the subject matter hereof and it supersedes any prior agreements, promises, representations, or inducements, written or oral, expressed, or implied, except the **Becker-Hensler Settlement Agreement,** the **Becker-Quinn Settlement Agreement**, and the fee agreements between and among **Becker** relating to the **Litigation**, which shall remain in full force and effect. The **Parties** acknowledge and agree that they are entering into this **Release** as their voluntary act and are not relying upon any representations, promises, or inducements other than those expressly set forth herein.

S. This **Release** may be executed in one or counterparts, each of which is an original, and all of which together constitute only one agreement between the **Parties**. The **Parties** agree that the executed Release may be delivered by means of electronic mail or DocuSign. It is understood and agreed that any copy of this **Release** may be considered as effective for any purpose as if it were the original.

T. The **Release** was prepared by the joint efforts of the **Parties** and shall be construed without consideration as to which party actually drafted this **Release**. No adverse rule of construction or interpretation shall be applied against any party as the drafting party of this **Release**.

**THE UNDERSIGNED HEREBY DECLARE THAT THEY HAVE FULLY READ AND UNDERSTAND THE TERMS OF THIS RELEASE; THAT THE SETTLEMENT PAYMENT IDENTIFIED HEREIN IS THE SOLE PAYMENT TO BE EXCHANGED AS CONSIDERATION FOR THIS RELEASE; AND THAT THEY HAVE REVIEWED THIS RELEASE WITH THEIR OWN INDEPENDENT CHOSEN COUNSEL AND ACCEPT THE SAME FOR THE PURPOSE OF MAKING AN AMICABLE COMPROMISE AND SETTLEMENT OF A DISPUTED CLAIM.**

IN WITNESS WHEREOF, the undersigned hereunto set forth their hand and seal intending to be legally bound hereby this 12th day of October 2026.

**Representative of Becker/Wholesale Mine Supply, LLC**

Gregory A. Sanders
**Print Name:**

[signature]
**Signature:**

10/16/2026, **2026**

**Date:**
**(By signing on behalf of Becker/Wholesale Mine Supply, LLC, I warrant I have authority to bind Becker/Wholesale Mine Supply, LLC to the within Release.)**

EXECUTION COPY

**Representative of Becker Global America, Inc.**

GREGORY A. SANDERS
**Print Name:**

______________________________
**Signature:**

10/16/2026__________________, **2026**
**Date:**
**(By signing on behalf of Becker Global America, Inc., I warrant I have authority to bind Becker Global America, Inc. to the within Release.)**

**Representative of Becker Mining Systems, A.G.**

______________________________
**Print Name:**

______________________________
**Signature:**

______________________________, **2026**
**Date:**
**(By signing on behalf of Becker Mining Systems A.G., I warrant I have authority to bind Becker Mining Systems, A.G. to the within Release.)**

**Gregory A. Sanders**

______________________________
**Signature:**

10/16/2026__________________, **2026**
**Date:**

**Wolfgang Wegener**

______________________________
**Signature:**

______________________________, **2026**
**Date:**



186930758.6

EXECUTION COPY

**Representative of Becker Global America, Inc.**

______________________________
**Print Name:**

______________________________
**Signature:**

______________________________, **2026**
**Date:**
**(By signing on behalf of Becker Global America, Inc., I warrant I have authority to bind Becker Global America, Inc. to the within Release.)**

**Representative of Becker Mining Systems, A.G.**
Prof. Dr. Wolfgang Wegener
CO-CEO
______________________________
**Print Name:**

______________________________
**Signature:**

13/10/, **2026**
**Date:**
**(By signing on behalf of Becker Mining Systems A.G., I warrant I have authority to bind Becker Mining Systems, A.G. to the within Release.)**

**Gregory A. Sanders**

______________________________
**Signature:**

______________________________, **2026**
**Date:**

**Wolfgang Wegener**

______________________________
**Signature:**

13/10/, **2026**
**Date:**



186930758.6

EXECUTION COPY

**Max Brinckman**

______________________________
**Signature:**

15/10/_____________________, **2026**
**Date:**

**Franz Becker**

______________________________
**Signature:**

13/10/_____________________, **2026**
**Date:**

**Alan J. Quinn**

______________________________
**Signature:**

______________________________, **2026**
**Date:**

**Representative of Comtrol Corp.**

______________________________
**Print Name:**

______________________________
**Signature:**

______________________________, **2026**
**Date:**
**(By signing on behalf of Comtrol Corp., I warrant I have authority to bind Comtrol Corp. to the within Release.)**

**Max Brinckman**

____________________________
**Signature:**

__________________________, **2026**
**Date:**

**Franz Becker**

____________________________
**Signature:**

__________________________, **2026**
**Date:**

**Alan J. Quinn**

[signature]
**Signature:**

10 /12, **2026**
**Date:**

**Representative of Comtrol Corp.**

Alan J. Quinn
**Print Name:**

[signature]
**Signature:**

10 /12, **2026**
**Date:**
**(By signing on behalf of Comtrol Corp., I warrant I have authority to bind Comtrol Corp. to the within Release.)**

EXECUTION COPY

**Representative of Comtrol-WEST, LLC**

Alan J. Quinn
______________________________
**Print Name:**

______________________________
**Signature:**

10/12______________________, **2026**
**Date:**
**(By signing on behalf of Comtrol-WEST, LLC, I warrant I have authority to bind Comtrol-WEST, LLC to the within Release.)**

**Representative of Hensler Communications Consultants, L.P. d/b/a HC Global**

______________________________
**Print Name:**

______________________________
**Signature:**

______________________________, **2026**
**Date:**
**(By signing on behalf of Hensler Communications Consultants, L.P. d/b/a HC Global, I warrant I have authority to bind Hensler Communications Consultants, L.P. d/b/a HC Global to the within Release.)**

**Representative of Wholesale Mine Supply, L.P.**

______________________________
**Print Name:**

______________________________
**Signature:**

______________________________, **2026**
**Date:**
**(By signing on behalf of Wholesale Mine Supply, L.P., I warrant I have authority to bind Wholesale Mine Supply, L.P. to the within Release.)**

EXECUTION COPY

**Representative of Comtrol-WEST, LLC**

______________________________
**Print Name:**

______________________________
**Signature:**

______________________________, **2026**
**Date:**
**(By signing on behalf of Comtrol-WEST, LLC, I warrant I have authority to bind Comtrol-WEST, LLC to the within Release.)**

**Representative of Hensler Communications Consultants, L.P. d/b/a HC Global**

William H Hensler JR.
**Print Name:**

[signature]
**Signature:**

10/12/2026, **2026**
**Date:**
**(By signing on behalf of Hensler Communications Consultants, L.P. d/b/a HC Global, I warrant I have authority to bind Hensler Communications Consultants, L.P. d/b/a HC Global to the within Release.)**

**Representative of Wholesale Mine Supply, L.P.**

William H Hensler JR
**Print Name:**

[signature]
**Signature:**

10/12/2026, **2026**
**Date:**
**(By signing on behalf of Wholesale Mine Supply, L.P., I warrant I have authority to bind Wholesale Mine Supply, L.P. to the within Release.)**

**Representative of WSAJT Properties, L.P.**

William H Hensler Jr
**Print Name:**

**Signature:**

10/12/2026, **2026**
**Date:**
**(By signing on behalf of WSAJT Properties, L.P., I warrant I have authority to bind WSAJT Properties, L.P. to the within Release.)**

**William H. Hensler Jr.**

William H Hensler Jr
**Signature:**

10/12, **2026**
**Date:**

**Susan J. Hensler**

Susan J. Hensler
**Signature:**

10/12, **2026**
**Date:**

**Representative of Sherrard, German & Kelly, P.C.**

Matt A. Jarrell
**Print Name:**

**Signature:**

October 20, **2026**
**Date:**
**(By signing on behalf of Sherrard, German, & Kelly, P.C., I warrant I have authority to bind Sherrard, German, & Kelly, P.C. to the within Release.)**

EXECUTION COPY

**Stanley J. Lehman**

Stanley J. Lehman
______________________________
**Signature:**

10/16/ , **2026**
______________________________
**Date:**

**Christopher J. Davis**

______________________________
**Signature:**

______________________________, **2026**
**Date:**

**Jennifer P. Richnafsky**

______________________________
**Signature:**

______________________________, **2026**
**Date:**

EXECUTION COPY

**Stanley J. Lehman**

______________________________
**Signature:**

______________________________, **2026**
**Date:**

**Christopher J. Davis**

______________________________
**Signature:**

October 16, **2026**
**Date:**

**Jennifer P. Richnafsky**

______________________________
**Signature:**

______________________________, **2026**
**Date:**

EXECUTION COPY

**Stanley J. Lehman**

______________________________
**Signature:**

______________________________, **2026**
**Date:**

**Christopher J. Davis**

______________________________
**Signature:**

______________________________, **2026**
**Date:**

**Jennifer P. Richnafsky**

Jennifer P. Richnafsky
**Signature:**

10/20/2026, **2026**
**Date:**



186930758.6

Doc ID: 6e629ec119361b1f92ec3096baeb65d924cc0838

# Exhibit A

# EXHIBIT A

## Methodology for Allocation of Settlement Proceeds

All capitalized terms not otherwise defined in this Exhibit A have the same meanings ascribed to them in the Full and Final General Release and Settlement Agreement (the "Malpractice Actions Settlement Agreement").

**I. Methodology.**

**A. *Pro Rata* Allocation of Insurance Proceeds Between the Hensler Parties and the Quinn Parties**

The proceeds of the Continental Policy and the North River Policy (collectively, the "Insurance Proceeds") are available to satisfy (i) the claims of Debtors Hensler and Susan Hensler and WMS (collectively, the "Hensler Parties") in the Hensler Parties' Malpractice Action and (ii) the claims of Quinn, Comtrol, and Comtrol-WEST (collectively, the "Quinn Parties") in the Quinn Parties' Malpractice Action (the Hensler Parties' Malpractice Action and the Quinn Parties' Malpractice Action are collectively referred to as the "Malpractice Actions."

The damages that the Hensler Parties and Quinn Parties are seeking to recover in the Malpractice Actions consist principally of (i) the values of the judgments that BWMS and Becker America (collectively, the "Becker Parties") obtained against the Hensler Parties and the Quinn Parties in the litigation consolidated at Docket Number 16CI05219 in the Court of Common Pleas of Westmoreland County, Pennsylvania (the "Underlying Lawsuit") and the corresponding prejudgment interest, where applicable, and post-judgment interest, and (ii) the attorneys' fees and costs that the Hensler Parties and the Quinn Parties paid in connection with the Underlying Lawsuit.

Accordingly, under the scenario that one or both of the Malpractice Actions settle prior to obtaining a verdict, the Hensler Parties and the Quinn Parties agreed to calculate (i) the values of the judgments obtained against them in the Underlying Lawsuit (the "Judgments"), including their corresponding interest calculations and (ii) the attorneys' fees and costs that they incurred in connection with the Underlying Lawsuit (the "Fees and Costs") and allocate the Insurance Proceeds between them *pro rata* based upon their respective percentages of the total Judgments and Fees and Costs, collectively, applying the following formula:

(a) The Hensler Parties' proportionate share of the Insurance Proceeds is (i) the value of the Becker Parties' aggregate Judgments against the Hensler Parties, including

applicable interest, plus the Fees and Costs paid by the Hensler Parties in connection with the Underlying Lawsuit, divided by (B) the aggregate value of the Becker Parties' Judgments against the Hensler Parties and the Quinn Parties collectively, including applicable interest, plus Fees and Costs paid by the Hensler Parties and the Quinn Parties, collectively, in connection with the Underlying Lawsuit.

(b) The Quinn Parties' proportionate share of the Insurance Proceeds is (i) the value of the Becker Parties' aggregate Judgments against the Quinn Parties, including applicable interest, plus the Fees and Costs paid by the Quinn Parties in connection with the Underlying Lawsuit, divided by (B) the aggregate value of the Becker Parties' Judgments against the Hensler Parties and the Quinn Parties collectively, including applicable interest, plus Fees and Costs paid by the Hensler Parties and the Quinn Parties, collectively, in connection with the Underlying Lawsuit.

**B. Calculation and Deduplication of Judgments Against the Hensler Parties and the Quinn Parties.**

The Judgments that the Becker Parties filed against the Hensler Parties and the Quinn Parties are based upon calculations prepared for trial by the Becker Parties' damages expert, William Krieger ("Krieger") of Gleason, as of July 1, 2021. To the extent that the Court permitted the Becker Parties to recover prejudgment interest, i.e., for contract-based claims, the Judgments reflect the addition of prejudgment interest for the period July 1, 2021 to the date of the Judgment.

To calculate the total value of the Judgments against the Hensler Parties and the Quinn Parties before deduplication, the parties (i) began with the amounts of the Judgments entered against the Hensler Parties and Quinn Parties in the Lawsuit; (ii) calculated prejudgment interest from July 1, 2021 through the date of the Judgment on the breach of contract portion of the Judgments; (iii) added the face amount of the Judgment and the allowable prejudgment interest; (iv) calculated post-judgment interest through September 30, 2026; and (v) calculated the total current value of the Judgments, which incorporates prejudgment interest and post-judgment interest.

The Judgments against the Hensler Parties and the Quinn Parties in the Underlying Lawsuit are based upon the Becker Parties' lost sales. To avoid duplication in the value of the Judgments, the parties eliminated portions of the Judgments against the Hensler Parties as a group and against the Quinn Parties as a group, to the extent those Judgments were based on the same lost sales. For the Hensler Parties, the parties eliminated duplicative damages among Hensler, Susan Hensler and WMS. Likewise, for the Quinn Parties, the parties eliminated duplicative damages among Quinn, Comtrol, and Comtrol-West. The end result is that the Hensler Parties, as a group, are not being credited twice for the same lost sales on which the Judgments are based and the Quinn Parties, as a group, are not being credited twice for the same lost sales. For example, BWMS' Judgment against Susan Hensler for breach of her Employment Agreement is entirely duplicative of a portion

of BWMS' Judgment entered against William Hensler for tortious interference with Susan Hensler's Employment Agreement, since both are based on the same sales by HC Global. Accordingly, the duplicative amount was considered in the value of the Judgment against Susan Hensler (where it is subject to prejudgment interest) and excluded from the value of the Judgment entered against Hensler (where it is not subject to prejudgment interest). Likewise, the parties eliminated duplicative damages that exist regarding the Judgments against Comtrol and Alan Quinn.

Based on this methodology, the parties (i) calculated the total **non-duplicative** Judgments entered against the Hensler Parties and the Quinn Parties, respectively, and (ii) added to those amounts the Fees and Costs paid by the Hensler Parties and the Quinn Parties, respectively, to derive the respective percentages of the total Judgments and Fees and Costs attributable to the Hensler Parties and the Quinn Parties. The parties concluded that **68.34%** of the non-duplicative Judgments and Fees and Costs were attributable to the Hensler Parties and **31.66%** of the non-duplicative Judgments and Fees and Costs were attributable to the Quinn Parties. Accordingly, the parties seek to have **68.34%** of the Insurance Proceeds allocated to the Hensler Parties and **31.66%** of the Insurance Proceeds allocated to the Quinn Parties.

The calculations supporting these allocations are set forth in Section II below.

## II. Allocation Calculations.

### A. Hensler Parties

#### 1. Hensler

a. Filed Judgment: $12,318,575 plus prejudgment interest for applicable claims from July 1, 2021

b. Subtract $1,002,994[1] => $11,315,581

c. Add prejudgment interest on breach of contract claims

---

[1] The sum of $1,002,994 represents sales made by HC Global from 2011 through 2014, which violated Susan Hensler's Employment Agreement. Accordingly, it represents damages for both (i) Hensler's tortious interference with Susan Hensler's Employment Agreement and (ii) Susan Hensler's breach of her Employment Agreement. *See* Supplemental Report of William G. Krieger dated December 19, 2022 ("Supplemental Krieger Report") at p. 6, Table 2 at Line 9 (Net Damages Against William Hensler) and at p. 7, Table 4 at Line 1 (Net Damages Against Susan Hensler). A true and correct copy of the Supplemental Krieger Report is attached hereto as Exhibit A.1. Because the damages for Susan Hensler's breach of her Employment Agreement are subject to prejudgment interest and the damages for Hensler's tortious interference with Susan Hensler's Employment Agreement are not subject to prejudgment interest, per the trial Court's rulings, the sum of $1,002,994 has been subtracted from the total current value of the judgment against William Hensler and included in the total current value of the non-duplicative judgment against Susan Hensler.

(i) Breach of Contract Damages Subject to Prejudgment Interest: $2,630,721[2]

(ii) Date of Judgment: January 26, 2024

(iii) Prejudgment Interest, 7/1/21 to 1/26/24: $406,500.45

(iv) $11,315,581 + $406,500.45 = $11,722,081.45

d. Add post-judgment interest for the period January 27, 2024 to September 30, 2026: $11,722,081.45 + $1,882,598.40 = $13,604,679.85

e. **Total Current Value of Non-Duplicative Judgment: $13,604,679.85**

**2. Susan Hensler**

a. Breach of Contract Damages: $1,561,507[3]

b. Add Prejudgment Interest, July 1, 2021 to January 26, 2024: $1,561,507 + $241,284.92 = $1,802,791.92

c. Add Post-Judgment Interest, January 27, 2024 to September 30, 2026: $1,802,791.92 + $289,533.32 = $2,092,325.24

d. **Total Current Value of Non-Duplicative Judgment: $2,092,325.24**

**3. Wholesale Mine Supply**

**a. BWMS v. WMS**

**(i) Non-Duplicative Portion of Judgment:** $1,424,498 plus prejudgment interest starting on July 1, 2021

---

[2] The breach of contract damages assessed against William Hensler are set forth in the Supplemental Krieger Report (Exhibit A.1 hereto) at p. 6, Table 2, lines 1, 2, and 3, *i.e.*, $1,581,462 for Comtrol sales from June 9, 2012 through January 22, 2016, $96,156 for HC Global sales covering 2010, and $140,810 for improper business expenses. Krieger's calculations of prejudgment interest on those amounts through June 30, 2021 are set forth in Trial Exhibit 1288-A on page 1, Comtrol Sales ($1,581,462 + $675,516 = $2,256,978), page 2, HC Global sales ($96,156 + $63,305 = $159,461), and page 3, improper business expenses ($140,809 + $73,473 = $214,282). A true and correct copy of Trial Exhibit 1288-A is attached hereto as Exhibit A.2. These amounts total $2,630,721.

[3] *See* Trial Exhibit 1288-A (Exhibit A.2 hereto) at p. 2, Sales Made by HC Global Which Violate Non-Competition Obligations, Susan Hensler Employment Agreement: $1,002,994 + $558,513 = $1,561,507.

(x) Non-Duplicative Comtrol Sales Included in Judgment: $1,395,141[4]

(y) Non-Duplicative HC Global Sales Included in Judgment: $29,357[5]

**(ii) Add Plus Prejudgment Interest**

(x) Date of Judgment: January 26, 2024

(y) Prejudgment Interest, 7/1/21 to 1/26/24: $1,424,498 + $220,114.21 = $1,644,612.21

**(iii)** Add Post-Judgment Interest, January 27, 2024 to September 30, 2026**:** $1,644,612.21 + $264,129.23 = $1,908,741.44

**(iv) Total Current Value of Non-Duplicative Portion of Judgment: $1,908,741.44**

**b. Becker America v. WMS**

**Net Judgment Agreed Upon per Settlement:** $3,305,312.55 as of December 31, 2024, plus post-judgment interest starting on January 1, 2025

**Post-judgment Interest, January 1, 2025 to September 30, 2026:** $346,106.97

**Total Current Value of Judgment: $3,651,419.52**

**TOTAL NON-DUPLICATIVE HENSLER JUDGMENTS: $21,257,166.05**

**TOTAL HENSLER FEES AND COSTS: $1,757,030.33**[6]

**TOTAL HENSLER JUDGMENTS, FEES, AND COSTS: $23,014,196.38**

---

4 *See* Trial Exhibit 1288-A (Exhibit A.2 hereto) at p. 1, Sales Made by Comtrol Which Violate Non-Competition Obligations, WMS Non-Competition Agreement damages of $3,652,119 minus William Hensler's duplicative Employment damages of $2,256,987 = $1,395,141.

5 *See* Trial Exhibit 1288-A (Exhibit A.2 hereto) at p. 2, Sales Made by HC Global Which Violate Non-Competition Obligations, WMS Non-Competition Agreement damages of $188,818 minus William Hensler's duplicative Employment Agreement damages of $159,461 = $29,357.

6 A summary of Hensler's fees and costs incurred in connection with the Underlying Lawsuit is attached as Exhibit A.3. The column titled "After $380,000 adjustment" reflects the equity value in certain real estate that Mr. Hensler transferred to Mr. Quinn during the Underlying Lawsuit in consideration of Mr. Quinn becoming responsible to pay SGK's fees and expenses moving forward.

## B. Quinn Parties

### 1. Alan Quinn

a. **Filed Judgment:** $5,783,787 plus prejudgment interest on Count XI only starting on July 1, 2021

b. Count XI, Breach of Employment Agreement, subject to prejudgment interest: $5,769,269[7]

(i) Date of Judgment: February 1, 2024

(ii) Prejudgment Interest, 7/1/21 to 2/1/24: $897,160.85

c. **Filed Judgment Plus Prejudgment Interest:** $6,680,947.85

d. **Post-judgment Interest, February 2, 2024 to September 30, 2026:** $1,066,389.10

e. **Total Current Value of Judgment: $7,747,336.95**

### 2. Comtrol

a. **Non-Duplicative Judgment:** $294,141[8]

Date of Judgment: February 1, 2024

b. **Post-judgment Interest, February 1, 2024 to September 30, 2026:** $46,998.09

c. **Total Current Value of Judgment: $341,139.09**

### 3. Comtrol-West

a. **Filed Judgment:** $378,501

Date of Judgment: January 26, 2024

b. **Post-judgment Interest, January 26, 2024 to September 30, 2026:** $60,850.52

---

[7] *See* Trial Exhibit 1288-A (Exhibit A.2 hereto) at p. 1, Sales Made by Comtrol Which Violate Non-Competition Obligations, Alan Quinn Employment Agreement, which lists damages of $4,481,948 and prejudgment interest through June 30, 2021 of $1,287,322 for total damages of $5,769,269. The slightly larger judgment entered against Quinn, $5,783,787, includes unjust enrichment damages of $14,517, which represent improper payments that BWMS paid on Quinn's behalf for non-existent "consulting services." *See* Supplemental Krieger Report (Exhibit A.1 hereto) at p. 7, Table 5, Line 1.

[8] Notice of Entry of Judgment (PA.R.C.P. 236) entered against Comtrol in the Court of Common Pleas of Westmoreland County on February 1, 2024 in the amount of $6,063,410, minus duplicative Comtrol sales that violate Alan Quinn Employment Agreement of $5,769,269.

c. **Total Current Value of Judgment: $439,351.52**

**TOTAL NON-DUPLICATIVE QUINN JUDGMENTS: $8,527,827.56**

**TOTAL QUINN FEES AND COSTS: $2,132,342.92**[9]

**TOTAL QUINN JUDGMENTS, FEES, AND COSTS: $10,660,170.48**

**TOTAL NON-DUPLICATIVE JUDGMENTS, FEES, AND COSTS – ALL DEFENDANTS: $33,674,366.86**

**HENSLER % ALLOCATION OF SETTLEMENT: 68.34%**

**QUINN % ALLOCATION OF SETTLEMENT : 31.66%**

[9] A summary of Quinn's fees and costs is attached hereto as Exhibit A.4. The column titled "After $380,000 adjustment" reflects the equity value in certain real estate that Mr. Hensler transferred to Mr. Quinn during the Underlying Lawsuit in consideration of Mr. Quinn becoming responsible to pay SGK's fees and expenses moving forward.

# Exhibit A.1

GLEASON EXPERTS

In the Court of Common Pleas of
Westmoreland County, Pennsylvania
Civil Division

Becker/Wholesale Mine Supply, LLC and
Becker Global America, Inc.,

v.

William H. Hensler, Jr., Susan J. Hensler, Wholesale Mine Supply, L.P., Comtrol Corp., Alan J. Quinn, Joseph A. DiBridge, Hensler Communications Consultants, L.P. d/b/a HC Global, and Comtrol-West, LLC.

Case No. 16CI06330
Consolidated at Case No. 16CI05219

# Supplemental Report of William G. Krieger

**Gleason Experts**

December 19, 2022

# TABLE OF CONTENTS

I. Background ... 2
II. Objectives of the Engagement ... 2
III. Tasks Performed and Methodology ... 3
IV. Analysis of Total Damages by Hensler Defendant - BWMS ... 4
a. William Hensler ... 4
b. Susan Hensler ... 6
c. Alan Quinn ... 7
d. Joseph DiBridge ... 8
e. Comtrol ... 9
f. WMS ... 10
g. HC Global ... 10
h. Comtrol-West ... 11
i. Summary of Total Net Damages to BWMS by Defendant ... 11
V. Analysis of Total Damages to Becker America by Defendant ... 12
VI. Additional Damages – Forfeiture and Severance ... 12
VII. Alternative Damages – Acquisition of Comtrol ... 14
VIII. Prejudgment Interest ... 16
IX. Supplemental Summary of Damages for Civil Conspiracy and Tortious Interference ... 19
IX. Supplemental Summary of Prejudgment Interest on Tort Claims ... 20

## I. BACKGROUND

1. The Court held a non-jury trial to address the (i) the claims asserted by William H. Hensler, Jr. ("Mr. Hensler"), Wholesale Mine Supply, L.P. ("WMS"), and WSAJT Properties, L.P. (collectively, the "Hensler Plaintiffs") against Becker/Wholesale Mine Supply ("BWMS") and Becker Global-America, Inc. ("Becker America") and (ii) the claims asserted by BWMS and Becker America against Mr. Hensler, Susan J. Hensler ("Mrs. Hensler"), WMS, Comtrol Corp. ("Comtrol"), Alan J. Quinn ("Mr. Quinn"), Joseph A. DiBridge ("Mr. DiBridge"), Hensler Communications Consultants, L.P. d/b/a HC Global ("HC Global"), and Comtrol-West, LLC ("Comtrol-West") (collectively, the "Hensler Defendants").

2. On August 22, 2022, the Court issued an Opinion and Order of Court finding in favor of BWMS and Becker America against the Hensler Defendants on 18 separate counts ("Opinion").

3. In paragraph 39 of the Court's Order dated August 22, 2022, the Court stated that the "Parties may raise any issues with regard to damages (including any removal and/or recalculation of duplicative damages) in their motion(s) for post-trial relief."

## II. OBJECTIVES OF THE ENGAGEMENT

4. We have been engaged by Fox Rothschild LLP ("Counsel") on behalf of BWMS and Becker America to analyze and offer opinions, within a reasonable degree of accounting and professional certainty, regarding the total damages that should be awarded against each of the Hensler Defendants based on the Opinion after considering any potential duplication inherent in the damages calculations.[1]

5. In addition, we have been engaged by counsel to calculate prejudgment interest on the total damages attributable to each of the Hensler Defendants.

6. Finally, we were asked to separately present damages, including prejudgment interest, for Civil Conspiracy against Comtrol, Mr. Hensler, Mr. Quinn and Mr. DiBridge (Count XVI) and Tortious Interference against Comtrol (Count VIII). As will be noted in the discussion that follows, we eliminated these damages as duplicative for the purpose of quantifying total net damages against each of the Hensler Defendants based on the Court's findings in the Opinion.

[1] This report does not address the Court's findings related to the Hensler Plaintiffs' claims against the BWMS Defendants.

## III. TASKS PERFORMED AND METHODOLOGY

7. Section IV of this report provides the total net damages to BWMS against each Hensler Defendant using the following methodology:

   - We first identified all gross damages included in the Opinion for each Count and each Hensler Defendant.

   - We then identified the applicable timeframe and product sales used in each of the damages calculations, as determined in the expert report filed in this matter on December 6, 2019 ("Krieger Report," Trial Exhibit 923) and adjusted for any difference between figures in the Krieger Report and the Court's findings in the Opinion.

   - Based on a comparison of the revenue and profits underlying the damages awarded for each Count, we eliminated any damage calculations that were duplicative, for the purpose of quantifying total net damages against each of the Hensler Defendants based on the Court's findings in the Opinion.

8. Section V identifies the total net damages to Becker America following the same methodology outlined above related to damages to BWMS.

9. Section VI provides alternative calculations to include forfeiture and severance damages, should the Court grant BWMS' post-trial motions regarding those claims.

10. Section VII provides alternative calculations assuming the Court grants BWMS' post-trial motion giving BWMS the opportunity to acquire Comtrol for the purchase price paid to Mr. Hensler by Mr. Quinn (which the Court found to be a breach of Mr. Hensler's fiduciary duty, and found Mr. Quinn, Mrs. Hensler and Comtrol liable for aiding and abetting Mr. Hensler's breaches of fiduciary duty).

11. Section VIII provides prejudgment interest figures for the contract damages awarded in the Opinion and the alternative calculations based on BWMS' post-trial motion seeking the Court to award prejudgment interest on all tort claims asserted against the Hensler Defendants, in addition to the contract claims.

12. Section IX provides a separate presentation of damages and prejudgment interest for Count XVI (civil conspiracy) and Count VIII (tortious interference), without regard to any potential duplication with other Counts.

## IV. ANALYSIS OF TOTAL DAMAGES BY HENSLER DEFENDANT - BWMS

### A. William Hensler

13. The following table summarizes the damages for each of the counts in which the Opinion found in favor of BWMS against Mr. Hensler:

***Table 1 – BWMS Gross Damages Against William Hensler***

| Line | Description | Timeframe | Amount |
|---|---|---|---|
| 1 | I. Breach of Employment Agreement - Comtrol | 06/9/12 - 01/22/16 | $ 1,581,462 |
| 2 | I. Breach of Employment Agreement – HC Global | 1/29/10 - 12/31/10 | 96,156 |
| 3 | I. Breach of Employment Agreement – Expenses | 2010 - 2016 | 140,810 |
| 4 | II. Breach of Fiduciary Duty – Comtrol | 06/9/12 - 01/22/16 | 1,581,462 |
| 5 | II. Breach of Fiduciary Duty – Comtrol Sale | 01/22/16 – 10/10/19 | 8,573,912 |
| 6 | II. Breach of Fiduciary Duty – HC Global | 01/29/10 - 12/31/10 | 96,156 |
| 7 | III. Tortious Interference – A. Quinn | 07/9/12 - 01/22/16 | 1,632,306 |
| 8 | III. Tortious Interference – J. DiBridge | 4/21/14 - 01/22/16 | 998,469 |
| 9 | III. Tortious Interference – S. Hensler | 01/1/11 - 12/31/14 | 1,002,994 |
| 10 | XVI. Civil Conspiracy | 06/9/12 - 10/10/19 | 4,542,051 |

14. The damages associated with Lines 1, 4, 5, 7, 8 and 10 in Table 1 above all stem from sales diverted from BWMS to Comtrol. In addition, Lines 2, 6 and 9 in Table 1 above all stem from sales diverted from BWMS to HC Global. As further described below, we have examined each claim as to the timeframe in which BWMS suffered damages, and as to the specific product sales included in each claim, to identify and remove duplication of diverted sales made by Comtrol or HC Global instead of BWMS.

15. The $1,581,462 in damages related to Count II (breach of fiduciary duty against Mr. Hensler with regard to sales diverted to Comtrol and shown on Line 4 of Table 1 above) are identical to the damages for Count I against Mr. Hensler and shown on Line 1 of Table 1 above. As a result, for purposes of determining Mr. Hensler's total net damages to BWMS, it is appropriate to eliminate the $1,581,462 in damages for Count II against Mr. Hensler identified in Line 4 of Table 1.

16. The $96,156 in damages related to Count II (breach of fiduciary duty with regard to sales diverted to HC Global and shown on Line 6 of Table 1 above) are identical to the damages for Count I against Mr. Hensler and shown on Line 2 of Table 1 above. As a result, for purposes of determining Mr. Hensler's total net damages to BWMS, it is appropriate to eliminate the $96,156 in damages for Count II against Mr. Hensler identified in Line 6 of Table 1.

17. The $1,632,206 in damages related to Count III (tortious interference against Mr. Hensler with regard to Mr. Quinn's employment agreement shown on Line 7 of Table 1 above) are

based on sales diverted to Comtrol from July 9, 2012 to January 22, 2016. A substantial portion of these diverted sales are also included in Count I (shown on Line 1 of Table 1 above) and therefore should be eliminated when combined with Count I against Mr. Hensler. However, the diverted sales included in Counts I and III are not identical. Specifically, Count III damages related to Mr. Quinn's employment agreement include $110,947 of lost profits related to tunneling customers that were not included in Count I damages related to Mr. Hensler's employment agreement. Therefore, when determining Mr. Hensler's total net damages, it is appropriate to reduce the damages on Line 7 of Table 1 to $110,947 of non-duplicative damages for Count III.

18. The $998,469 in damages related to Count III (tortious interference against Mr. Hensler with regard to Mr. DiBridge's employment agreement shown on Line 8 of Table 1 above) include sales diverted to Comtrol from April 21, 2014 to January 22, 2016. BWMS' lost profits related to Comtrol's diverted sales during this period are entirely included in Count I on Line 1 of Table 1 above. Therefore, as a result, for purposes of determining Mr. Hensler's total net damages to BWMS, it is appropriate to eliminate the damages on Line 8 of Table 1 above.

19. The $1,002,994 in damages related to Count III (tortious interference against Mr. Hensler with regard to Mrs. Hensler's employment agreement shown on Line 9 of Table 1 above) include sales diverted to HC Global from January 1, 2011 to December 31, 2014, which coincides with the period that Susan Hensler owned HC Global. Such damages are not duplicative of any other damages in Table 1 and do not require adjustment.

20. The $4,542,051 in damages related to Count XVI (civil conspiracy against Mr. Hensler, Mr. Quinn, Mr. DiBridge and Comtrol included on Line 10 of Table 1 above) is the sum total of all lost profits suffered by BWMS from June 9, 2012 to October 10, 2019, excluding any duplicative amounts during that period of time.[2] We determined the damages for Count XVI as the $4,481,948 in damages stemming from sales diverted to Comtrol related to the breach of Mr. Quinn's employment agreement plus $60,103 in damages that are related to Mr. Hensler's employment agreement but not Mr. Quinn's employment agreement.[3] We

[2] Count XVI damages are identified in the Opinion as $10,135,293. However, that amount sums damages against all four Hensler Defendants named in Count XVI. Because the lost profit damages related to Comtrol's competing sales are calculated for overlapping timeframes, it is appropriate to reduce the Count XVI damages stated in the Opinion to eliminate duplication, even before considering its relationship to other counts. In addition, it appears the $10,125,293 included in the Opinion inadvertently includes prejudgment interest despite the Court's finding in the Opinion that prejudgment should not apply to tort claims. Based on the Opinion, the correct amount of damages regarding conspiracy is $4,542,051. We have excluded prejudgment interest from this portion of the analysis, which is addressed in Sections VIII and IX below.

[3] The $60,103 of damages identified here relate to sales diverted to Comtrol from June 9, 2012 to July 9, 2012 and to international sales from June 9, 2012 to January 22, 2016. Such sales are included within the $1,581,462 of damages in Count I against Mr. Hensler but excluded from the $4,481,948 of damages in Count XI against Mr. Quinn.

also determined that the entire amount of damages for Count XVI against Mr. Hensler is also included within the damages related to Counts I and III against Mr. Hensler. Therefore, it is appropriate to eliminate the damages on Line 10 of Table 1 above when determining Mr. Hensler's total net damages.

21. The following table summarizes the total net damages to BWMS against Mr. Hensler, after eliminating all duplication:

***Table 2 – BWMS Net Damages Against William Hensler***

| Line | Description | Timeframe | Amount |
|---|---|---|---|
| 1 | I. Breach of Employment Agreement – Comtrol | 06/9/12 - 01/22/16 | $ 1,581,462 |
| 2 | I. Breach of Employment Agreement – HC Global | 01/29/10 - 12/31/10 | 96,156 |
| 3 | I. Breach of Employment Agreement – Expenses | 2010 - 2016 | 140,810 |
| 5 | II. Breach of Fiduciary Duty – Comtrol Sale | 01/22/16 – 10/10/19 | 8,573,912 |
| 7 | III. Tortious Interference – A. Quinn | 07/9/12 - 01/22/16 | 110,947 |
| 9 | III. Tortious Interference – S. Hensler | 01/1/11 - 12/31/14 | 1,002,994 |
| | | **Total** | **$ 11,506,281** |

## B. Susan Hensler

22. The following table summarizes the damages for each of the counts in which the Opinion found in favor of BWMS against Mrs. Hensler:

***Table 3 – BWMS Gross Damages Against Susan Hensler***

| Line | Description | Timeframe | Amount |
|---|---|---|---|
| 1 | XIV. Breach of Employment Agreement | 01/1/11 - 12/31/14 | $ 1,002,994 |
| 2 | XV. Aiding and Abetting – Comtrol Sale | 01/22/16 – 10/10/19 | 8,573,912 |
| 3 | XXI. Fraudulent Conveyance | 07/25/2018 | 238,330 |
| 4 | XXII. Breach of Fiduciary Duty | 07/25/2018 | 238,330 |

23. In Counts XXI and XXII, the Court found that the transfer of HC Global's assets to Comtrol in July 2018 left HC Global with insufficient assets to pay its liability to BWMS. The damages related to Counts XXI and XXII are calculated as the value of HC Global's tangible assets as of the date of the fraudulent transfer. It would overcompensate BWMS to receive both (1) damages stemming from sales diverted to HC Global ($1,002,994 on Line 1 of Table 3 above) and (2) the value of the assets fraudulently transferred from HC Global to avoid the liability related to those diverted sales. Therefore, it is appropriate to

eliminate the amounts on Line 3 and 4 of Table 3 above when determining Mrs. Hensler's total net damages.

24. The following table summarizes the total net damages to BWMS against Mrs. Hensler, after eliminating all duplication:

***Table 4 - BWMS Net Damages Against Susan Hensler***

| Line | Description | Timeframe | Amount |
|---|---|---|---|
| 1 | XIV. Breach of Employment Agreement | 01/1/11 - 12/31/14 | $ 1,002,994 |
| 2 | XV. Aiding and Abetting – Comtrol Sale | 01/22/16 – 10/10/19 | 8,573,912 |
| | | Total | **$ 9,576,906** |

## C. Alan Quinn

25. The following table summarizes the damages for each of the counts in which the Opinion found in favor of BWMS against Mr. Quinn:

***Table 5 - BWMS Gross Damages Against Alan Quinn***

| Line | Description | Timeframe | Amount |
|---|---|---|---|
| 1 | X. Unjust Enrichment | 02/1/15 - 07/1/15 | $ 14,517 |
| 2 | XI. Breach of Employment Agreement | 07/9/12 - 10/10/19 | 4,481,948 |
| 3 | XII. Aiding and Abetting – Comtrol Sale | 01/22/16 – 10/10/19 | 8,573,912 |
| 4 | XVI. Civil Conspiracy | 06/9/12 - 01/22/16 | 4,542,051 |
| 5 | XXI. Fraudulent Conveyance | 07/25/2018 | 238,330 |

26. The $4,481,948 in damages related to Count XI (breach of contract/employment agreement shown on Line 2 of Table 5 above) result from the sales diverted to Comtrol from July 9, 2012 to October 10, 2019. The damages for Count XII (aiding and abetting breach of fiduciary duty with regard to the sale of Comtrol on Line 3 of Table 5 above) also stem from sales diverted to Comtrol from January 22, 2016 to October 10, 2019. Therefore, for purposes of determining Mr. Quinn's total net damages to BWMS, it is appropriate to reduce the damages related to Count XI by $2,849,642 to exclude damages in Count XI related to diverted sales after January 22, 2016. The remaining damages related to Count XI are $1,632,306, or BWMS' lost profits related to Comtrol's competing sales from July 9, 2012 to January 22, 2016.[4]

27. With regarding to Count XII (aiding and abetting breach of fiduciary duty), we understand that BWMS contends the Opinion erred in omitting damages against Quinn relating to sales

[4] Note that this amount is identical to the damages calculated in Count III against Mr. Hensler related to his tortious interference with Mr. Quinn's employment agreement during the same period of time, July 9, 2012 to January 22, 2016.

diverted from BWMS to Comtrol from June 9, 2012 to January 1, 2016, or the period of time that Mr. Quinn aided and abetted Mr. Hensler's breaches of his fiduciary duty arising from Comtrol's sales before Comtrol was sold to Mr. Quinn. As explained in the Krieger Report and adopted by the Court in the Opinion, BWMS' damages from the sales diverted to Comtrol during that period of time are $1,581,462. However, we have not adjusted the table above to include damages to BWMS against Mr. Quinn for this amount, as we have also determined that the damages are duplicative with Counts XI, XII and XVI against Mr. Quinn.

28. With regard to Count XVI (civil conspiracy against Mr. Hensler, Mr. Quinn, Mr. DiBridge and Comtrol), we have adjusted the amount referenced in the Opinion to be $4,542,051 as explained in Section IV.A., and as shown in Line 4 of Table 5 above. Additionally, we determined that the majority of the damages to BWMS for Count XVI are also included within the damages related to Counts XI and XII against Mr. Quinn. Therefore, for purposes of determining Mr. Quinn's total net damages to BWMS, we have reduced the damages on Line 4 of Table 5 above by $4,481,948. The remaining damages to BWMS against Mr. Quinn related to Count XVI (civil conspiracy) are $60,103 which is the amount of damages awarded to BWMS related to Mr. Hensler's employment agreement that is not also included in the damages related to Mr. Quinn's employment agreement.

29. The following table summarizes the total net damages to BWMS against Mr. Quinn, after eliminating all duplication:

***Table 6 - BWMS Net Damages Against Alan Quinn***

| Line | Description | Timeframe | Amount |
|---|---|---|---|
| 1 | X. Unjust Enrichment | 02/1/15 - 07/1/15 | $ 14,517 |
| 2 | XI. Breach of Employment Agreement | 07/9/12 - 10/10/19 | 1,632,306 |
| 3 | XII. Aiding and Abetting – Comtrol Sale | 01/22/16 – 10/10/19 | 8,573,912 |
| 4 | XVI. Civil Conspiracy | 06/9/12 - 01/22/16 | 60,103 |
| 5 | XXI. Fraudulent Conveyance | 07/25/2018 | 238,330 |
| | | **Total** | **$ 10,519,168** |

## D. Joseph DiBridge

30. The following table summarizes the damages for each of the counts for which the Opinion found in favor of BWMS against Mr. DiBridge:

***Table 7 - BWMS Gross Damages Against Joseph DiBridge***

| Line | Description | Timeframe | Amount |
|---|---|---|---|
| 1 | XIII. Breach of Employment Agreement | 04/21/14 - 01/13/17 | $ 1,564,641 |
| 2 | XVI. Civil Conspiracy | 06/9/12 - 01/22/16 | 4,542,051 |

31. The damages for Count XVI (civil conspiracy) referenced in the Opinion have been adjusted as explained in Section IV.A above and are related to sales diverted to Comtrol from June 9, 2012 to October 10, 2019. As explained in the Opinion, all four named Hensler Defendants are joint and severally liable for Count XVI damages, including Mr. DiBridge. We have determined, however, that a portion of Count XVI damages are duplicative with the damages related to Count XIII (breach of employment agreement against Mr. DiBridge from April 21, 2014 to January 13, 2017). As a result, for purposes of determining Mr. DiBridge's total net damages to BWMS, it is appropriate to reduce the damages related to XVI by $1,564,641, or the amount awarded to BWMS against Mr. DiBridge for Count XIII.

32. The following table summarizes the total net damages to BWMS against Mr. DiBridge, after eliminating all duplication:

***Table 8 - BWMS Net Damages Against Joseph DiBridge***

| Line | Description | Timeframe | Amount |
|---|---|---|---|
| 1 | XIII. Breach of Employment Agreement | 04/21/14 - 01/13/17 | $ 1,564,641 |
| 2 | XVI. Civil Conspiracy | 06/9/12 - 01/22/16 | 2,977,410 |
| | | **Total** | **$ 4,542,051** |

## E. <u>Comtrol</u>

33. The following table summarizes the damages for each of the counts for which the Opinion found in favor of BWMS against Comtrol:

***Table 9 - BWMS Gross Damages Against Comtrol***

| Line | Description | Timeframe | Amount |
|---|---|---|---|
| 1 | VIII. Tortious Interference – W. Hensler | 06/9/12 - 01/22/16 | $ 1,581,462 |
| 2 | VIII. Tortious Interference – A. Quinn | 07/9/12 – 10/10/19 | 4,481,948 |
| 3 | VIII. Tortious Interference – J. DiBridge | 04/21/14 - 01/22/16 | 1,564,641 |
| 4 | IX. Aiding and Abetting – Comtrol Sale | 01/22/16 – 10/10/19 | 8,573,912 |
| 5 | IX. Aiding and Abetting – W. Hensler[5] | 06/9/12 - 01/22/16 | 1,581,462 |
| 6 | XVI. Civil Conspiracy | 06/9/12 – 10/10/19 | 4,542,051 |
| 7 | XXI. Fraudulent Conveyance | 07/25/2018 | 238,330 |

34. BWMS' damages against Comtrol related to Count VIII (tortious interference shown on Lines 1-3 of Table 9 above) stem from sales diverted to Comtrol from June 9, 2012 to October 10, 2019 in violation of the employment agreements of Messrs. Hensler, Quinn and DiBridge. The majority of these lost profits are overlapping with regard to timeframe

[5] The Court found damages related to Count IX for diverted sales from BWMS in the amount of $2,256,978. However, it appears the Court inadvertently included prejudgment interest in this amount, despite finding that prejudgment interest did not apply to Count IX. We have adjusted the Court's finding to $1,581,462, or the amount identified in the Krieger Report, excluding prejudgment interest which is discussed further in Section VIII below.

and are duplicative with Count IX (which includes damages from June 9, 2012 to present). Therefore, for purposes of determining Comtrol's total net damages to BWMS, it is appropriate to reduce damages related to Count VIII to $110,947, or the damages associated with diverted sales to tunneling customers from July 9, 2012 to January 1, 2022, which are included in damages for Count VIII but not included in damages for Count IX.

35. As with other Hensler Defendants, we have reduced the amount of damages related to Count XVI (civil conspiracy) to $4,542,051. As the entire amount relates to sales diverted to Comtrol from June 9, 2012 to October 10, 2019, it is duplicative with the damages for Counts VIII and IX against Comtrol and therefore can be removed for purposes of determining total net damages to BWMS against Comtrol.

36. The following table summarizes the total net damages to BWMS against Comtrol, after eliminating all duplication:

***Table 10 – BWMS Net Damages Against Comtrol***

| Line | Description | Timeframe | Amount |
|---|---|---|---|
| 1 | VIII. Tortious Interference – A. Quinn | 07/9/12 – 01/22/16 | $ 110,947 |
| 2 | IX. Aiding and Abetting – W. Hensler | 07/9/12 – 01/22/16 | 1,581,462 |
| 3 | IX. Aiding and Abetting – Comtrol Sale | 01/22/16 – 10/10/2019 | 8,573,912 |
| 4 | XXI. Fraudulent Conveyance | 07/25/2018 | 238,330 |
| | | **Total** | **$ 10,504,651** |

### F. WMS

37. The Court found in favor of BWMS against WMS for one claim: Count VII (breach of contract as it relates to competing sales by Comtrol and HC Global). There is no duplication in the damages awarded to BWMS against WMS for Count VII. Therefore, BWMS' total net damages against WMS are as stated in the Opinion:

***Table 11 – BWMS Net Damages Against WMS***

| Line | Description | Timeframe | Amount |
|---|---|---|---|
| 1 | VII. Breach of Contract (Comtrol) | 06/9/12 – 01/22/16 | $ 2,554,373 |
| 2 | VII. Breach of Contract (HC Global) | 1/29/10 – 12/31/10 | 113,859 |
| | | **Total** | **$ 2,668,232** |

### G. HC Global

38. The following table summarizes the damages for each of the counts in which the Opinion found in favor of BWMS against HC Global:

***Table 12 – BWMS Gross Damages Against HC Global***

| Line | Description | Timeframe | Amount |
|---|---|---|---|
| 1 | XVII. Tortious Interference | 01/29/2010 – 12/31/10 | $ 96,156 |
| 2 | XVII. Tortious Interference | 1/1/11 – 12/31/14 | 1,002,994 |
| 3 | XXI. Fraudulent Conveyance | 7/25/2018 | 238,330 |

39. As explained in Section IV.B above, damages related to Count XXI (fraudulent conveyance) are duplicative with the claims BWMS has against HC Global related to sales diverted from BWMS. As a result, we have eliminated the damages for Count XXI for purposes of determining HC Global's total net damages to BWMS.

40. The following table summarizes the total net damages to BWMS against HC Global, after eliminating all duplication:

***Table 13 – BWMS Net Damages Against HC Global***

| Line | Description | Timeframe | Amount |
|---|---|---|---|
| 1 | XVII. Tortious Interference | 01/29/2010 – 12/31/10 | $ 96,156 |
| 2 | XVII. Tortious Interference | 01/1/11 – 12/31/14 | 1,002,994 |
| | | **Total** | $ 1,099,150 |

## H. <u>Comtrol-West</u>

41. The Court found in favor of BWMS against Comtrol-West for one claim: Count XIX (tortious interference with contractual relations). There is no duplication in the damages awarded to BWMS against Comtrol-West for Count XIX. Therefore, BWMS' total net damages against Comtrol-West are as stated in the Opinion and shown below:

***Table 14 – BWMS Net Damages Against Comtrol-West***

| Line | Description | Timeframe | Amount |
|---|---|---|---|
| 1 | XIX. Tortious Interference | | $ 757,003 |
| | | **Total** | **$ 757,003** |

42. We understand that BWMS entered into a Settlement Agreement and Release with David and Rebecca Wallace (the "Wallaces") in October 2022 in which the Wallaces, as a 50 percent owner of Comtrol-West, agreed to pay $378,501.48 to BWMS in four equal installments of $94,625.37 payable on October 31, 2022, November 30, 2022, December 31, 2022 and January 31, 2023. We also understand that in exchange for these payments, BWMS agreed to provide a release to the Wallaces related to its claim against Comtrol-West and to reduce the amount of any judgment entered against Comtrol-West in this litigation by the total payments to be made by the Wallaces. As a result, and based on the assumption that the Wallaces will make all of the required installment payments, we have

reduced the damages identified in Line 1 of Table 14 above by $378,501.48 (the total amount the Wallaces have agreed to pay).

43. The following table summarizes the total net damages to BWMS against Comtrol-West, after considering BWMS' Settlement Agreement and Release with the Wallaces:

***Table 15 – BWMS Net Damages Against Comtrol-West***

| Description | Timeframe | Amount |
|---|---|---|
| XIX. Tortious Interference | | $ 378,501 |
| | **Total** | **$ 378,501** |

## I. Summary of Total Net Damages to BWMS by Defendant

44. The following table summarizes the analyses above regarding total net damages to BWMS for each Hensler Defendant, before consideration of (1) BWMS' post-trial motions for forfeiture and severance damages, (2) BWMS' claim for imposition of a constructive trust affording BWMS the opportunity to acquire Comtrol, and (3) prejudgment interest:

***Table 16 – BWMS Net Damages Against Hensler Defendants***

| Defendant | Amount |
|---|---|
| William Hensler | $ 11,506,281 |
| Susan Hensler | 9,576,906 |
| Alan Quinn | 10,519,168 |
| Joseph DiBridge | 4,542,051 |
| Comtrol | 10,504,651 |
| WMS | 2,668,232 |
| HC Global | 1,099,150 |
| Comtrol-West | 378,501 |

# V. ANALYSIS OF TOTAL DAMAGES TO BECKER AMERICA BY DEFENDANT

45. The Court found in favor of Becker America against the Hensler Defendants on Counts V, XXI and XXII, as shown below:

***Table 17 – Becker America Gross Damages Against Hensler Defendants***

| Count | Defendant(s) | Amount |
|---|---|---|
| V. Breach of Contract | WMS | $ 2,384,447 |
| XXI. Fraudulent Conveyance | HC Global | 238,330 |
| XXI. Fraudulent Conveyance | Comtrol | 238,330 |
| XXI. Fraudulent Conveyance | A. Quinn | 238,330 |
| XXI. Fraudulent Conveyance | S. Hensler | 238,330 |
| XXII. Breach of Fiduciary Duty | S. Hensler | 238,330 |

46. There is no duplication of damages with regard to Count V (breach of contract related to Section 7.01 of the Contribution Agreement). Becker America's damages against Mrs. Hensler for Counts XXI and XXII are duplicative with each other and therefore should be consolidated to one number for purposes of determining the total net damages to Becker America against Mrs. Hensler.

47. The following table summarizes the total net damages to Becker America against each Hensler Defendant, after eliminating all duplication per defendant and before consideration of prejudgment interest:

***Table 18 – Becker America Gross Damages Against Hensler Defendants***

| Count | Defendant(s) | Amount |
|---|---|---|
| V. Breach of Contract | WMS | $ 2,384,447 |
| XXI. Fraudulent Conveyance | HC Global | 238,330 |
| XXI. Fraudulent Conveyance | Comtrol | 238,330 |
| XXI. Fraudulent Conveyance | A. Quinn | 238,330 |
| XXI. Fraudulent Conveyance | S. Hensler | 238,330 |

## VI. ADDITIONAL DAMAGES – FORFEITURE AND SEVERANCE

48. We understand that, in addition to the damages provided in the Opinion, per its post-trial motions, BWMS is seeking the forfeiture of compensation paid by BWMS to Mr. Hensler, Mrs. Hensler, Mr. Quinn and Mr. DiBridge as relief for the breach of contract claims described in Counts I, XI, XIII, and XIV. Additionally, in its post-trial motion, we understand BWMS is separately seeking damages stemming from severance payments Mr. Hensler directed BWMS to make to Mrs. Hensler and Mr. DiBridge as relief for the breach of contract claims described in Counts I, XIII, and XIV.

49. The following table summarizes the compensation paid to the Hensler Defendants during the relevant periods of time, as described in the Krieger Report[6] and in BWMS' and Becker America's Post-Trial Findings of Fact and Conclusions of Law.[7]

[6] Krieger Report, paragraphs 130 – 131.
[7] BMWS' and Becker America's Post-Trial Findings of Fact and Conclusions of Law, paragraphs 1463-1466 and 1507-1511. The compensation figures for Messrs. Quinn and DiBridge above are reduced from the amounts shown in the Krieger Report to reflect the appropriate timeframe for which BWMS claims damages.

***Table 19 - Forfeiture of Compensation***

| | W. Hensler | S. Hensler | J. DiBridge | A. Quinn |
|---|---|---|---|---|
| **2010** | $ 286,380 | $ 181,773 | $ - | $ - |
| **2011** | 435,714 | 258,444 | - | - |
| **2012** | 428,759 | 521,068 | - | 29,715 |
| **2013** | 412,597 | - | - | 54,475 |
| **2014** | 362,647 | - | 83,240 | 57,219 |
| **2015** | 158,833 | - | 84,345 | 5,625 |
| **2016** | 139,173 | - | - | - |
| **Total** | **$ 2,224,102** | **$ 961,285** | **$ 167,585** | **$ 147,034** |

50. The compensation identified in the table above includes a $275,000 severance payment made to Mrs. Hensler in 2012 and $46,850 in severance payments made to Mr. DiBridge in 2015. We understand that BWMS is seeking damages for such severance payments as a separate form of relief from forfeiture. However, when determining total net damages for each Hensler Defendant, we have included the severance payments only once, should the Court find in favor of BWMS with regard to both its claim for forfeiture and its claim to recover damages related to the severance payments.

51. The following table provides an alternative determination of total net damages to the BMWS Plaintiffs per Hensler Defendant, assuming the Court finds in favor of BWMS with regard to its forfeiture and severance claims:

***Table 20 – Total Net Damages Against Hensler Defendants***

| Plaintiff | Defendant | Amount[8] | Forfeiture | Severance | Total |
|---|---|---|---|---|---|
| BWMS | William Hensler | $ 11,506,281 | 2,224,102 | 321,850 | $ 14,052,233 |
| BWMS | Susan Hensler[9] | 9,576,906 | 686,285 | 275,000 | 10,538,191 |
| BWMS | Alan Quinn | 10,519,168 | 147,034 | - | 10,666,202 |
| BWMS | Joseph DiBridge[10] | 4,542,051 | 120,735 | 46,850 | 4,709,636 |
| BWMS | Comtrol | 10,504,651 | - | - | 10,504,651 |
| BWMS | WMS | 2,668,232 | - | - | 2,668,232 |
| Becker America | WMS | 2,384,447 | - | - | 2,384,447 |
| BWMS | HC Global | 1,099,150 | - | - | 1,099,150 |
| BWMS | Comtrol-West | 378,501 | - | - | 378,501 |

[8] Dollars in this column reflect the damages presented in Tables 16 and 18. In addition to the amounts reflected in this table, the Opinion found HC Global, Comtrol, A. Quinn and S. Hensler liable to Becker America for fraudulent conveyance for $238,330. We have excluded Becker America's verdict of $238,330 from the analysis of total net damages by each Hensler Defendant because the same amount is already considered in the damages found for BWMS.
[9] Forfeiture for S. Hensler is equal to total compensation of $961,285 less $275,000 severance payment.
[10] Forfeiture for J. DiBridge is equal to $167,585 in compensation less $46,850 in severance payments.

## VII. ALTERNATIVE DAMAGES – ACQUISITION OF COMTROL

52. Mr. Hensler's sale of Comtrol to Mr. Quinn for $1 million was found by the Court to be a breach of fiduciary duty by Mr. Hensler (Count II),which was aided and abetted by Mr. Quinn (Count XII), Comtrol (Count IX), and Mrs. Hensler (Count XV). In BWMS' post-trial motion, we understand that BWMS is asking the Court to impose a constructive trust to provide BWMS the opportunity to acquire Comtrol for the $1 million purchase price paid by Mr. Quinn in 2016.

53. Should the Court find in favor of BWMS, we have provided an alternative calculation of total net damages for each of the Hensler Defendants, excluding any damages based on the value of Comtrol (which BWMS now seeks to receive through acquisition). To do so, we have first considered the methodology used to calculate damages in the Krieger Report, which was awarded in the Opinion for Counts II, XII, IX and XV as follows:

***Table 21 – Damages Related to Sale of Comtrol***

| | |
|---|---|
| Comtrol's Cash Flow from 01/22/2016 to 10/10/2019 | $ 1,911,406 |
| Valuation of Comtrol at 10/10/2019 | 7,683,612 |
| Purchase Price | (1,021,106) |
| Total Damages | $ 8,573,912 |

54. Should the Court find that BWMS can acquire Comtrol for $1 million, it is appropriate to reduce the damages above by $6,662,506, which is the valuation of Comtrol as of October 10, 2019, net of the purchase price. The remaining damages, $1,911,406 are still appropriate under Counts II, XII, IX and XV as those damages represent benefits that Comtrol and Mr. Quinn received (and BWMS was denied) in the past and which would not be cured through a current acquisition of Comtrol.

55. The following two tables provide the total net damages per each Hensler Defendant. The first table assumes the Court (i) finds that BWMS can acquire Comtrol and (ii) awards forfeiture and severance damages. The second table assumes the Court (i) finds that BWMS can acquire Comtrol, and (ii) denies forfeiture and severance damages.

***Table 22 – BWMS Total Net Damages Per Hensler Defendant – Including Forfeiture and Severance and Acquisition of Comtrol***

| Plaintiff | Defendant | Amount[11] | Comtrol Acquisition | Total |
|---|---|---|---|---|
| BWMS | William Hensler | $ 14,052,233 | $ (6,662,506) | $ 7,389,727 |
| BWMS | Susan Hensler | 10,538,191 | (6,662,506) | 3,875,685 |
| BWMS | Alan Quinn | 10,666,202 | (6,662,506) | 4,003,696 |
| BWMS | Joseph DiBridge | 4,709,636 | - | 4,709,636 |
| BWMS | Comtrol | 10,504,651 | (6,662,506) | 3,842,145 |
| BWMS | WMS | 2,668,232 | - | 2,668,232 |
| Becker America | WMS | 2,384,447 | - | 2,384,447 |
| BWMS | HC Global | 1,099,150 | - | 1,099,150 |
| BWMS | Comtrol-West | 378,501 | - | 378,501 |

***Table 23 – BWMS Total Net Damages Per Hensler Defendant – Without Forfeiture and Severance and Including Acquisition of Comtrol***

| Plaintiff | Defendant | Amount[12] | Comtrol Acquisition | Total |
|---|---|---|---|---|
| BWMS | William Hensler | $ 11,506,281 | $ (6,662,506) | $ 4,843,775 |
| BWMS | Susan Hensler | 9,576,906 | (6,662,506) | 2,914,400 |
| BWMS | Alan Quinn | 10,519,168 | (6,662,506) | 3,856,662 |
| BWMS | Joseph DiBridge | 4,542,051 | - | 4,542,051 |
| BWMS | Comtrol | 10,504,651 | (6,662,506) | 3,842,145 |
| BWMS | WMS | 2,668,232 | - | 2,668,232 |
| Becker America | WMS | 2,384,447 | - | 2,384,447 |
| BWMS | HC Global | 1,099,150 | - | 1,099,150 |
| BWMS | Comtrol-West | 378,501 | - | 378,501 |

## VIII. PREJUDGMENT INTEREST

56. The Court's Opinion provided for prejudgment interest on breach of contract claims contained in Counts I, V, VII, XI, XIII, and XIV. We understand that the BWMS Plaintiffs are currently requesting the Court to award prejudgment interest on all tort claims asserted against the Hensler Defendants, in addition to breach of contract claims. Accordingly, in **Exhibits A-D**, we have provided calculations of prejudgment interest both assuming that it is allowable only for breach of contract claims and assuming that it is allowable for both breach of contract and tort claims. All interest calculations are updated through August

[11] As shown in Table 20.
[12] As shown in Table 20.

22, 2022.[13]

57. For each calculation of damages and prejudgment interest in **Exhibits A-D**, we have also provided subtotals that exclude forfeiture and severance damages, should the Court deny BWMS' post-trial motions regarding those claims.

58. For BWMS' claim against Comtrol-West, we have calculated prejudgment interest on the amount of damages awarded in the Opinion, or $757,003, as payments pursuant to the Settlement Agreement and Release had not been received as of the date of the prejudgment interest calculation (August 22, 2022).

59. **In Exhibits C and D**, we have also provided alternative calculations assuming the Court grants BWMS' post-trial motion giving BWMS the opportunity to acquire Comtrol for the purchase price paid to Mr. Hensler by Mr. Quinn, both including and excluding prejudgment interest on all tort claims asserted against the Hensler Defendants, in addition to the contract claims.

60. Specifically, **Exhibit A** to this report calculates prejudgment interest for the total net damages to BWMS and Becker America against each Hensler Defendant, (i) assuming that BWMS does not acquire Comtrol, prejudgment interest applies to both contract and tort counts and, no severance or forfeiture damages are awarded[14] and alternatively (ii) assuming forfeiture and severance damages are awarded against Mr. Hensler, Mrs. Hensler, Mr. Quinn and Mr. DiBridge.[15] The following table summarizes total net damages and interest for each Hensler Defendant calculated on **Exhibit A**.[16]

---

[13] We understand that post-judgment interest begins on August 23, 2022 and is applied to all claims. The daily rate of interest can be determined by multiplying the damages (including any prejudgment interest) by 6.0 percent and dividing by 365.

[14] On **Exhibit A,** see line items titled "Subtotal Net Damages" against Mr. Hensler, Mrs. Hensler, Mr. Quinn and Mr. DiBridge and "Total Net Damages" against Comtrol, WMS, HC Global, and Comtrol-West.

[15] On **Exhibit A,** see line items titled "Total Net Damages" for parties, including Mr. Hensler, Mrs. Hensler, Mr. Quinn and Mr. DiBridge.

[16] In addition to the amounts reflected in this table, the Opinion found HC Global, Comtrol, A. Quinn and S. Hensler liable to Becker America for fraudulent conveyance for $238,330. We have excluded Becker America's claim for this figure from the analysis of prejudgment interest by Hensler Defendant and from **Exhibits A, B, C and D** because the same amount is already considered in the damages found for BWMS.

*Table 24 –Net Damages For No Acquisition of Comtrol, Prejudgment Interest on Tort and Contract Claims, and Forfeiture and Severance*

| | Net Damages | Interest on Net Damages | Forfeiture/ Severance | Interest on Forfeiture/ Severance | Grand Total |
|---|---|---|---|---|---|
| BWMS v. W. Hensler | $ 11,506,281 | $ 3,044,126 | $ 2,545,952 | $ 1,472,496 | $ 18,568,856 |
| BWMS v. S. Hensler | 9,576,906 | 2,056,389 | 961,285 | 622,854 | 13,217,434 |
| BWMS v. A. Quinn | 10,519,168 | 2,326,855 | 147,034 | 78,402 | 13,071,459 |
| BWMS v. J. DiBridge | 4,542,051 | 1,622,020 | 167,585 | 76,895 | 6,408,551 |
| BWMS v. Comtrol | 10,504,651 | 2,321,344 | - | - | 12,825,995 |
| BWMS v. WMS | 2,668,232 | 1,356,046 | - | - | 4,024,278 |
| Becker America v. WMS | 2,384,447 | 1,458,353 | - | - | 3,842,800 |
| BWMS v. HC Global | 1,099,150 | 697,343 | - | - | 1,796,493 |
| BWMS v. Comtrol-West | 378,501 | 180,681 | - | - | 559,182 |

61. **Exhibit B** to this report calculates prejudgment interest for the total net damages to BWMS and Becker America against each Hensler Defendant containing the same assumptions and alternative assumptions as contained in **Exhibit A**, except that prejudgment interest is awarded for contract claims only. The following table summarizes total net damages and interest for each Hensler Defendant calculated on **Exhibit B:**

*Table 25 – Net Damages For No Acquisition of Comtrol, Prejudgment Interest on Contract Claims Only, and Forfeiture and Severance*

| | Net Damages | Interest on Net Damages | Forfeiture/ Severance | Interest on Forfeiture/ Severance | Grand Total |
|---|---|---|---|---|---|
| BWMS v. W. Hensler | $ 11,506,281 | $ 937,868 | $ 2,545,952 | $ 1,472,496 | $ 16,462,598 |
| BWMS v. S. Hensler | 9,576,906 | 627,431 | 961,285 | 622,854 | 11,788,476 |
| BWMS v. A. Quinn | 10,519,168 | 804,403 | 147,034 | 78,402 | 11,549,008 |
| BWMS v. J. DiBridge | 4,542,051 | 649,155 | 167,585 | 76,895 | 5,435,686 |
| BWMS v. Comtrol | 10,504,651 | - | - | - | 10,504,651 |
| BWMS v. WMS | 2,668,232 | 1,356,046 | - | - | 4,024,278 |
| Becker America v. WMS | 2,384,447 | 1,458,353 | - | - | 3,842,800 |
| BWMS v. HC Global | 1,099,150 | - | - | - | 1,099,150 |
| BWMS v. Comtrol-West | 378,501 | - | - | - | 378,501 |

62. **Exhibit C** to this report calculates prejudgment interest for the total net damages to BWMS and Becker America against each Hensler Defendant for contract and tort counts, assuming the same assumptions and alternative assumptions as contained in **Exhibit A**, except that

BWMS is permitted to and decides to acquire Comtrol. The following table summarizes total net damages and interest for each Hensler Defendant calculated on **Exhibit C:**

***Table 26 – Net Damages For Acquisition of Comtrol, Prejudgment Interest on Tort and Contract Claims, and Forfeiture and Severance***

| | Net Damages | Interest on Net Damages | Forfeiture/ Severance | Interest on Forfeiture/ Severance | Grand Total |
|---|---|---|---|---|---|
| BWMS v. W. Hensler | $ 4,843,775 | $ 2,127,236 | $ 2,545,952 | $ 1,472,496 | $ 10,989,459 |
| BWMS v. S. Hensler | 2,914,400 | 1,139,498 | 961,285 | 622,854 | 5,638,037 |
| BWMS v. A. Quinn | 3,856,662 | 1,409,964 | 147,034 | 78,402 | 5,492,063 |
| BWMS v. J. DiBridge | 4,542,051 | 1,622,020 | 167,585 | 76,895 | 6,408,551 |
| BWMS v. Comtrol | 3,842,145 | 1,404,453 | - | - | 5,246,598 |
| BWMS v. WMS | 2,668,232 | 1,356,046 | - | - | 4,024,278 |
| Becker America v. WMS | 2,384,447 | 1,458,353 | - | - | 3,842,800 |
| BWMS v. HC Global | 1,099,150 | 697,343 | - | - | 1,796,493 |
| BWMS v. Comtrol-West | 378,501 | 180,681 | - | - | 559,182 |

63. **Exhibit D** to this report calculates prejudgment interest for the total net damages to BWMS and Becker America against each Hensler Defendant for contract claims only, assuming the same assumptions and alternative assumptions as contained in **Exhibit B** except that BWMS is permitted to and decides to acquire Comtrol. The following table summarizes total net damages and interest for each Hensler Defendant calculated on **Exhibit D:**

***Table 27 – Net Damages For Acquisition of Comtrol, Prejudgment Interest on Contract Claims Only, and Forfeiture and Severance***

| | Net Damages | Interest on Net Damages | Forfeiture/ Severance | Interest on Forfeiture/S everance | Grand Total |
|---|---|---|---|---|---|
| BWMS v. W. Hensler | $ 4,843,775 | $ 937,868 | $ 2,545,952 | $ 1,472,496 | $ 9,800,092 |
| BWMS v. S. Hensler | 2,914,400 | 627,431 | 961,285 | 622,854 | 5,125,970 |
| BWMS v. A. Quinn | 3,856,662 | 804,403 | 147,034 | 78,402 | 4,886,502 |
| BWMS v. J. DiBridge | 4,542,051 | 649,155 | 167,585 | 76,895 | 5,435,686 |
| BWMS v. Comtrol | 3,842,145 | - | - | - | 3,842,145 |
| BWMS v. WMS | 2,668,232 | 1,356,046 | - | - | 4,024,278 |
| Becker America v. WMS | 2,384,447 | 1,458,353 | - | - | 3,842,800 |
| BWMS v. HC Global | 1,099,150 | - | - | - | 1,099,150 |
| BWMS v. Comtrol-West | 378,501 | - | - | - | 378,501 |

## IX. SUPPLEMENTAL SUMMARY OF DAMAGES FOR CIVIL CONSPIRACY AND TORTIOUS INTERFERENCE

64. At counsel's request, we have calculated prejudgment interest on the damages awarded under BWMS' (i) Civil Conspiracy claim against Mr. Hensler, Mr. Quinn, Mr. DiBridge and Comtrol (Count XVI) and (ii) Tortious Interference claims against Comtrol regarding Mr. Hensler's, Mr. Quinn's, and Mr. DiBridge's breaches of their employment agreements with BWMS (Count VIII) and presented these damages without considering the duplication of damages with other counts when determining total net damages. In both instances, the damages are equal to BWMS' lost profit on all sales diverted to Comtrol from June 9, 2012 to October 10, 2019, or $4,542,051.

65. The following tables summarize total damages and interest related to Count XVI and Count VIII, before elimination of duplicative damages:

***Table 28 – Count XVI (Civil Conspiracy) Damages***

| Defendant | Amount | Interest | Total |
|---|---|---|---|
| W. Hensler | $ 4,542,051 | $ 1,622,020 | $ 6,164,071 |
| A. Quinn | 4,542,051 | 1,622,020 | 6,164,071 |
| J. DiBridge | 4,542,051 | 1,622,020 | 6,164,071 |
| Comtrol | 4,542,051 | 1,622,020 | 6,164,071 |

***Table 29 – Count VIII (Tortious Interference) Damages***

| Defendant | Amount | Interest | Total |
|---|---|---|---|
| Comtrol | 4,542,051 | 1,622,020 | 6,164,071 |

## X. SUPPLEMENTAL SUMMARY OF PREJUDGMENT INTEREST ON TORT CLAIMS

66. At counsel's request, we have prepared the following table to summarize total damages and prejudgment interest on each of the tort claims for which the Opinion reached a verdict in favor of BWMS and/or Becker America, before consideration of any potential duplication with other counts:

***Table 30 - BWMS Gross Damages on Tort Claims, Including Interest***

| Description | Damages | Prejudgment Interest | Total |
|---|---|---|---|
| II. Breach of Fiduciary Duty | $ 10,251,530[17] | $ 2,283,051 | $ 12,534,581 |
| III. Tortious Interference | 2,635,300[18] | 1,431,834 | 4,067,134 |
| VIII. Tortious Interference | 4,542,051[19] | 1,622,020 | 6,164,071 |
| IX. Aiding and Abetting | 10,155,374[20] | 2,213,140 | 12,368,514 |
| XII. Aiding and Abetting | 10,155,374[21] | 2,213,140 | 12,368,514 |
| XV. Aiding and Abetting | 8,573,912[22] | 1,428,958 | 10,002,870 |
| XVI. Civil Conspiracy | 4,542,051[23] | 1,622,020 | 6,164,071 |
| XVII. Tortious Interference | 1,099,150[24] | 697,343 | 1,796,493 |
| XIX. Tortious Interference | 378,501[25] | 180,681 | 559,182 |
| XXI. Fraudulent Conveyance | 238,330[26] | 58,335 | 296,665 |
| XXII. Breach of Fiduciary Duty | 238,330[27] | 58,335 | 296,665 |

The prejudgment interest calculations for the tort claims appearing in Table 30 are all contained on Exhibits A and C or appear elsewhere in this report, except for the counts and damages set forth below in Tables 31 (Count II for Breach of Fiduciary Duty against Hensler); Table 32 (Count III for Tortious Interference with Contractual Relations against Hensler) and Table 33 (Count XII for Aiding and Abetting Breaches of Fiduciary Duty Against Quinn). That is because the total damages for each of those three Counts contain duplicative damages, which are not contained on Exhibits A and C.

[17] See Table 31 below.
[18] See Table 32 below.
[19] Count VIII is for tortious interference with contractual relations by BWMS v. Comtrol. As explained in paragraph 34 above, the damages for Count VIII stem from sales diverted to Comtrol from June 9, 2012 to October 10, 2019 in violation of the employment agreements of Messrs. Hensler, Quinn, and DiBridge, the majority of which are overlapping. This is the same measure of damages as BWMS' claim in Count XVI for civil conspiracy against Messrs. Hensler, Quinn, and DiBridge and Comtrol. The non-duplicative damages relating to sales diverted to Comtrol from June 9, 2012 to October 10, 2019 in violation of the employment agreements of Messrs. Hensler, Quinn, and DiBridge were calculated in paragraph 20 above as $4,542,051. See also paragraph 65, Table 29.
[20] See paragraph 33 above, Table 9 at lines 4 and 5.
[21] See Table 33 below. As explained in paragraph 27 above, the damages for Count XII (BWMS v. Quinn for aiding and abetting Hensler's breaches of fiduciary duty) consist of (i) $8,573,912 for Hensler's sale of Comtrol to Quinn and (ii) $1,581,462 for sales diverted from BWMS to Comtrol from June 9, 2012 to January 1, 2016, which is the period of time that Mr. Quinn aided and abetted Mr. Hensler's breaches of fiduciary duty arising from Comtrol's sales before Comtrol was sold to Quinn.
[22] See paragraph 22 above, Table 3 at line 2.
[23] See paragraphs 20 and 65 above, Table 28.
[24] See paragraph 38 above at Table 12, lines 1 and 2.
[25] See paragraphs 41-43 above.
[26] See paragraph 22 above at Table 3, line 3; paragraph 25 at Table 5, line 5; paragraph 33 at Table 9, line 7; and paragraph 38 at Table 12, line 3.
[27] See paragraph 22 above at Table 3, line 4.

***Table 31 – Count II (Breach of Fiduciary Duty: BWMS v.Hensler)***

| Defendant | Amount | Interest | Total |
|---|---|---|---|
| Sales Diverted to Comtrol | $ 1,581,462[28] | $ 784,181 | $ 2,365,643 |
| Sales Diverted to HC Global | 96,156[29] | 69,912 | 166,068 |
| Failure to Offer Comtrol for Sale | 8,573,912[30] | 1,428,958 | 10,002,870 |
| **Total** | **$ 10,251,530** | **$ 2,283,051** | **$ 12,534,581** |

***Table 32 – Count III (Tortious Interference: BWMS v. Hensler)***

| Defendant | Amount | Interest | Total |
|---|---|---|---|
| Sales Diverted to Comtrol | $ 1,632,306[31] | $ 804,403 | $ 2,436,709 |
| Sales Diverted to HC Global | 1,002,994[32] | 627,431 | 1,630,425 |
| **Total** | **$ 2,635,300** | **$ 1,431,834** | **$ 4,067,134** |

***Table 33 – Count XII***
***(Aiding and Abetting Breaches of Fiduciary Duty:***
***BWMS v. Quinn)***

| Defendant | Amount | Interest | Total |
|---|---|---|---|
| Sales Diverted to Comtrol | $ 1,581,462[33] | $ 784,181 | $ 2,365,643 |
| Failure to Offer Comtrol for Sale | 8,573,912[34] | 1,428,958 | 10,002,870 |
| **Total** | **$ 10,155,374** | **$ 2,213,140** | **$ 12,368,513** |

* * * * * * * *

67. This report represents my opinions regarding the matters incorporated herein based upon information available to date. All of the work conducted in preparing this report and the related analysis was performed by me or others working under my direct supervision. The opinions and conclusions stated in this report are expressed with a reasonable degree of professional certainty. In the event that additional data or testimony is made available,

[28] See paragraph 13 above at Table 1, line 1.
[29] See paragraph 13 above at Table 1, line 2.
[30] See paragraph 13 above at Table 1, line 5.
[31] See paragraph 13 above at Table 1, line 7.
[32] See paragraph 13 above at Table 1, line 9.
[33] Quinn is liable for Hensler's breaches of fiduciary duty in diverting sales from BWMS to Comtrol. The damages for sales diverted from BWMS to Comtrol are set forth at paragraph 13 above at Table 1, line 1.
[34] Quinn is liable for Hensler's breach of fiduciary duty in selling Comtrol to Quinn. Damages related to the Comtrol sale are set forth at paragraph 13 above at Table 1, line 5.

I reserve the right to revise or supplement my opinions.

68. The use of this report is limited to the current matter referenced above and may not be used for any other purpose without prior written consent.

69. The matters stated herein are true and correct to the best of my knowledge, information, and belief.

William G. Krieger, CPA/ABV/CFF/CGMA, CFE, MBA
WGK/jbs

Exhibits A-D

**BWMS, et al v. William H. Hensler, et al** **Exhibit A**

**Calculation of Prejudgment Interest**

***Interest on All Claims***

| | Damages | Prejudgment Interest to 08/22/2022 | Total |
|---|---|---|---|
| **BWMS v. William Hensler** | | | |
| Count I - Breach of Contract (Comtrol sales) | $ 1,581,462 | $ 784,181 | $ 2,365,643 |
| Count I - Breach of Contract (HC Global sales) | 96,156 | 69,912 | 166,068 |
| Count I - Breach of Contract (Personal Expenses) | 140,810 | 83,775 | 224,585 |
| Count II - Breach of Fiduciary Duty (Sale of Comtrol) | 8,573,912 | 1,428,958 | 10,002,870 |
| Count III - Tortious Interference (A. Quinn) | 110,947 | 49,869 | 160,816 |
| Count III - Tortious Interference (S. Hensler) | 1,002,994 | 627,431 | 1,630,425 |
| **Subtotal Net Damages - BWMS v. W. Hensler** | **$ 11,506,281** | **$ 3,044,126** | **$ 14,550,407** |
| Count I - Forfeiture | 2,224,102 | 1,284,909 | 3,509,011 |
| Count I - Severance | 321,850 | 187,587 | 509,437 |
| **Total Net Damages - BWMS v. W. Hensler** | **$ 14,052,233** | **$ 4,516,623** | **$ 18,568,856** |
| **BWMS v. Susan Hensler** | | | |
| Count XIV - Breach of Contract (HC Global sales) | $ 1,002,994 | $ 627,431 | $ 1,630,425 |
| Count XV - Aiding and Abetting (Sale of Comtrol) | 8,573,912 | 1,428,958 | 10,002,870 |
| **Subtotal Net Damages - BWMS v. S. Hensler** | **$ 9,576,906** | **$ 2,056,389** | **$ 11,633,295** |
| Count XIV - Forfeiture | 686,285 | 455,368 | 1,141,653 |
| Count XIV - Severance | 275,000 | 167,486 | 442,486 |
| **Total Net Damages - BWMS v. S. Hensler** | **$ 10,538,191** | **$ 2,679,243** | **$ 13,217,434** |
| **BWMS v. Alan Quinn** | | | |
| Count X - Unjust Enrichment (Consulting Fees) | $ 14,517 | $ 6,338 | $ 20,855 |
| Count XI - Breach of Contract (Comtrol Sales) | 1,632,306 | 804,403 | 2,436,709 |
| Count XII - Aiding and Abetting (Sale of Comtrol) | 8,573,912 | 1,428,958 | 10,002,870 |
| Count XVI - Civil Conspiracy (Comtrol Sales) | 60,103 | 28,820 | 88,923 |
| Count XXI - Fraudulent Conveyance (HC Global) | 238,330 | 58,335 | 296,665 |
| **Subtotal Net Damages - BWMS v. A. Quinn** | **$ 10,519,168** | **$ 2,326,855** | **$ 12,846,023** |
| Count XI - Forfeiture | 147,034 | 78,402 | 225,436 |
| **Total Net Damages - BWMS v. A. Quinn** | **$ 10,666,202** | **$ 2,405,257** | **$ 13,071,459** |
| **BWMS v. Joseph DiBridge** | | | |
| Count XIII - Breach of Contract (Comtrol Sales) | $ 1,564,641 | $ 649,155 | $ 2,213,796 |
| Count XVI - Civil Conspiracy (Comtrol Sales) | 2,977,410 | 972,865 | 3,950,275 |
| **Subtotal Net Damages - BWMS v. J. DiBridge** | **$ 4,542,051** | **$ 1,622,020** | **$ 6,164,071** |
| Count XIII - Forfeiture | 120,735 | 56,795 | 177,530 |
| Count XIII - Severance | 46,850 | 20,101 | 66,951 |
| **Total Net Damages - BWMS v. J. DiBridge** | **$ 4,709,636** | **$ 1,698,915** | **$ 6,408,551** |

Note - Damages subtotals are calculated based on Court's Opinion and awarding prejudgment interest on all claims. To the extent that the Court agrees with the Becker parties' post-trial motion regarding damages for Forfeiture and/or Severance, the additional damages related to these counts have been included in the Total Net Damages.

**BWMS, et al v. William H. Hensler, et al** **Exhibit A**

**Calculation of Prejudgment Interest**

***Interest on All Claims***

| | Damages | Prejudgment Interest to 08/22/2022 | Total |
|---|---|---|---|
| **BWMS v. Comtrol** | | | |
| Count VIII - Tortious Interference (A. Quinn) | $ 110,947 | $ 49,869 | $ 160,816 |
| Count IX - Aiding and Abetting (Sale of Comtrol) | 8,573,912 | 1,428,958 | 10,002,870 |
| Count IX - Aiding and Abetting (Comtrol Sales) | 1,581,462 | 784,181 | 2,365,643 |
| Count XXI - Fraudulent Conveyance (HC Global) | 238,330 | 58,335 | 296,665 |
| **Total Net Damages - BWMS v. Comtrol** | **$ 10,504,651** | **$ 2,321,344** | **$ 12,825,995** |
| **BWMS v. WMS** | | | |
| Count VII - Breach of Contract (Comtrol Sales) | $ 2,554,373 | $ 1,273,263 | $ 3,827,636 |
| Count VII - Breach of Contract (HC Global Sales) | 113,859 | 82,783 | 196,642 |
| **Total Net Damages - BWMS v. WMS** | **$ 2,668,232** | **$ 1,356,046** | **$ 4,024,278** |
| **BWMS v. HC Global** | | | |
| Count XVII - Tortious Interference (W. Hensler) | $ 96,156 | $ 69,912 | $ 166,068 |
| Count XVII - Tortious Interference (S. Hensler) | 1,002,994 | 627,431 | 1,630,425 |
| **Total Net Damages for HC Global** | **$ 1,099,150** | **$ 697,343** | **$ 1,796,493** |
| **BWMS v. Comtrol-West** | | | |
| Count XIX - Tortious Interference (A. Quinn) | $ 378,501 | $ 180,681 | $ 559,182 |
| **Total Net Damages for Comtrol-West** | **$ 378,501** | **$ 180,681** | **$ 559,182** |
| **Becker America v. Hensler Defendants** | | | |
| Count V - Breach of Contract v. WMS (7.01 of the Contribution Agreement) | $ 2,384,447 | $ 1,458,353 | $ 3,842,800 |
| Count XXI v. HC Global (Fraudulent Conveyance) | 238,330 | 58,335 | 296,665 |
| Count XXI v. Comtrol (Fraudulent Conveyance) | 238,330 | 58,335 | 296,665 |
| Count XXI v. A. Quinn (Fraudulent Conveyance) | 238,330 | 58,335 | 296,665 |
| Count XXI v. S. Hensler (Fraudulent Conveyance) | 238,330 | 58,335 | 296,665 |

**BWMS, et al v. William H. Hensler, et al** **Exhibit B**

**Calculation of Prejudgment Interest**

***Interest on Breach of Contract Claims Only***

| | Damages | Prejudgment Interest to 08/22/2022 | Total |
|---|---|---|---|
| **BWMS v. William Hensler** | | | |
| Count I - Breach of Contract (Comtrol sales) | $ 1,581,462 | $ 784,181 | $ 2,365,643 |
| Count I - Breach of Contract (HC Global sales) | 96,156 | 69,912 | 166,068 |
| Count I - Breach of Contract (Personal Expenses) | 140,810 | 83,775 | 224,585 |
| Count II - Breach of Fiduciary Duty (Sale of Comtrol) | 8,573,912 | - | 8,573,912 |
| Count III - Tortious Interference (A. Quinn) | 110,947 | - | 110,947 |
| Count III - Tortious Interference (S. Hensler) | 1,002,994 | - | 1,002,994 |
| **Subtotal Net Damages - BWMS v. W. Hensler** | **$ 11,506,281** | **$ 937,868** | **$ 12,444,149** |
| Count I - Forfeiture | 2,224,102 | 1,284,909 | 3,509,011 |
| Count I - Severance | 321,850 | 187,587 | 509,437 |
| **Total Net Damages - BWMS v. W. Hensler** | **$ 14,052,233** | **$ 2,410,365** | **$ 16,462,598** |
| | | | |
| **BWMS v. Susan Hensler** | | | |
| Count XIV - Breach of Contract (HC Global sales) | $ 1,002,994 | $ 627,431 | $ 1,630,425 |
| Count XV - Aiding and Abetting (Sale of Comtrol) | 8,573,912 | - | 8,573,912 |
| **Subtotal Net Damages - BWMS v. S. Hensler** | **$ 9,576,906** | **$ 627,431** | **$ 10,204,337** |
| Count XIV - Forfeiture | 686,285 | 455,368 | 1,141,653 |
| Count XIV - Severance | 275,000 | 167,486 | 442,486 |
| **Total Net Damages - BWMS v. S. Hensler** | **$ 10,538,191** | **$ 1,250,285** | **$ 11,788,476** |
| | | | |
| **BWMS v. Alan Quinn** | | | |
| Count X - Unjust Enrichment (Consulting Fees) | $ 14,517 | $ - | $ 14,517 |
| Count XI - Breach of Contract (Comtrol Sales) | 1,632,306 | 804,403 | 2,436,709 |
| Count XII - Aiding and Abetting (Sale of Comtrol) | 8,573,912 | - | 8,573,912 |
| Count XVI - Civil Conspiracy (Comtrol Sales) | 60,103 | - | 60,103 |
| Count XXI - Fraudulent Conveyance (HC Global) | 238,330 | - | 238,330 |
| **Subtotal Net Damages - BWMS v. A. Quinn** | **$ 10,519,168** | **$ 804,403** | **$ 11,323,571** |
| Count XI - Forfeiture | 147,034 | 78,402 | 225,436 |
| **Total Net Damages - BWMS v. A. Quinn** | **$ 10,666,202** | **$ 882,806** | **$ 11,549,008** |
| | | | |
| **BWMS v. Joseph DiBridge** | | | |
| Count XIII - Breach of Contract (Comtrol Sales) | $ 1,564,641 | $ 649,155 | $ 2,213,796 |
| Count XVI - Civil Conspiracy (Comtrol Sales) | 2,977,410 | - | 2,977,410 |
| **Subtotal Net Damages - BWMS v. J. DiBridge** | **$ 4,542,051** | **$ 649,155** | **$ 5,191,206** |
| Count XIII - Forfeiture | 120,735 | 56,795 | 177,530 |
| Count XIII - Severance | 46,850 | 20,101 | 66,951 |
| **Total Net Damages - BWMS v. J. DiBridge** | **$ 4,709,636** | **$ 726,050** | **$ 5,435,686** |

Note - Damages Subtotals are calculated based on the Court's Opinion. To the extent that the Court agrees with the Becker parties' post-trial motion regarding damages for Forfeiture and/or Severance, the additional damages related to these counts have been included in the Total Net Damages.

**BWMS, et al v. William H. Hensler, et al** **Exhibit B**

**Calculation of Prejudgment Interest**

***Interest on Breach of Contract Claims Only***

| | Damages | Prejudgment Interest to 08/22/2022 | Total |
|---|---|---|---|
| **BWMS v. Comtrol** | | | |
| Count VIII - Tortious Interference (A. Quinn) | $ 110,947 | $ - | $ 110,947 |
| Count IX - Aiding and Abetting (Sale of Comtrol) | 8,573,912 | - | 8,573,912 |
| Count IX - Aiding and Abetting (Comtrol Sales) | 1,581,462 | - | 1,581,462 |
| Count XXI - Fraudulent Conveyance (HC Global) | 238,330 | - | 238,330 |
| **Total Net Damages - BWMS v. Comtrol** | **$ 10,504,651** | **$ -** | **$ 10,504,651** |
| | | | |
| **BWMS v. WMS** | | | |
| Count VII - Breach of Contract (Comtrol Sales) | $ 2,554,373 | $ 1,273,263 | $ 3,827,636 |
| Count VII - Breach of Contract (HC Global Sales) | 113,859 | 82,783 | 196,642 |
| **Total Net Damages - BWMS v. WMS** | **$ 2,668,232** | **$ 1,356,046** | **$ 4,024,278** |
| | | | |
| **BWMS v. HC Global** | | | |
| Count XVII - Tortious Interference (W. Hensler) | $ 96,156 | $ - | $ 96,156 |
| Count XVII - Tortious Interference (S. Hensler) | 1,002,994 | - | 1,002,994 |
| **Total Net Damages for HC Global** | **$ 1,099,150** | **$ -** | **$ 1,099,150** |
| | | | |
| **BWMS v. Comtrol-West** | | | |
| Count XIX - Tortious Interference (A. Quinn) | $ 378,501 | $ - | $ 378,501 |
| **Total Net Damages for Comtrol-West** | **$ 378,501** | **$ -** | **$ 378,501** |
| | | | |
| **Becker America v. Hensler Defendants** | | | |
| Count V - Breach of Contract v. WMS (7.01 of the Contribution Agreement) | $ 2,384,447 | $ 1,458,353 | $ 3,842,800 |
| Count XXI v. HC Global (Fraudulent Conveyance) | 238,330 | - | 238,330 |
| Count XXI v. Comtrol (Fraudulent Conveyance) | 238,330 | - | 238,330 |
| Count XXI v. A. Quinn (Fraudulent Conveyance) | 238,330 | - | 238,330 |
| Count XXI v. S. Hensler (Fraudulent Conveyance) | 238,330 | - | 238,330 |

**BWMS, et al v. William H. Hensler, et al** **Exhibit C**

**Calculation of Prejudgment Interest**

***Interest on All Claims***

***Assuming BWMS Acquires Comtrol***

| | Damages | Prejudgment Interest to 08/22/2022 | Total |
|---|---|---|---|
| **BWMS v. William Hensler** | | | |
| Count I - Breach of Contract (Comtrol sales) | $ 1,581,462 | $ 784,181 | $ 2,365,643 |
| Count I - Breach of Contract (HC Global sales) | 96,156 | 69,912 | 166,068 |
| Count I - Breach of Contract (Personal Expenses) | 140,810 | 83,775 | 224,585 |
| Count II - Breach of Fiduciary Duty (Sale of Comtrol) | 1,911,406 | 512,068 | 2,423,474 |
| Count III - Tortious Interference (A. Quinn) | 110,947 | 49,869 | 160,816 |
| Count III - Tortious Interference (S. Hensler) | 1,002,994 | 627,431 | 1,630,425 |
| **Subtotal Net Damages - BWMS v. W. Hensler** | **$ 4,843,775** | **$ 2,127,236** | **$ 6,971,011** |
| Count I - Forfeiture | 2,224,102 | 1,284,909 | 3,509,011 |
| Count I - Severance | 321,850 | 187,587 | 509,437 |
| **Total Net Damages - BWMS v. W. Hensler** | **$ 7,389,727** | **$ 3,599,732** | **$ 10,989,459** |
| **BWMS v. Susan Hensler** | | | |
| Count XIV - Breach of Contract (HC Global sales) | $ 1,002,994 | $ 627,431 | $ 1,630,425 |
| Count XV - Aiding and Abetting (Sale of Comtrol) | 1,911,406 | 512,068 | 2,423,474 |
| **Subtotal Net Damages - BWMS v. S. Hensler** | **$ 2,914,400** | **$ 1,139,498** | **$ 4,053,898** |
| Count XIV - Forfeiture | 686,285 | 455,368 | 1,141,653 |
| Count XIV - Severance | 275,000 | 167,486 | 442,486 |
| **Total Net Damages - BWMS v. S. Hensler** | **$ 3,875,685** | **$ 1,762,352** | **$ 5,638,037** |
| **BWMS v. Alan Quinn** | | | |
| Count X - Unjust Enrichment (Consulting Fees) | $ 14,517 | $ 6,338 | $ 20,855 |
| Count XI - Breach of Contract (Comtrol Sales) | 1,632,306 | 804,403 | 2,436,709 |
| Count XII - Aiding and Abetting (Sale of Comtrol) | 1,911,406 | 512,068 | 2,423,474 |
| Count XVI - Civil Conspiracy (Comtrol Sales) | 60,103 | 28,820 | 88,923 |
| Count XXI - Fraudulent Conveyance (HC Global) | 238,330 | 58,335 | 296,665 |
| **Subtotal Net Damages - BWMS v. A. Quinn** | **$ 3,856,662** | **$ 1,409,964** | **$ 5,266,626** |
| Count XI - Forfeiture | 147,034 | 78,402 | 225,436 |
| **Total Net Damages - BWMS v. A. Quinn** | **$ 4,003,696** | **$ 1,488,367** | **$ 5,492,063** |
| **BWMS v. Joseph DiBridge** | | | |
| Count XIII - Breach of Contract (Comtrol Sales) | $ 1,564,641 | $ 649,155 | $ 2,213,796 |
| Count XVI - Civil Conspiracy (Comtrol Sales) | 2,977,410 | 972,865 | 3,950,275 |
| **Subtotal Net Damages - BWMS v. J. DiBridge** | **$ 4,542,051** | **$ 1,622,020** | **$ 6,164,071** |
| Count XIII - Forfeiture | 120,735 | 56,795 | 177,530 |
| Count XIII - Severance | 46,850 | 20,101 | 66,951 |
| **Total Net Damages - BWMS v. J. DiBridge** | **$ 4,709,636** | **$ 1,698,915** | **$ 6,408,551** |

Note - Damages subtotals are calculated based on Court's Opinion and awarding prejudgment interest on all claims. To the extent that the Court agrees with the Becker parties' post-trial motion regarding damages for Forfeiture and/or Severance, the additional damages related to these counts have been included in the Total Net Damages.

**BWMS, et al v. William H. Hensler, et al** **Exhibit C**

**Calculation of Prejudgment Interest**

***Interest on All Claims***

***Assuming BWMS Acquires Comtrol***

| | Damages | Prejudgment Interest to 08/22/2022 | Total |
|---|---|---|---|
| **BWMS v. Comtrol** | | | |
| Count VIII - Tortious Interference (A. Quinn) | $ 110,947 | $ 49,869 | $ 160,816 |
| Count IX - Aiding and Abetting (Sale of Comtrol) | 1,911,406 | 512,068 | 2,423,474 |
| Count IX - Aiding and Abetting (Comtrol Sales) | 1,581,462 | 784,181 | 2,365,643 |
| Count XXI - Fraudulent Conveyance (HC Global) | 238,330 | 58,335 | 296,665 |
| **Total Net Damages - BWMS v. Comtrol** | **$ 3,842,145** | **$ 1,404,453** | **$ 5,246,598** |
| **BWMS v. WMS** | | | |
| Count VII - Breach of Contract (Comtrol Sales) | $ 2,554,373 | $ 1,273,263 | $ 3,827,636 |
| Count VII - Breach of Contract (HC Global Sales) | 113,859 | 82,783 | 196,642 |
| **Total Net Damages - BWMS v. WMS** | **$ 2,668,232** | **$ 1,356,046** | **$ 4,024,278** |
| **BWMS v. HC Global** | | | |
| Count XVII - Tortious Interference (W. Hensler) | $ 96,156 | $ 69,912 | $ 166,068 |
| Count XVII - Tortious Interference (S. Hensler) | 1,002,994 | 627,431 | 1,630,425 |
| **Total Net Damages for HC Global** | **$ 1,099,150** | **$ 697,343** | **$ 1,796,493** |
| **BWMS v. Comtrol-West** | | | |
| Count XIX - Tortious Interference (A. Quinn) | $ 378,501 | $ 180,681 | $ 559,182 |
| **Total Net Damages for Comtrol-West** | **$ 378,501** | **$ 180,681** | **$ 559,182** |
| **Becker America v. Hensler Defendants** | | | |
| Count V - Breach of Contract v. WMS (7.01 of the Contribution Agreement) | $ 2,384,447 | $ 1,458,353 | $ 3,842,800 |
| Count XXI v. HC Global (Fraudulent Conveyance) | 238,330 | 58,335 | 296,665 |
| Count XXI v. Comtrol (Fraudulent Conveyance) | 238,330 | 58,335 | 296,665 |
| Count XXI v. A. Quinn (Fraudulent Conveyance) | 238,330 | 58,335 | 296,665 |
| Count XXI v. S. Hensler (Fraudulent Conveyance) | 238,330 | 58,335 | 296,665 |

**BWMS, et al v. William H. Hensler, et al** **Exhibit D**
**Calculation of Prejudgment Interest**
***Interest on Breach of Contract Claims Only***
***Assuming BWMS Acquires Comtrol***

| | Damages | Prejudgment Interest to 08/22/2022 | Total |
|---|---|---|---|
| **BWMS v. William Hensler** | | | |
| Count I - Breach of Contract (Comtrol sales) | $ 1,581,462 | $ 784,181 | $ 2,365,643 |
| Count I - Breach of Contract (HC Global sales) | 96,156 | 69,912 | 166,068 |
| Count I - Breach of Contract (Personal Expenses) | 140,810 | 83,775 | 224,585 |
| Count II - Breach of Fiduciary Duty (Sale of Comtrol) | 1,911,406 | - | 1,911,406 |
| Count III - Tortious Interference (A. Quinn) | 110,947 | - | 110,947 |
| Count III - Tortious Interference (S. Hensler) | 1,002,994 | - | 1,002,994 |
| **Subtotal Net Damages - BWMS v. W. Hensler** | **$ 4,843,775** | **$ 937,868** | **$ 5,781,643** |
| Count I - Forfeiture | 2,224,102 | 1,284,909 | 3,509,011 |
| Count I - Severance | 321,850 | 187,587 | 509,437 |
| **Total Net Damages - BWMS v. W. Hensler** | **$ 7,389,727** | **$ 2,410,365** | **$ 9,800,092** |
| | | | |
| **BWMS v. Susan Hensler** | | | |
| Count XIV - Breach of Contract (HC Global sales) | $ 1,002,994 | $ 627,431 | $ 1,630,425 |
| Count XV - Aiding and Abetting (Sale of Comtrol) | 1,911,406 | - | 1,911,406 |
| **Subtotal Net Damages - BWMS v. S. Hensler** | **$ 2,914,400** | **$ 627,431** | **$ 3,541,831** |
| Count XIV - Forfeiture | 686,285 | 455,368 | 1,141,653 |
| Count XIV - Severance | 275,000 | 167,486 | 442,486 |
| **Total Net Damages - BWMS v. S. Hensler** | **$ 3,875,685** | **$ 1,250,285** | **$ 5,125,970** |
| | | | |
| **BWMS v. Alan Quinn** | | | |
| Count X - Unjust Enrichment (Consulting Fees) | $ 14,517 | $ - | $ 14,517 |
| Count XI - Breach of Contract (Comtrol Sales) | 1,632,306 | 804,403 | 2,436,709 |
| Count XII - Aiding and Abetting (Sale of Comtrol) | 1,911,406 | - | 1,911,406 |
| Count XVI - Civil Conspiracy (Comtrol Sales) | 60,103 | - | 60,103 |
| Count XXI - Fraudulent Conveyance (HC Global) | 238,330 | - | 238,330 |
| **Subtotal Net Damages - BWMS v. A. Quinn** | **$ 3,856,662** | **$ 804,403** | **$ 4,661,065** |
| Count XI - Forfeiture | 147,034 | 78,402 | 225,436 |
| **Total Net Damages - BWMS v. A. Quinn** | **$ 4,003,696** | **$ 882,806** | **$ 4,886,502** |
| | | | |
| **BWMS v. Joseph DiBridge** | | | |
| Count XIII - Breach of Contract (Comtrol Sales) | $ 1,564,641 | $ 649,155 | $ 2,213,796 |
| Count XVI - Civil Conspiracy (Comtrol Sales) | 2,977,410 | - | 2,977,410 |
| **Subtotal Net Damages - BWMS v. J. DiBridge** | **$ 4,542,051** | **$ 649,155** | **$ 5,191,206** |
| Count XIII - Forfeiture | 120,735 | 56,795 | 177,530 |
| Count XIII - Severance | 46,850 | 20,101 | 66,951 |
| **Total Net Damages - BWMS v. J. DiBridge** | **$ 4,709,636** | **$ 726,050** | **$ 5,435,686** |

Note - Damages subtotals are calculated based on Court's Opinion. To the extent that the Court agrees with the Becker parties' post-trial motion regarding damages for Forfeiture and/or Severance, the additional damages related to these counts have been included in the Total Net Damages.

**BWMS, et al v. William H. Hensler, et al** **Exhibit D**

**Calculation of Prejudgment Interest**

***Interest on Breach of Contract Claims Only***

***Assuming BWMS Acquires Comtrol***

| | Damages | Prejudgment Interest to 08/22/2022 | Total |
|---|---|---|---|
| **BWMS v. Comtrol** | | | |
| Count VIII - Tortious Interference (A. Quinn) | $ 110,947 | $ - | $ 110,947 |
| Count IX - Aiding and Abetting (Sale of Comtrol) | 1,911,406 | - | 1,911,406 |
| Count IX - Aiding and Abetting (Comtrol Sales) | 1,581,462 | - | 1,581,462 |
| Count XXI - Fraudulent Conveyance (HC Global) | 238,330 | - | 238,330 |
| **Total Net Damages - BWMS v. Comtrol** | **$ 3,842,145** | **$ -** | **$ 3,842,145** |
| **BWMS v. WMS** | | | |
| Count VII - Breach of Contract (Comtrol Sales) | $ 2,554,373 | $ 1,273,263 | $ 3,827,636 |
| Count VII - Breach of Contract (HC Global Sales) | 113,859 | 82,783 | 196,642 |
| **Total Net Damages - BWMS v. WMS** | **$ 2,668,232** | **$ 1,356,046** | **$ 4,024,278** |
| **BWMS v. HC Global** | | | |
| Count XVII - Tortious Interference (W. Hensler) | $ 96,156 | $ - | $ 96,156 |
| Count XVII - Tortious Interference (S. Hensler) | 1,002,994 | - | 1,002,994 |
| **Total Net Damages for HC Global** | **$ 1,099,150** | **$ -** | **$ 1,099,150** |
| **BWMS v. Comtrol-West** | | | |
| Count XIX - Tortious Interference (A. Quinn) | $ 378,501 | $ - | $ 378,501 |
| **Total Net Damages for Comtrol-West** | **$ 378,501** | **$ -** | **$ 378,501** |
| **Becker America v. Hensler Defendants** | | | |
| Count V - Breach of Contract v. WMS | | | |
| (7.01 of the Contribution Agreement) | $ 2,384,447 | $ 1,458,353 | $ 3,842,800 |
| Count XXI v. HC Global (Fraudulent Conveyance) | 238,330 | - | 238,330 |
| Count XXI v. Comtrol (Fraudulent Conveyance) | 238,330 | - | 238,330 |
| Count XXI v. A. Quinn (Fraudulent Conveyance) | 238,330 | - | 238,330 |
| Count XXI v. S. Hensler (Fraudulent Conveyance) | 238,330 | - | 238,330 |

# Exhibit A.2

# Summary of Damages Related to Comtrol Sales

| | Damages | Prejudgment Interest to 6/30/21 | Total Due BWMS Plaintiffs |
|---|---|---|---|
| Failure to Offer Comtrol for Sale to BWMS | | | |
| Pretax cash flow | $ 1,911,406 | $ 380,730 | $ 2,292,136 |
| Enterprise value | 7,683,612 | 794,464 | 8,478,077 |
| Purchase Price | (1,021,106) | (335,370) | (1,356,476) |
| **Total Damages – Failure to Offer Comtrol to BWMS[1]** | **$ 8,573,912** | **$ 839,825** | **$ 9,413,737** |
| Sales Made by Comtrol Which Violate Non-Competition Obligations | | | |
| **WMS Non-Competition Agreement[2]** | **$ 2,554,373** | **$ 1,097,746** | **$ 3,652,119** |
| **William Hensler Employment Agreement[3]** | **$ 1,581,462** | **$ 675,516** | **$ 2,256,978** |
| **Alan Quinn Employment Agreement[4]** | **$ 4,481,948** | **$ 1,287,322** | **$ 5,769,269** |
| **Joseph DiBridge His Employment Agreement[5]** | **$ 1,564,641** | **$ 544,404** | **$ 2,109,046** |
| Alternative Claim for Disgorgement Damages for Tortious Interference Claims | | | |
| **Sales Made by Comtrol In Violation of Non-Competition Obligations** | **$ 2,278,865** | **$ 567,279** | **$ 2,846,144** |

[1] Applies against Comtrol, Hensler, Quinn, and Susan Hensler.

[2] Applies against Wholesale Mine Supply for violations of non-competition obligations.

[3] Applies against (i) William Hensler for violations of his non-competition obligations and his breach of fiduciary duties and (ii) Comtrol's tortious interference regarding the non-competition obligations contained in the employment agreement between Hensler and BWMS.

[4] Applies against (i) Alan Quinn for violations of his non-competition obligations, (ii) Comtrol's tortious interference regarding the non-competition obligations contained in the employment agreement between Quinn and BWMS, and (iii) Hensler's tortious interference regarding the non-competition obligations contained in the employment agreement between Quinn and BWMS. Damages regarding tortious interference against William Hensler is limited to $1,632,306 before interest, which covers the period William Hensler owned Comtrol.

[5] Applies against (i) Joseph DiBridge for violations of his non-competition obligations, (ii) Comtrol's tortious interference regarding the non-competition obligations contained in the employment agreement between DiBridge and BWMS, and (iii) Hensler's tortious interference regarding the non-competition obligations contained in the employment agreement between DiBridge and BWMS. Damages regarding tortious interference against William Hensler is limited to $998,469 before interest, which covers the period William Hensler owned Comtrol.

JOINT TRIAL EXHIBIT
1288-A
16CI05219-2021

**Trial Exhibit 1288 (page 1)**

*Source: Krieger Report, December 6, 2019 at ¶ 134, and Krieger Reply Report, January 31, 2020 at Exhibit A.4 (Trial Exhibit 923)*

# Summary of Damages Related to HC Global and Comtrol-West Sales

| | Damages | Prejudgment Interest to 6/30/21 | Total Due BWMS Plaintiffs |
|---|---|---|---|
| Sales Made by HC Global Which Violate Non-Competition Obligations | | | |
| **WMS Non-Competition Agreement[1]** | **$ 113,859** | **$ 74,959** | **$ 188,818** |
| **William Hensler Employment Agreement[2]** | **$ 96,156** | **$ 63,305** | **$ 159,461** |
| **Susan Hensler Employment Agreement[3]** | **$ 1,002,994** | **$ 558,513** | **$ 1,561,507** |
| Alternative Claim for Disgorgement Damages for Tortious Interference Claims | | | |
| **Sales Made by HC Global In Violation of Non-Competition Obligations** | **$ 1,116,852** | **$ 633,251** | **$ 1,750,103** |
| Sales Made by Comtrol-West (Tortiously Interference) | | | |
| **Tortious Interference by Comtrol-West** | **$ 757,003** | **$ 128,666** | **$ 885,668** |
| Alternative Claim for Disgorgement Damages for Tortious Interference Claims | | | |
| **Sales Made by Comtrol-West In Violation of Non-Competition Obligations** | **$ 779,176** | **$ 132,308** | **$ 911,484** |

[1] Applies against Wholesale Mine Supply for violations of non-competition obligations.

[2] Applies against (i) William Hensler for violations of his non-competition obligations and breach of his fiduciary duties, (ii) HC Global's tortious interference regarding the non-competition obligations contained in the employment agreement between Hensler and BWMS, (iii) HC Global, Comtrol, Susan Hensler, and Alan Quinn for fraudulent conveyance, and (iv) Susan Hensler for breach of fiduciary duty.

[3] Applies against (i) Susan Hensler for violations of her non-competition obligations, (ii) HC Global's tortious interference regarding the non-competition obligations contained in the employment agreement between Susan Hensler and BMWS, (iii) HC Global, Comtrol, Susan Hensler, and Alan Quinn for fraudulent conveyance, and (iv) Susan Hensler for breach of fiduciary duty.

**Trial Exhibit 1288 (page 2)**

*Source: Krieger Report, December 6, 2019 at Exhibit D.1, Exhibit C.1, and Krieger Reply Report, January 31, 2020 at Exhibit C (Trial Exhibit 923)*

# Summary of Damages Related to Other Claims

| | Damages | Prejudgment Interest to 6/30/21 | Total Due BWMS Plaintiffs |
|---|---|---|---|
| **Section 7.01 of Contribution Agreement (salaries)** | **$ 2,384,447** | **$ 1,294,512** | **$ 3,678,959** |
| Severance Payments and Consulting Payments | | | |
| **Susan Hensler Severance Payment** | **$ 275,000** | **$ 148,590** | **$ 423,590** |
| **Joe DiBridge Severance Payment** | **$ 80,392** | **$ 29,774** | **$ 110,166** |
| **Alan Quinn Consulting Payments** | **$ 14,517** | **$ 5,195** | **$ 19,712** |
| Forfeiture of Compensation (including severance, excluding consulting) | | | |
| Bill Hensler | $ 2,224,102 | $ 1,132,086 | $ 3,356,188 |
| Susan Hensler | 961,285 | 556,802 | 1,518,087 |
| Joe DiBridge | 909,078 | 492,112 | 1,401,190 |
| Alan Quinn | 641,641 | 363,321 | 1,004,962 |
| **Total Forfeiture of Compensation** | **$ 4,736,106** | **$ 2,544,321** | **$ 7,280,427** |
| Personal Use of BWMS Assets | | | |
| Lease and indirect expenses regarding leased corporate jet | $ 46,908 | $ 24,113 | $ 71,021 |
| Expenses for using corporate jet on five trips | 33,508 | 17,982 | 51,490 |
| Restaurant expenses | 58,235 | 30,190 | 88,425 |
| Other personal expenses | 2,158 | 1,188 | 3,346 |
| **Total Personal Use of BWMS Assets** | **$ 140,809** | **$ 73,473** | **$ 214,282** |

**Trial Exhibit 1288 (page 3)**
*Source: Krieger Report, December 6, 2019 at ¶ 134 (Trial Exhibit 923)*

# Exhibit A.3

| | | Source |
|---|---|---|
| Paid to SGK | $ 1,254,100.17 | See SGK sheet |
| Paid to Grossman | $ 13,214.07 | See GYF sheet |
| Paid to Precise | $ 3,535.50 | See email |
| Paid to McCabe | $ 15,212.21 | 4.7.26 email |
| RJG Translations | $22,580.48 | |
| Bodenheimer Herzberg | $ 17,797.50 | |
| Pittsburgh Reporting Service | $6,140.37 | |
| Clicks Document Management | $572.03 | |
| JAMS | $0.00 | QC0165 |
| Brian Thompson | $ 43,878.00 | 4.15.26 email |
| | $ 1,377,030.33 | |
| Adjustment Due to Transfer of Property | $380,000 | |
| Hensler Total Fees and Costs | $1,757,030.33 | |

# Exhibit A.4

| | | | |
|---|---|---|---|
| SGK | $ | 889,505.30 | SGK sheet |
| Grossman | $ | 172,030.00 | |
| Dilworth | $ | 1,140,611.07 | |
| JAMS | $ | 11,763.75 | [1] |
| Campbell | $ | 257,000.00 | |
| Aviolo | $ | 28,050.00 | |
| Gantverg | $ | 3,920.60 | |
| Guy Jones | $ | 7,800.00 | |
| Betler's | $ | 1,662.20 | |
| | $ | - | |
| | $ | 2,512,342.92 | |
| | $ | 2,512,342.92 | |
| Adjustment Due to Equity Value Received in Transferred Property | | ($380,000) | |
| Quinn Total Fees and Costs | $ | 2,132,342.92 | |

[1](Disregarding QC0165 because it is a $1600 adjustment that does not change the allocation numbers)

Westmoreland County - NOT AN OFFICIAL COPY


EXHIBIT B
TO MOTION
TO SEAL

IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA

WILLIAM H. HENSLER, JR., WHOLESALE MINE SUPPLY, L.P., and WSAJT PROPERTIES, L.P.,

Plaintiffs,

v.

BECKER/WHOLESALE MINE SUPPLY, LLC, BECKER GLOBAL-AMERICA, INC. (aka/fka/ successor-in-interest to BECKER MINING AMERICA, INC.), BECKER MINING SYSTEMS AG, GREGORY A. SANDERS, FRANZ BECKER, WOLFGANG WEGENER, and MAX BRINCKMAN,

Defendants.

CIVIL DIVISION

NO. 16CI05219

**STIPULATED CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER**

Filed on Behalf of all Parties

Counsel of Record for Plaintiffs:

Stanley J. Lehman, Esquire
Pa. I.D. #31455
Suzanne L. DeWalt, Esquire
Pa. I.D. #42072
Sherrard, German & Kelly. P.C.
535 Smithfield Street, Suite 300
Pittsburgh, PA 15222
412-355-0200 (Phone)
412-261-6221 (Fax)

William J. McCabe, Esquire
Pa. I.D. #32618
DeBernardo, Antoniono, McCabe & Davis
11 North Main Street,
Greensburg, PA 15601
724-836-0700 (Phone)
724-836-1995 (Fax)

Counsel for Defendants:

Jay D. Marinstein, Esquire
PA ID No. 53163
Patrick L. Abramowich, Esquire
PA ID No. 74494
FOX ROTHSCHILD LLP
500 Grant Street, Suite 2500
Pittsburgh, PA 15219
412-391-1334 (Phone)
412-391-6984 (Fax)

FILED
APR 28 PM 1:24
PROTHONOTARY

IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA

WILLIAM H. HENSLER, JR., WHOLESALE MINE SUPPLY, L.P., and WSAJT PROPERTIES, L.P.,

Plaintiffs,

v.

BECKER/WHOLESALE MINE SUPPLY, LLC, BECKER GLOBAL-AMERICA, INC. (aka/fka/ successor-in-interest to BECKER MINING AMERICA, INC.), BECKER MINING SYSTEMS AG, GREGORY A. SANDERS, FRANZ BECKER, WOLFGANG WEGENER, and MAX BRINCKMAN,

Defendants.

CIVIL DIVISION

NO. 16CI05219

**STIPULATED CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER**

Upon motion of the parties for a Protective Order pursuant to Pennsylvania Rule of Civil Procedure 4012, Plaintiffs, William H. Hensler, Jr., Wholesale Mine Supply, L.P., and WSAJT Properties, L.P. and Defendants, Becker/Wholesale Mine Supply, LLC, Becker Global-America, Inc. (aka/fka/successor-in-interest to Becker Mining America, Inc.), Becker Mining Systems, AG, Gregory A. Sanders, Franz Becker, Wolfgang Wegener, and Max Brinckman, by and through their respective counsel, agree as follows:

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

**Proceedings and Information Governed.**

1. This Stipulated Confidentiality Agreement and Protective Order and any amendments or modifications hereto ("Protective Order") shall govern any document, information or other thing furnished by any party, to any other party, and includes non-parties

who receive a subpoena in connection with this action. The information protected includes, but is not limited to, answers to interrogatories, answers to requests for admission, responses to requests for production of documents, transcripts and videotapes, exhibits, and other writings or things produced, given or filed in this action that are designated by a party as "Confidential Information" or "Confidential Attorneys Eyes Only Information" in accordance with the terms of this Order, as well as to any copies, excerpts, abstracts, analyses, summaries, descriptions, or other forms of recorded information containing, reflecting, or disclosing such information (collectively, the "Protected Information").

**Designation and Maintenance of Information.**

2. For purposes of this Protective Order,

(a) the "Confidential Information" designation shall mean that the document is comprised of trade secrets or proprietary commercial information or other information that is not publicly known or is of technical or commercial advantage to its possessor, or other type of information legally protectable from disclosure, including personal information of individual persons, confidential research, and any proprietary business or financial information, as well as any development or commercial information within the meaning Pa. R. Civ. P. 4012(a)(9), or other information required by law or agreement to be kept confidential; and

(b) the "Confidential Attorneys Eyes Only Information" designation shall mean that the document is comprised of information that the producing party deems especially sensitive, which may include, but is not limited to, confidential research and development, financial, technical, marketing, compensation information, any other sensitive trade secret information, information capable of being utilized for the preparation or prosecution of a patent application, and any other information that is of such character or nature that if it is disclosed to persons

permitted to view information, the producing party will be unfairly or significantly disadvantaged in the marketplace dealing with such subject matter. Confidential Information and Confidential Attorneys Eyes Only Information does not include information that has been disclosed to the public or third persons in a manner making such information no longer confidential.

3. When Confidential Information and/or Confidential Attorneys Eyes Only Information is presented or discussed during any deposition or at any argument, hearing or trial, counsel for the Party designating the Protected Information as such shall have the right to exclude from such deposition or, if permitted by the Court, argument, hearing or trial, during such time as the Protected Information at issue is subject to presentation or discussion, any person who is not authorized by this Protective Order to receive the Protected Information at issue. A Party intending to introduce any Confidential Information and/or Confidential Attorneys Eyes Only Information designated as such by the other Party shall endeavor, to the extent possible, to provide at least five (5) calendar days' prior written notice to the designating Party before referring to or using any such material in any proceeding open or available to the public.

4. (a) Documents and things produced during the course of this litigation within the scope of paragraph 2(a) above, may be designated by the producing party as containing Confidential Information by placing on each page and each thing a legend substantially as follows:

## CONFIDENTIAL INFORMATION

Documents and things produced during the course of this litigation within the scope of paragraph 2(b) above may be designated by the producing party as containing Confidential Attorneys Eyes Only Information by placing on each page and each thing a legend substantially as follows:

## CONFIDENTIAL ATTORNEYS EYES ONLY INFORMATION

(b) A party may designate information disclosed at a deposition as Confidential Information or Confidential Attorneys Eyes Only Information by requesting the reporter to so designate the transcript or any portion thereof at the time of the deposition. If no such designation is made at the time of the deposition, any party shall have thirty (30) calendar days after the date the transcript is received to designate, in writing to the other parties and to the court reporter, whether the transcript is to be designated as Confidential Information or Confidential Attorneys Eyes Only Information. If no such designation is made at the deposition or within such thirty (30) calendar day period (during which period, the transcript shall be treated as Confidential Attorneys Eyes Only Information, unless the disclosing party consents to less confidential treatment of the information), the entire deposition will be considered devoid of Confidential Information or Confidential Attorneys Eyes Only Information. All deposition transcripts shall be treated as "Confidential Attorneys Eyes Only" for a period of thirty (30) days after the receipt of the transcript, except that this provision of the Protective Order shall not prevent a deponent from reviewing his or her deposition for purposes of review and signing and/or correcting that deposition during the thirty (30) day period after the receipt of the transcript, or, such shorter period as the Court may direct or the parties may agree to for such review and signing and/or correcting. All depositions involving information designated as "Confidential" or "Confidential Attorneys Eyes Only" Information shall be attended only by the

court reporter, the witnesses, their counsel, and individuals who are permitted to review such information pursuant to the terms of this Protective Order ("Qualified Persons"). All transcripts of depositions containing information designated as "Confidential" or "Confidential Attorneys Eyes Only" Information shall be so designated on their cover page and shall be covered by this Protective Order. Each party and the court reporter shall attach a copy of any final and timely written designation notice to the transcript and each copy thereof in its possession, custody or control, and the portions designated in such notice shall thereafter be treated in accordance with this Protective Order.

(c) It is the responsibility of counsel for each party to maintain materials containing Confidential Information or Confidential Attorneys Eyes Only Information in a secure manner and appropriately identified so as to allow access to such information only to such persons and under such terms as is permitted under this Protective Order.

**Inadvertent Failure to Designate.**

5. The inadvertent failure to designate or withhold any information as confidential or privileged will not be deemed to waive a later claim as to its confidential or privileged nature, or to stop the producing party from designating such information as confidential at a later date in writing and with particularity. The information shall be treated by the receiving party as confidential from the time the receiving party is notified in writing of the change in the designation.

**Challenge to Designations.**

6. A receiving party may challenge a producing party's designation at any time. Any receiving party disagreeing with a designation may request in writing that the producing party

change the designation. The producing party shall then have fourteen 14 days after receipt of a challenge notice to advise the receiving party whether or not it will change the designation. If the parties are unable to reach agreement after the expiration of this fourteen (14) day time frame, and after a conference, the receiving party may at any time thereafter seek a Court Order to alter the confidential status of the designated information. Until any dispute under this paragraph is ruled upon by the Court, the designation shall remain in full force and effect and the information shall continue to be accorded the confidential treatment required by this Protective Order.

**Disclosure and Use of Confidential Information.**

7. Information designated as Confidential Information or Confidential Attorneys Eyes Only Information may only be used for purposes of preparation, trial and appeal of this action. Confidential Information or Confidential Attorneys Eyes Only Information may not be used under any circumstances for prosecuting any patent application, for patent licensing or for any other purpose. All protections relating to the inadvertent disclosure of privileged information shall apply in all cases governed by this Protective Order.

8. Subject to paragraph 10 below, Confidential Information may be disclosed by the receiving party only to the following individuals provided that such individuals are informed of the terms of this Protective Order:

(a) Any party to the litigation, including both current and former employees of such party, only to the extent that and for the time during which such disclosure is necessary to assist in the investigation, analysis, mediation, defense, prosecution, resolution, or adjudication of the litigation;

(b) Both in-house and outside counsel employed by any party to assist in the litigation, including without limitation the attorneys, paralegals, and stenographic and clerical employees in the respective law firms or legal departments of such outside or in-house counsel; the personnel supplied by any commercial photocopying,

data storage or evidence presentation firms with whom such attorneys work in connection with the litigation; and stenographic employees and court reporters recording and transcribing testimony relating to the litigation;

(c) Experts and consultants (including independent experts) who are employed, retained, or otherwise consulted by counsel or a party for the purpose of assisting in, or consulting with respect to, the preparation and trial of the litigation; *provided that*: (i) access to Confidential Information by experts and consultants shall be limited to documents that the experts or consultants reasonably need to review in their roles as experts or consultants with respect to this litigation; and (ii) such person has read this Protective Order and agrees to be bound by its terms in accordance with Paragraph 10 hereof before viewing any such Confidential Information and otherwise complies with this Protective Order.

(d) The Court and any members of its staff to whom it is reasonably necessary to disclose Confidential Information for the purpose of assisting the Court in this litigation, including with respect to the adjudication of any challenge to any designation as Confidential Information; and

(e) Any mediator engaged by the parties or appointed by the Court to assist in resolution of the litigation, and any person employed by such mediator.

9. Subject to paragraph 10 below, Confidential Attorneys Eyes Only Information may be disclosed by the receiving party only to the following individuals provided that such individuals are informed of the terms of this Protective Order:

(a) Both in-house and outside counsel employed by any party to assist in the litigation, including without limitation the attorneys, paralegals, and stenographic and clerical employees in the respective law firms or legal departments of such outside or in-house counsel; the personnel supplied by any commercial photocopying, data storage or evidence presentation firms with whom such attorneys work in connection with the litigation; and stenographic employees and court reporters recording and transcribing testimony relating to the litigation;

(b) Experts and consultants (including independent experts) who are employed, retained, or otherwise consulted by counsel or a party for the purpose of assisting in, or consulting with respect to, the preparation and trial of the litigation; provided that: (i) access to

Confidential Attorneys Eyes Only Information by experts and consultants shall be limited to documents that the experts or consultants reasonably need to review in their roles as experts or consultants with respect to this litigation; and (ii) such person has read this Protective Order and agrees to be bound by its terms in accordance with Paragraph 10 hereof before viewing any such Confidential Attorneys Eyes Only Information and otherwise complies with this Protective Order; and

(c) The Court and any members of its staff to whom it is reasonably necessary to disclose Confidential Attorneys Eyes Only Information for the purpose of assisting the Court in this litigation, including with respect to the adjudication of any challenge to any designation as Confidential Attorneys Eyes Only Information.

(d) Any mediator engaged by the parties or appointed by the Court to assist in resolution of the litigation, and any person employed by such mediator.

10. Further, prior to disclosing Confidential Information or Confidential Attorneys Eyes Only Information to a receiving party's proposed expert and/or consultant and their respective employees, the receiving party shall obtain a signed Confidentiality Agreement in the form attached as Exhibit A.

11. Counsel shall be responsible for the adherence by third-party vendors to the terms and conditions of this Protective Order. Counsel may fulfill this obligation by obtaining a signed Confidentiality Agreement in the form attached as Exhibit A.

12. Confidential Information or Confidential Attorneys Eyes Only Information may be disclosed to a person, not already allowed access to such information under this Protective Order, if: the information was previously received or authored by the person; the information was authored or received by a director, officer, employee or agent of the company for which the person is testifying as a Rule 4007.1(e) designee; the designating party is the person or is a party for whom the person is a director, officer, employee, consultant or agent; or counsel for the party designating the material agrees that the material may be disclosed to the person. In the event of disclosure under this paragraph, only the reporter, the person, his or her counsel, the judge and

persons to whom disclosure may be made, and who are bound by the Protective Order, may be present during the disclosure or discussion of Confidential Information or Confidential Attorneys Eyes Only Information. Disclosure of material pursuant to this paragraph shall not constitute a waiver of the confidential status of the material so disclosed.

**Non-Party Information.**

13. If a non-party provides discovery to any party in connection with this litigation, such non-Party may adopt the terms of this Protective Order with regard to the production of Confidential Information and/or Confidential Attorney's Eyes Only Information by executing and filing with the Court a Notice of Election in the form attached hereto as Exhibit B. In the event of such election, the provisions of this Protective Order shall apply to such discovery as if such discovery were being provided by a party. Under such circumstances, the non-party shall have the same rights and obligations under this Protective Order as held by the parties to the litigation.

**Filing Documents With the Court.**

14. In the event that counsel for any Party determines to file with this Court any Confidential Information or Confidential Attorneys Eyes Only Information or any documents containing or making reference to such Confidential Information or Confidential Attorneys Eyes Only Information, such documents, or the portions of them that contain Confidential Information or Confidential Attorneys Eyes Only Information, shall be filed only in a sealed envelope on which the case caption and a statement substantially in the following form shall be endorsed:

CONFIDENTIAL

This envelope contains documents that are subject to a Stipulated Confidentiality Agreement and Protective Order, approved as an order of Court, governing the use of confidential documents and information. This envelope is not to be opened until further order of Court.

All such material so filed shall be maintained separate from the public records in this litigation and shall be released only upon further order of the Court. However, the Court may release such materials to Court personnel and to counsel of record for the parties without further order.

**No Prejudice.**

15. Producing or receiving confidential information, or otherwise complying with the terms of this Protective Order, shall not (a) operate as an admission by any party that any particular Confidential Information or Confidential Attorneys Eyes Only Information contains or reflects trade secrets or any other type of confidential or proprietary information; (b) prejudice the rights of a party to object to the production of information or material that the party does not consider to be within the scope of discovery; (c) prejudice the rights of a party to seek a determination by the Court that particular materials be produced; (d) prejudice the rights of a party to apply to the Court for further protective orders; (e) prejudice the rights of a party to object to the admission of any evidence on any ground; or (f) prevent the parties from agreeing in writing to alter or waive the provisions or protections provided for herein with respect to any particular information or material.

16. The inadvertent production of any privileged document or information will not be deemed a waiver or impairment of any claim of privilege, including but not limited to the attorney client privilege or work-product doctrine, concerning such document or information, any unproduced document or information, or the subject matter of the produced document or information. The document or information claimed to be produced inadvertently must be

declared to be an inadvertent production within ten (10) calendar days of the producing party learning of the inadvertent production. Inadvertent production of privileged documents and information may include the mistaken production of privileged documents or information that has been reviewed by the disclosing party's attorneys prior to production.

17. This Protective Order shall not bar any attorney herein in the course of rendering advice to his client with respect to this litigation from conveying to any party client his evaluation in a general way of "Confidential" or "Confidential Attorneys Eyes Only Information" produced or exchanged herein; provided, however that in rendering such advice and otherwise communicating with his client, the attorney shall not disclose any specific content of any "Confidential" or "Confidential Attorneys Eyes Only Information" produced by another party herein if that disclosure would be contrary to the terms of this Protective Order.

18. Unless otherwise agreed to in writing by the parties or ordered by the Court, all proceedings involving or relating to Protected Information shall be subject to the provisions of this Protective Order.

**Conclusion of Litigation.**

19. Within thirty (30) calendar days after final judgment in this action, including the exhaustion of all appeals, or within thirty (30) calendar days after dismissal pursuant to a settlement agreement, each party or other person subject to the terms of this Protective Order shall be under an obligation to destroy or return to the producing party all materials and documents and copies thereof containing Confidential Information or Confidential Attorneys Eyes Only Information, and to certify to the producing party such destruction or return. However, outside counsel for any party shall be entitled to retain all court papers, trial transcripts, exhibits, pleadings, correspondence, production documents, and attorney work

product provided that any such materials are maintained and Confidential in accordance with the terms of this Protective Order.

**Other Proceedings.**

20. By entering this Order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. In the event that any party is served with legal process (by subpoena, discovery requests or otherwise) or is required by court order or rule of law to produce or reveal any other party's Confidential Information and/or Confidential Attorney Eyes Only Information in this litigation or any other matter, such party shall immediately inform and provide copies of any such process to the party whose Confidential Information and/or Confidential Attorney Eyes Only Information has been sought so that that party may, at its own cost, have the opportunity to object to the production of such Confidential Information and/or Confidential Attorney Eyes Only Information by timely and appropriate action. These provisions apply even in the event that a party whose Confidential Information and/or Confidential Attorney Eyes Only Information is sought has no objection to the discovery or disclosure of the Confidential Information and/or Confidential Attorney Eyes Only Information at issue; such party shall nevertheless invoke this Protective Order and shall otherwise make reasonable efforts to prevent discovery or disclosure of the Confidential Information and/or Confidential Attorney Eyes Only Information until the final resolution of any objection or motion of the party whose Confidential Information and/or Confidential Attorney Eyes Only Information has been sought.

**Remedies.**

21. Any party designating any person as a Qualified Person shall have the duty to reasonably ensure that such person observes the terms of this Protective Order. By signing this Protective Order, or agreeing to its terms, each person agrees that he or she may be subject to contempt for his or her failure to observe the terms of this Protective Order. Each party also agrees that it will take reasonable precautions to make certain that its respective employees, agents, experts, and consultants are aware of the provisions in this Protective Order and comply with its requirements with respect to Protected Information. Each party agrees that, in the event of breach or threatened breach of this Protective Order, any other party may seek injunctive or equitable relief without the necessity of posting bond or proving that it has no adequate remedy at law. The parties further acknowledge and agree that the actual or threatened disclosure or use of any Protected Information in a manner not authorized by this Protective Order may cause the party whose Protected Information is at issue to suffer irreparable harm to its business. All other remedies available to any person(s) injured by a violation of this Protective Order are fully reserved.

22. Unless otherwise agreed to in writing by the parties or ordered by the Court, all proceedings involving or relating to Protected Information shall be subject to the provisions of this Protective Order.

23. Any party may petition the Court for good cause shown, in the event such party desires relief from a term or condition of this Order.

SHERRARD, GERMAN & KELLY, P.C.

Stanley J. Lehman /lwg

Stanley J. Lehman, Esquire
Suzanne L. DeWalt, Esquire
Sherrard, German & Kelly, P.C.
535 Smithfield Street, Suite 300
Pittsburgh, PA 15222

William J. McCabe, Esquire
DeBernardo, Antoniono, McCabe & Davis
11 North Main Street
Greensburg, PA 15601

FOX ROTHSCHILD LLP

Jay Marinstein /lwg

Jay Marinstein, Esquire
Patrick L. Abramowich, Esquire
Fox Rothschild LLP
500 Grant Street, Suite 2500
Pittsburgh, PA 15219

IT IS SO HEREBY ORDERED BY THE COURT this 28th day of April,

2017.

BY THE COURT:

Anthony G. Marsili

Anthony G. Marsili, J.

ATTEST:
CHRISTINA O'BRIEN
PROTHONOTARY



{S1053528.2}
ACTIVE\45518257.v2-4/27/17

SHERRARD, GERMAN & KELLY, P.C.

Stanley J. Lehman, Esquire
Suzanne L. DeWalt, Esquire
Sherrard, German & Kelly, P.C.
535 Smithfield Street, Suite 300
Pittsburgh, PA 15222

William J. McCabe, Esquire
DeBernardo, Antoniono, McCabe & Davis
11 North Main Street
Greensburg, PA 15601

FOX ROTHSCHILD LLP

Jay Marinstein, Esquire
Patrick L. Abramowich, Esquire
Fox Rothschild LLP
500 Grant Street, Suite 2500
Pittsburgh, PA 15219

IT IS SO HEREBY ORDERED BY THE COURT this _____ day of ____________________,

2017.

BY THE COURT:

Anthony G. Marsili, J.

SHERRARD, GERMAN & KELLY, P.C.

____________________________
Stanley J. Lehman, Esquire
Suzanne L. DeWalt, Esquire
Sherrard, German & Kelly, P.C.
535 Smithfield Street, Suite 300
Pittsburgh, PA 15222

William J. McCabe, Esquire
DeBernardo, Antoniono, McCabe & Davis
11 North Main Street
Greensburg, PA 15601

FOX ROTHSCHILD LLP

Jay D. Marinstein
Jay Marinstein, Esquire
Patrick L. Abramowich, Esquire
Fox Rothschild LLP
500 Grant Street, Suite 2500
Pittsburgh, PA 15219

IT IS SO HEREBY ORDERED BY THE COURT this _____ day of ____________________,

2017.

BY THE COURT:

____________________________
Anthony G. Marsili, J.



{S1053528 3}
ACTIVE\45518257.v2-4/27/17

**EXHIBIT A**

IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA

WILLIAM H. HENSLER, JR., WHOLESALE MINE SUPPLY, L.P., and WSAJT PROPERTIES, L.P.,

Plaintiffs,

v.

BECKER/WHOLESALE MINE SUPPLY, LLC, BECKER GLOBAL-AMERICA, INC. (aka/fka/ successor-in-interest to BECKER MINING AMERICA, INC.), BECKER MINING SYSTEMS AG, GREGORY A. SANDERS, FRANZ BECKER, WOLFGANG WEGENER, and MAX BRINCKMAN,

Defendants.

CIVIL DIVISION

NO. 16CI05219

**CERTIFICATE OF CONFIDENTIALITY**

I, __________________________, hereby acknowledge that I am about to receive information or documents designated as "CONFIDENTIAL" or "CONFIDENTIAL ATTORNEYS EYES ONLY INFORMATION by one or more of the parties to the Protective Order having an effective date of ______________, 2017. I have been given a copy of, have read, and understand the Protective Order, and by signing below agree to be bound by the terms thereof. In particular, I acknowledge that I: (i) will only use the Confidential Information and Confidential Attorneys Eyes Only Information in connection with the above captioned litigation, (ii) will not provide the Confidential Information and Confidential Attorneys Eyes Only Information to anyone else, and (iii) if requested, will return all Confidential Information and Confidential Attorneys Eyes Only Information, as well as any notes and records that I make regarding the Confidential

Information and Confidential Attorneys Eyes Only Information, to the attorney who provided the Information to me.

For the purpose of all matters concerning enforcement or violation of the Protective Order, I agree and do hereby submit myself to the jurisdiction of the Court of Common Pleas of Westmoreland County, Pennsylvania. For this purpose, I may be served and do hereby accept service by registered or certified mail, return receipt requested, at the address below my signature.

DATED this ___________ day of ________________________, 201_.

By (signature): ____________________________________
Name (print): ____________________________________
Address (print): ____________________________________
____________________________________

# EXHIBIT B

IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA

| | |
|---|---|
| WILLIAM H. HENSLER, JR., WHOLESALE MINE SUPPLY, L.P., and WSAJT PROPERTIES, L.P., Plaintiffs, | CIVIL DIVISION |
| v. | NO. 16CI05219 |
| BECKER/WHOLESALE MINE SUPPLY, LLC, BECKER GLOBAL-AMERICA, INC. (aka/fka/ successor-in-interest to BECKER MINING AMERICA, INC.), BECKER MINING SYSTEMS AG, GREGORY A. SANDERS, FRANZ BECKER, WOLFGANG WEGENER, and MAX BRINCKMAN, Defendants. | |

## NOTICE OF ELECTION TO ADOPT STIPULATED PROTECTIVE ORDER

1. ________________________________, a non-party to the above-captioned litigation, has been requested and/or subpoenaed by a party to produce discovery containing Confidential Information and/or Confidential Attorneys Eyes Only Information in connection with the litigation.

2. ________________________________ hereby elects to adopt the terms of the Protective Order dated ________________, 2017 with regard to its production of Confidential Information and/or Confidential Attorneys Eyes Only Information.

3. The provisions of the Protective Order shall apply to written discovery and testimony produced by ______________________________ as if such discovery were being provided by a party. ____________________________ shall have the same rights and obligations under the Protective Order as held by the parties.

4. All capitalized terms herein shall have the meaning ascribed to them in the Protective Order.

______________________________

By: ______________________________

______________________________

______________________________

______________________________

Dated: ______________